Teresa H. Pearson, P.C., OSB No. 953750
teresa.pearson@millernash.com
MILLER NASH LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204-3699
Telephone:  (503) 224-5858
Fax:  (503) 224-0155

Attorneys for Receiver
Pivotal Solutions, Inc.


UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Orchards Village Investments, LLC,<br><br>          Debtor. | Case No. 09-30893-rld11<br><br>Chapter 11<br><br>Adversary Proceeding Case No.<br><br>DECLARATION OF TERESA H. PEARSON IN SUPPORT OF RECEIVER'S MOTION TO DISMISS BANKRUPTCY CASE, OR IN THE ALTERNATIVE, TO EXCUSE COMPLIANCE WITH 11 U.S.C. §543<br><br>**(Oral Argument Requested)** |

I, Teresa H. Pearson, declare as follows:

1.      I am one of the attorneys for Pivotal Solutions, Inc. ("Pivotal").  I make this declaration in support of Pivotal's motion to dismiss this case, or in the alternative, to excuse compliance with 11 U.S.C. §543.

2.      I make the statements in this declaration based upon my personal knowledge and my review of the pertinent court records and the records of Miller Nash, LLP.  I am over 18 years of age and competent to testify.

**Page 1 of 2**   Declaration of Teresa H. Pearson in Support of Receiver's Motion to Dismiss Bankruptcy Case, or in the Alternative, to Excuse Compliance with 11 U.S.C. §543

3.      Attached as Exhibit A is a true copy of the Declaration of Brian Yarrington, which is filed in the case entitled <u>Bank of Wyoming v. Orchards Village Investments, LLC, et al.</u>, Superior Court of Washington for Clark County, case no. 08-2-04250-6 (the "Receivership Case").

4.      Attached as Exhibit B is a true copy of the Complaint, and Exhibit P to that Complaint, which are filed in the Receivership Case.

5.      Attached as Exhibit C is a true copy of the plaintiff's Motion for Order Appointing a General Receiver, which is filed in the Receivership Case.

6.      Attached as Exhibit D is a true copy of the Order Appointing General Receiver, which is filed in the Receivership Case.

7.      Attached as Exhibit E is a true copy of the Notice of Granting of Provisional License to Regency Pacific, Inc., which is filed in the Receivership Case.

8.      Attached as Exhibit F is a true copy of the Order Granting Receiver's Motion to Establish Bid Procedures and to Reject Contract with MBK Senior Living, LLC, which is filed in the Receivership Case.

9.      Attached as Exhibit G is a true copy of the Order Granting Receiver's Motion to Extend Automatic Stay, filed in the Receivership Case.

10.     On several occasions, I informed Anita Manishan of my opinion that, due to the terms of the Order Appointing General Receiver, Mr. Chamberlain did not have the authority to file OVI into bankruptcy

I declare under penalty of perjury under the laws of the United States of America and the state of Oregon that the foregoing is true and correct.

EXECUTED on this 17th day of February, 2009, in Portland, Oregon.

/s/ Teresa H. Pearson

_____

Teresa H. Pearson

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

SUPERIOR COURT OF WASHINGTON

COUNTY OF CLARK

| | |
|---|---|
| BANK OF WYOMING, a Wyoming state-chartered bank, | NO. 08-2-04250-6 |
| Plaintiff, | DECLARATION OF BRIAN YARRINGTON IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER APPOINTING GENERAL RECEIVER |
| v. | |
| ORCHARDS VILLAGE INVESTMENTS, LLC, an Oregon limited liability company; ORCHARDS VILLAGE PROPERTIES, LLC, an Oregon limited liability company; FARMINGTON CENTERS, INC., an Oregon corporation; HENRY'S ORCHARDS VILLAGE, LLC, a Washington limited liability company; SUGARMAN'S ORCHARD, LLC, an Oregon limited liability company; CARBURTON PROPERTIES 8, LLC, a Delaware limited liability company; JACK BURGESS and TERESA BURGESS, CO-TRUSTEES OF THE BURGESS FAMILY TRUST DATED 7/31/1992, an Oregon trust; JEFFREY L. CHAMBERLAIN, an individual; DONNA J. CHAMBERLAIN, an individual; THEADORE J. CHAMBERLAIN, an individual; FAYE M. CHAMBERLAIN, an individual; ZALTA III, LLC, an Oregon limited liability company; PINNACLE BANK OF OREGON, an Oregon state-chartered bank; and CLARK COUNTY, a political subdivision of the State of Washington, | |
| Defendants. | |

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 1

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855874.DOC;3}

**Exhibit A**
**Page 1 of 9**

Brian Yarrington declares as follows:

1.     I am the President of plaintiff Bank of Wyoming (the "Lender"), a Wyoming state-chartered bank. I am competent to testify and have personal knowledge of the matters stated herein.

2.     I am personally familiar with the records relating to the subject of this lawsuit, including records showing the history of the account and the balances due. I am a custodian of records for the Lender. The exhibits attached to the Complaint and referenced herein were generated, received, and maintained in the regular and ordinary course of the Lender's business.

3.     The Lender is seeking the appointment of a general receiver for defendants Orchards Village Investments, LLC ("OVI"), Orchards Village Properties, LLC ("OVP"), Henry's Orchards Village, LLC ("Henry"), Sugarman's Orchard, LLC ("Sugarman"), Carburton Properties 8, LLC ("Carburton"), and Jack Burgess and Teresa Burgess as Co-Trustees of the Burgess Family Trust dated 7/31/1992 ("Burgess") (collectively, the "Receivership Defendants") and their assets and business operations.

4.     As more fully described below and in the Complaint, the Lender is a secured creditor of the Receivership Defendants. As a result of certain defaults by OVI, the balance owing to the Lender, which exceeds $11,535,160.98, is now due, and the Lender is entitled to possession of or foreclosure on the Real Property, buildings and building improvements, fixtures, the Personal Property, the Assigned Rights, and the Management Agreement (the "Collateral"). The appointment of a receiver is reasonably necessary to protect the value of the Collateral and facilitate its sale. Other remedies are not available or will not be adequate to protect the Collateral's value.

5.     On September 28, 2005, the Lender and OVI entered into that certain Construction Loan Agreement (the "Construction Loan Agreement") concerning certain terms and provisions of a secured construction loan being made by Lender to OVI (the "OVI

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

Indebtedness"). See Complaint, Ex. A. The OVI Indebtedness was incurred for the purpose of building a senior assisted living facility called Orchards Village, in or near Vancouver, Washington. Disbursements under the Construction Loan Agreement were made pursuant to the terms of that certain Disbursing Agreement dated September 28, 2005, by and between Lender, OVI, and Chicago Title Insurance Company. See Complaint, Ex. FF.

6.     On September 28, 2005, to evidence the OVI Indebtedness, OVI made and delivered that certain Promissory Note in the principal amount of $11,550,000.00. See Complaint, Ex. B.

7.     On September 28, 2005, to secure the OVI Indebtedness, OVI, Henry, and Sugarman entered into that certain Construction and Permanent Deed of Trust and Security Agreement and Fixture Filing (the "Deed of Trust"), granting to the Lender, among other things, a security interest in the Real Property, buildings and improvements thereon, and personal property of OVI. The Deed of Trust was recorded with the Clark County Auditor on October 5, 2005. See Complaint, Ex. C. On October 24, 2005, the Lender perfected its security interest in OVI's personal property by filing a financing statement with the Oregon Secretary of State. See Complaint, Ex. E.

8.     On September 28, 2005, as further security for the OVI Indebtedness, OVI executed and delivered to the Lender that certain Assignment of Rents and Lease(s) (the "Assignment of Rents"). The Assignment of Rents was recorded with the Clark County Auditor on October 5, 2005. See Complaint, Ex. D. The Assignment of Rents covers Assigned Rights (as defined therein), including, among other things, that certain Commercial Lease Orchards Village Facility dated June 1, 2005 (the "Lease") between OVI as Landlord and OVP as Tenant. See Complaint, Ex. P.

9.     On September 28, 2005, Henry and Sugarman executed that certain Subordination and Standstill Agreement in favor of the Lender. See Complaint, Ex. J.

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 3

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855874.DOC;3}

10.     Upon information and belief, on or about January 24, 2006, OVI and Carburton entered into that certain Orchards Village Tenants in Common Agreement. On February 28, 2006, the Lender, OVI, and the Guarantors entered into that certain Amendment to Loan Documents for the purpose, among other things, of adding Carburton as a tenant in common on Schedule 6.9(a) to the Construction Loan Agreement. See Complaint, Ex. CC. On March 2, 2006, a Warranty Deed dated March 1, 2006, was recorded with the Clark County Auditor, conveying a 17.87% tenant in common interest in the Real Property from OVI to Carburton. See Complaint, Ex. Y. On March 7, 2006, a Subordination and Standstill Agreement dated February 28, 2006, was recorded, pursuant to which Carburton subordinated any and all right to payment as a tenant in common and to the Real Property in favor of the Lender. See Complaint, Ex. W.

11.     Upon information and belief, on or about July 7, 2006, OVI and Burgess entered into that certain Orchards Village Tenants in Common Agreement. On August 22, 2006, the Lender, OVI, and the Guarantors entered into that certain Second Amendment to Loan Documents ("Second Amendment") for the purpose, among other things, of adding Burgess as a tenant in common on Schedule 6.9(a) to the Construction Loan Agreement. See Complaint, Ex. DD. On August 24, 2006, a Warranty Deed dated August 22, 2006, was recorded with the Clark County Auditor, conveying a 9.62% tenant in common interest in the Real Property from OVI to Burgess. See Complaint, Ex. Z. On September 11, 2006, a Subordination and Standstill Agreement dated August 25, 2006, was recorded, pursuant to which Burgess subordinated any and all right to payment as a tenant in common and to the Real Property in favor of the Lender. See Complaint, Ex. X.

12.     On September 28, 2005, Farmington entered into a Subordination of Management Agreement ("SMA"), agreeing, among other things, that its interest under the Management Agreement is subject and subordinate to the lien of the Deed of Trust, including any rights to payment on Operator Receivables (as defined therein), which are fully subordinated upon receipt of written notice from the Lender. See Complaint, Ex. L. The Lender has not yet given that

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 4

*Cairncross & Hempelmann, P.S.*
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

{00855874.DOC;3}

written notice, but reserves the right to do so or to delegate such right to any receiver. Also, on September 28, 2005, OVP executed and delivered to the Lender that certain Collateral Assignment of Management Agreement ("CAMA"), which relates to and grants to the Lender a security interest in that certain Management Agreement for services relating to the operation of the facility at the Real Property. See Complaint, Exs. M & Q. On June 5, 2008, the Lender perfected its security interest in the Management Agreement by filing a UCC-1 financing statement with the Oregon Secretary of State. See Complaint, Ex. V.

13.    The ownership of the Real Property is subject to that certain Orchards Village Tenants in Common Agreement dated August 31, 2005, among Henry, Sugarman, and OVI (the "TIC Agreement"), see Complaint, Ex. S, as well as an Orchards Village Tenants in Common Agreement dated January 24, 2005 [sic], between Carburton and OVI; and an Orchards Village Tenants in Common Agreement dated July 7, 2006, between Burgess and OVI. Henry and Sugarman as landlords have leased their tenant in common interests to OVI as tenant. See Complaint, Exs. T & U. The common ownership of the Real Property excludes Improvements as defined in the TIC Agreement. Improvements are the property of OVI as described in the Lease; however, the Second Amendment describes OVI, Carburton, and Burgess sharing 72.51%, 17.87%, and 9.62% interests, respectively, therein.

14.    The OVI Indebtedness and obligations under the Promissory Note, Deed of Trust, and Assignment of Rents are now in default, and all sums owed by OVI are now due and payable and declared to be due and payable. Not including interest, fees, costs, and other charges, the amount owed as of July 10, 2008, is $11,535,160.98. On March 21, 2008, the Lender mailed a Notice of Default, by certified mail, return receipt requested, to OVI, with a copy to Farmington. See Complaint, Ex. EE. On July 10, 2008, the Lender sent a Notice of Acceleration to OVI, Farmington, and the Guarantors. See Complaint, Ex. GG. Defaults are ongoing and uncured and, without limitation, include OVI's failure to make the monthly payments due on the Promissory Note on January 20, 2008, and on the 20th day of each subsequent month, OVI's

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 5

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855874.DOC;3}

failure to pay certain real property taxes, interest, and penalties, and special assessments affecting the Real Property for 2007 and 2008, due April 30, 2008, in the amount of $126,447.25, and OVI's suffering and permitting to attach to the Real Property a mechanic's lien in favor of LRS Architects and the related foreclosure action relating to that mechanic's lien, and OVI's failure to discharge that lien. OVI's defaults have also given rise to the Lender's right to enforce the CAMA and the SMA.

16.    On July 10, 2008, as a result of the foregoing, the Lender filed the above-captioned action to enforce its rights and remedies, including foreclosure and appointment of a receiver. In connection with appointment of the receiver, the Lender requests that no bond be required so long as the proposed receiver maintains an E&O insurance policy with policy limits of $1,000,000. The cost of a bond would ultimately be borne by OVI and the Guarantors in any event.

17.    The Lender proposes appointment of Pivotal Solutions, Inc. ("PSI"), with principals Richard Hooper and Marcia Frey, as the general receiver.

18.    A receiver should be appointed under RCW 7.60.0125(1)(b)(ii). The above-captioned lawsuit is an action to foreclose upon liens on real and personal property. The Lender's interest in the real and personal property that is the subject of the action is not just probable, but certain, based on the documents described above, including without limitation the Deed of Trust, the Assignment of Rents, the Subordination and Standstill Agreements, and the CAMA. The Receivership Defendants have agreed to appointment of a receiver as follows: (a) OVI, specifically in Sections 5.3 and 7.3(c) of the Deed of Trust and Section 6.1 of the Assignment of Rents; (b) OVP's, under Section 11.2 of its Lease with OVI, which has been assigned to the Lender under the Assignment of Rents; and (c) Henry, Sugarman, Carburton, and Burgess, in subordinating to the Lender's rights pursuant to Section 2(a) of their respective Subordination and Standstill Agreements. Consequently, all of the Receivership Defendants have agreed to appointment of a receiver.

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 6

*Cairncross & Hempelmann, P.S.*
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

{00855874.DOC;3}

19.    In addition to having obtained the agreement of the Receivership Defendants to appointment of a receiver, such appointment is reasonably necessary to effectuate or enforce the Assignment of Rents. There are a number of choke points between collection of revenues and payment to the Lender, which appointment of a receiver would relieve. OVI, Henry, Sugarman, Carburton, and Burgess own to varying extents the real property and improvements subject to the Lender's security interest and, through OVI, have leased them to OVP. OVI has assigned that Lease to the Lender. OVP has entered into the Management Agreement with Farmington to collect essentially all of the revenues generated by the facility. OVP has granted the Lender a security interest in the Management Agreement. In order to see that revenues are appropriately collected and rent paid over to the Lender, which under the current multilayered contractual configuration has not been happening, the appointment of a receiver over the Receivership Defendants will establish control over the collection and payment of rents and a method for carrying out OVP's rights to review and/or replace Farmington under OVP's Management Agreement. The key to payment of the Lender's debt, to the extent the facility remains a going concern, is collection of rent. To the extent there is an entity left out of the stream of payments, the ability to collect rents is impaired; there is a short in the circuit. The documents described above are drafted to permit the Lender to take over the collection process. A single receiver over the Receivership Defendants will streamline the enforcement of this right considerably.

20.    The property or its revenue-producing potential is in danger of being lost or materially injured or impaired. The Defendants have failed to provide basic financial information notwithstanding their contractual obligations and the Lender's repeated requests. In addition, efforts by OVI to refinance the OVI Indebtedness have fallen through, and OVI has also not been able to establish a definitive agreement for the sale of the facility. OVI has recently experienced management upheaval, including the termination of its CEO. The ongoing nondisclosure, failed efforts to solve financial problems through refinance or sale, and management instability all evidence danger of financial loss.

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 7

*Cairncross & Hempelmann, P.S.*
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

{00855874.DOC;3}

21.     Based on the documents attached to the Complaint and the nature of the defaults alleged therein, appointment is reasonably necessary. By way of summary, OVI's (and its affiliated contracting parties' and agents') default on the OVI Indebtedness is substantial and demonstrates an inability to operate the business effectively as a going concern under the current configuration.

22.     The business being operated is an assisted living facility. In the absence of a receiver who can stabilize the financial operations of the facility, the health and welfare of its resident disabled senior citizens would be at risk. Moreover, to the extent the residents have options, they may choose to relocate and further reduce revenues. The property and business need to be managed and supervised under the control of a person experienced in the area of assisted living. PSI would be such a receiver.

23.     Other available remedies either are not available or are inadequate. The problem needs immediate attention. While the Lender is pursuing its foreclosure, breach of contract, and other remedies, they are either unavailable or inadequate to address the current need to fix the Receivership Defendants' management of facility and collection of revenue. Foreclosure of the Lender's collateral in a way that maximizes value may be difficult to accomplish if done in a piecemeal fashion. Breach of contract claims will result in judgments, but leave the problems of collection and operations unsolved. All of these remedies will not produce any concrete result until the dispositive motions stage, at the earliest. The best way to pay off the OVI Indebtedness, maintain the facility, and protect its residents is through a sale as a going concern or refinancing so that operations are maintained by competent and stable management. The Receivership Defendants have no ability to accomplish such a result. Although the Lender is entitled to possession of its collateral, it is not in the business of running assisted living facilities. An experienced receiver would serve the needs of all interested parties. Ultimately, a comprehensive disposition of the property owned by multiple tenants in common through a sale

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 8

*Cairncross & Hempelmann, P.S.*
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

{00855874.DOC;3}

1    free and clear and simplification or modification of intertwined contractual relationships requires

2    appointment of a general receiver over all of the Receivership Defendants.

3        I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE

4    OF WYOMING THAT THE FOREGOING IS TRUE AND CORRECT.

5        DATED this 29th day of July, 2008.

6

7    _____
    Brian Yarrington

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF BRIAN YARRINGTON IN
SUPPORT OF PLAINTIFF'S MOTION FOR
ORDER APPOINTING GENERAL RECEIVER - 9

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855874.DOC;3}

**COPY**
**ORIGINAL FILED**

JUL 1 1 2008

Sherry W. Parker, Clerk, Clark Co.

SUPERIOR COURT OF WASHINGTON

COUNTY OF CLARK

BANK OF WYOMING, a Wyoming state-chartered bank,

                Plaintiff,

    v.

ORCHARDS VILLAGE INVESTMENTS, LLC, an Oregon limited liability company; ORCHARDS VILLAGE PROPERTIES, LLC, an Oregon limited liability company; FARMINGTON CENTERS, INC., an Oregon corporation; HENRY'S ORCHARDS VILLAGE, LLC, a Washington limited liability company; SUGARMAN'S ORCHARD, LLC, an Oregon limited liability company; CARBURTON PROPERTIES 8, LLC, a Delaware limited liability company; JACK BURGESS and TERESA BURGESS, CO-TRUSTEES OF THE BURGESS FAMILY TRUST DATED 7/31/1992, an Oregon trust; JEFFREY L. CHAMBERLAIN, an individual; DONNA J. CHAMBERLAIN, an individual; THEADORE J. CHAMBERLAIN, an individual; FAYE M. CHAMBERLAIN, an individual; ZALTA III, LLC, an Oregon limited liability company; PINNACLE BANK OF OREGON, an Oregon state-chartered bank; and CLARK COUNTY, a political subdivision of the State of Washington,

                Defendants.

No. **08  2   04250   6**

COMPLAINT
(Foreclosure of Real Property, Management Agreement, and Personal Property; Money Damages for Breach of Contract, Promissory Note, and Guaranties; Appointment of Receiver; Accounting)

{00698869.DOC;6}
COMPLAINT- 1



*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 ● Fax: 206-587-2308*

Plaintiff Bank of Wyoming, a Wyoming state-chartered bank, alleges as follows:

## PARTIES

1. At all times material, Plaintiff Bank of Wyoming is a Wyoming state-chartered bank (the "Lender"). Until January 3, 2005, when it changed its name, the Bank was known as First State Bank of Thermopolis, a Wyoming state-chartered bank.

2. At all times material, Defendant Orchards Village Investments, LLC ("OVI") is an Oregon limited liability company transacts business and owns the Real Property (as defined in the Deed of Trust, as defined below) in Clark County, Washington that is the subject of this action as a 23.51% (until March 1, 2006, 51%, and until August 22, 2006, 33.13%) undivided tenant in common, the buildings and building improvements (as a 72.51% tenant in common) and fixtures on the Real Property, and personal property subject to the Deed of Trust.

3. Defendant Orchards Village Properties, LLC ("OVP") is an Oregon limited liability company and transacts business in Clark County, Washington.

4. Farmington Centers, Inc. ("Farmington") is an Oregon corporation and transacts business in Clark County, Washington.

5. Henry's Orchards Village, LLC ("Henry") is a Washington limited liability company and owns the Real Property as a 20.36% tenant in common.

6. Sugarman's Orchard, LLC ("Sugarman") is an Oregon limited liability company and owns the Real Property as a 28.64% tenant in common.

7. Carburton Properties 8, LLC ("Carburton") is a Delaware limited liability company and owns the Real Property and certain improvements thereon as a 17.87% tenant in common.

8. Jack Burgess and Teresa Burgess are co-trustees of The Burgess Family Trust dated 7/31/1992 ("Burgess"), which owns the Real Property and certain improvements thereon as a 9.62% tenant in common.

{00698869.DOC;6}
COMPLAINT- 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

9.   Jeffrey L. Chamberlain and Donna J. Chamberlain are a married couple believed to be residents of the State of Oregon.

10.   Theadore [sic] J. Chamberlain and Faye M. Chamberlain are a married couple believed to be residents of the State of Michigan.

11.   Zalta III, LLC ("Zalta") is an Oregon limited liability company.

12.   Pinnacle Bank of Oregon ("Pinnacle") is an Oregon state-chartered bank.

13.   Clark County is a political subdivision of the State of Washington.

## JURISDICTION AND VENUE

14.   Jurisdiction and venue are properly placed in this Court pursuant to RCW 4.12.010, because the Real Property, buildings and building improvements, fixtures, and personal property subject to this action are, on information and belief and at least in part, situated in Clark County, Washington.

## FACTS

15.   _Instruments._ In support of its causes of action, the Lender relies on the following instruments (the "Instruments"). True and correct copies of the Instruments are attached hereto, and the respective terms of each are incorporated herein by reference.

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Construction Loan Agreement dated September 28, 2005 |
| B | Promissory Note dated September 28, 2005 |
| C | Construction and Permanent Deed of Trust and Security Agreement and Fixture Filing dated September 28, 2005 |
| D | Assignment of Rents and Lease(s) dated September 28, 2005 |
| E | UCC Financing Statement (State of Oregon Secretary of State)(OVI) |
| F | Guaranty (Jeffrey L. and Donna J. Chamberlain) dated September 28, 2005 |
| G | Guaranty (Theodore J. and Faye M. Chamberlain) dated September 28, 2005 |
| H | Guaranty (Zalta) dated September 28, 2005 |

{00698869.DOC;6}
COMPLAINT- 3

_Cairncross & Hempelmann, P.S._
_Law Offices_
_524 Second Avenue, Suite 500_
_Seattle, Washington 98104-2323_
_Phone: 206-587-0700 • Fax: 206-587-2308_

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| I | Environmental Indemnity Agreement dated September 28, 2005 |
| J | Subordination and Standstill Agreement (Henry and Sugarman) dated September 28, 2005 |
| K | Subordination and Standstill Agreement (Pinnacle) dated September 28, 2005 |
| L | Subordination of Management Agreement (Farmington) dated September 28, 2005 |
| M | Collateral Assignment of Management Agreement dated September 28, 2005 |
| N | Security Assignment [of] Owner's Representative Agreement dated September 28, 2005 |
| O | Assignment of Contract Documents and Intangibles dated September 28, 2005 |
| P | Commercial Lease Orchards Village Facility dated June 1, 2005 |
| Q | Farmington Centers, Inc. Management Agreement dated May 31, 2005 |
| R | Owner's Representative Agreement dated June 15, 2005 |
| S | Orchards Village Tenants in Common Agreement dated August 31, 2005 |
| T | Triple Net Land Lease Orchards Village Facility Henry dated September 6, 2005 |
| U | Triple Net Land Lease Orchards Village Facility Sugarman dated September 6, 2005 |
| V | UCC Financing Statement (State of Oregon Secretary of State) (OVP) |
| W | Subordination and Standstill Agreement (Carburton) |
| X | Subordination and Standstill Agreement (Burgess) |
| Y | Warranty Deed (Carburton) |
| Z | Warranty Deed (Burgess) |
| AA | Quit Claim Deed (Carburton to Clark County) |

{00698869.DOC;6}
COMPLAINT- 4

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| BB | Quit Claim Deed (Burgess to Clark County) |
| CC | Amendment to Loan Documents (Carburton) |
| DD | Second Amendment to Loan Documents (Burgess) |
| EE | Notice of Default |
| FF | Disbursing Agreement |
| GG | Notice of Acceleration |

16.    Construction Loan Agreement. On September 28, 2005, the Lender and OVI entered into that certain Construction Loan Agreement (the "Construction Loan Agreement") concerning certain terms and provisions of a secured construction loan being made by Lender to OVI (the "OVI Indebtedness"). See Exhibit A hereto. The OVI Indebtedness was incurred for the purpose of building a senior assisted living facility called Orchards Village, in or near Vancouver, Washington. Disbursements under the Construction Loan Agreement were made pursuant to the terms of that certain Disbursing Agreement dated September 28, 2005, by and between Lender, OVI, and Chicago Title Insurance Company. See Exhibit FF hereto.

17.    Promissory Note. On September 28, 2005, to evidence the OVI Indebtedness, OVI made and delivered that certain Promissory Note in the principal amount of $11,550,000.00. See Exhibit B hereto.

18.    Deed of Trust. On September 28, 2005, to secure the OVI Indebtedness, OVI, Henry, and Sugarman entered into that certain Construction and Permanent Deed of Trust and Security Agreement and Fixture Filing (the "Deed of Trust"), granting to the Lender, among other things, a security interest in the Real Property, buildings and improvements thereon, and personal property of OVI. The Deed of Trust was recorded with the Clark County Auditor on October 5, 2005. See Exhibit C hereto. On October 24, 2005, the Lender perfected its security interest in OVI's personal property by filing a financing statement with the Oregon Secretary of State. See Exhibit E hereto.

{00698869.DOC;6}
COMPLAINT- 5

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

19.     <u>Assignment of Rents</u>.  On September 28, 2005, as further security for the OVI Indebtedness, OVI executed and delivered to the Lender that certain Assignment of Rents and Lease(s) (the "Assignment of Rents").  The Assignment of Rents was recorded with the Clark County Auditor on October 5, 2005.  <u>See</u> Exhibit D hereto.  The Assignment of Rents covers Assigned Rights (as defined therein), including, among other things, that certain Commercial Lease Orchards Village Facility dated June 1, 2005 (the "Lease") between OVI as Landlord and OVP as Tenant.  <u>See</u> Exhibit P hereto.

20.     <u>Guaranties</u>.  On September 28, 2005, the OVI Indebtedness was absolutely and unconditionally guaranteed by Jeffrey L. and Donna J. Chamberlain, Theadore J. and Faye M. Chamberlain, and Zalta (collectively, the "Guarantors").  <u>See</u> Exhibits F, G & H hereto (collectively, the "Guaranties").

21.     <u>Subordination</u>.  On September 28, 2005, Henry and Sugarman executed that certain Subordination and Standstill Agreement in favor of the Lender.  <u>See</u> Exhibit J hereto.  On the same date, Pinnacle entered into a separate Subordination and Standstill Agreement in favor of the Lender.  <u>See</u> Exhibit K hereto.

22.     <u>Conveyance to and Subordination by Carburton</u>.  Upon information and belief, on or about January 24, 2006, OVI and Carburton entered into that certain Orchards Village Tenants in Common Agreement.  On February 28, 2006, the Lender, OVI, and the Guarantors entered into that certain Amendment to Loan Documents for the purpose, among other things, of adding Carburton as a tenant in common on Schedule 6.9(a) to the Construction Loan Agreement.  <u>See</u> Exhibit CC hereto.  On March 2, 2006, a Warranty Deed dated March 1, 2006, was recorded with the Clark County Auditor, conveying a 17.87% tenant in common interest in the Real Property from OVI to Carburton.  <u>See</u> Exhibit Y hereto.  On March 7, 2006, a Subordination and Standstill Agreement dated February 28, 2006, was recorded, pursuant to which Carburton subordinated any and all right to payment as a tenant in common and to the Real Property in favor of the Lender.  <u>See</u> Exhibit W hereto.  By Quit Claim Deed dated November 8, 2006, and

{00698869.DOC;6}
COMPLAINT- 6

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit B**
**Page 6 of 36**

recorded December 1, 2006, Carburton granted an interest in the Real Property to Clark County relating to a right of way dedication. See Exhibit AA hereto.

23.    Conveyance to and Subordination by Burgess.  Upon information and belief, on or about July 7, 2006, OVI and Burgess entered into that certain Orchards Village Tenants in Common Agreement.  On August 22, 2006, the Lender, OVI, and the Guarantors entered into that certain Second Amendment to Loan Documents ("Second Amendment") for the purpose, among other things, of adding Burgess as a tenant in common on Schedule 6.9(a) to the Construction Loan Agreement.  See Exhibit DD hereto.  On August 24, 2006, a Warranty Deed dated August 22, 2006, was recorded with the Clark County Auditor, conveying a 9.62% tenant in common interest in the Real Property from OVI to Burgess.  See Exhibit Z hereto.  On September 11, 2006, a Subordination and Standstill Agreement dated August 25, 2006, was recorded, pursuant to which Burgess subordinated any and all right to payment as a tenant in common and to the Real Property in favor of the Lender.  See Exhibit X hereto.  By Quit Claim Deed dated November 10, 2006, and recorded December 1, 2006, Burgess granted an interest in the Real Property to Clark County relating to a right of way dedication.  See Exhibit BB hereto.

24.    Management Agreement.  On September 28, 2005, Farmington entered into a Subordination of Management Agreement ("SMA"), agreeing, among other things, that its interest under the Management Agreement is subject and subordinate to the lien of the Deed of Trust, including any rights to payment on Operator Receivables (as defined therein), which are fully subordinated upon receipt of written notice from the Lender.  See Exhibit L hereto.  The Lender has not yet given that written notice, but reserves the right to do so or to delegate such right to any receiver.  Also, on September 28, 2005, OVP executed and delivered to the Lender that certain Collateral Assignment of Management Agreement ("CAMA"), which relates to and grants to the Lender a security interest in that certain Management Agreement for services relating to the operation of the facility at the Real Property.  See Exhibits M & Q hereto.  On

{00698869.DOC;6}
COMPLAINT- 7

Cairncross & Hempelmann, P.S.
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

June 5, 2008, the Lender perfected its security interest in the Management Agreement by filing a UCC-1 financing statement with the Oregon Secretary of State. See Exhibit V hereto.

25.    Collateral Assignments re Construction Project. On September 28, 2005, OVI executed and delivered to the Lender that certain Security Assignment of Owner's Representative Agreement, which relates to the Owner's Representative Agreement among Farmington, OVI, and OVP dated June 15, 2005. See Exhibits N & R hereto. On September 28, 2005, executed and delivered to the Lender that certain Assignment of Contract Documents and Intangibles. See Exhibit O hereto.

26.    Real Property. The ownership of the Real Property is subject to that certain Orchards Village Tenants in Common Agreement dated August 31, 2005, among Henry, Sugarman, and OVI (the "TIC Agreement"), see Exhibit S hereto, as well as an Orchards Village Tenants in Common Agreement dated January 24, 2005 [sic], between Carburton and OVI; and an Orchards Village Tenants in Common Agreement dated July 7, 2006, between Burgess and OVI. Henry and Sugarman as landlords have leased their tenant in common interests to OVI as tenant. See Exhibits T & U. The common ownership of the Real Property excludes Improvements as defined in the TIC Agreement. Improvements are the property of OVI as described in the Lease; however, the Second Amendment describes OVI, Carburton, and Burgess sharing 72.51%, 17.87%, and 9.62% interests, respectively, therein.

27.    OVI Default. The OVI Indebtedness and obligations under the Promissory Note, Deed of Trust, and Assignment of Rents are now in default, and all sums owed by OVI are now due and payable and declared to be due and payable. Not including interest, fees, costs, and other charges, the amount owed as of July 10, 2008, is $11,535,160.98. On March 21, 2008, the Lender mailed a Notice of Default, by certified mail, return receipt requested, to OVI, with a copy to Farmington. See Exhibit EE hereto. On July 10, 2008, the Lender sent a Notice of Acceleration to OVI, Farmington, and the Guarantors. See Exhibit GG hereto. Defaults are ongoing and uncured and, without limitation, include OVI's failure to make the monthly

Cairncross & Hempelmann, P.S.
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

payments due on the Promissory Note on January 20, 2008, and on the 20th day of each subsequent month, OVI's failure to pay certain real property taxes, interest, and penalties, and special assessments affecting the Real Property for 2007 and 2008, due April 30, 2008, in the amount of $126,447.25, and OVI's suffering and permitting to attach to the Real Property a mechanic's lien in favor of LRS Architects and the related foreclosure action relating to that mechanic's lien, and OVI's failure to discharge that lien

28.    Guaranty Default.  Because the obligations under the Promissory Note and Deed of Trust are now in default, all sums owed by the Guarantors are now due and payable and declared to be due and payable.

29.    Collateral Assignment of Management Agreement/Subordination of Management Agreement.  OVI's defaults have given rise to the Lender's right to enforce the CAMA and the SMA.

## FIRST CAUSE OF ACTION – FORECLOSURE ON REAL PROPERTY

(OVI; OVP; Henry; Sugarman; Carburton; Burgess; Pinnacle; Clark County)

30.    The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

31.    Based on the allegations above, the Lender is entitled to possess and foreclose on the Real Property, buildings and building improvements, fixtures, and other realty subject to the Deed of Trust and other Instruments, including without limitation under RCW 61.24.020 and RCW 61.12.040.

## SECOND CAUSE OF ACTION – ENFORCEMENT OF ASSIGNMENT OF RENTS

(OVI; OVP)

32.    The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

33.    Based on the allegations above, the Lender is entitled to enforce the Assignment of Rents.

{00698869.DOC;6}
COMPLAINT- 9

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit B
Page 9 of 36**

### THIRD CAUSE OF ACTION – FORECLOSURE ON PERSONAL PROPERTY

#### (OVI)

34.     The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

35.     Based on the allegations above, the Lender is entitled to possess and foreclose on the personal property subject to the Deed of Trust and other Instruments, including without limitation under RCW 62A.9A-601(a)(1).

### FOURTH CAUSE OF ACTION – FORECLOSURE ON MANAGEMENT AGREEMENT

#### (OVP and Farmington)

36.     The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

37.     Based on the allegations above, the Lender is entitled to enforce the CAMA and possess and foreclose on under the Management Agreement, including without limitation under RCW 62A.9A-601(a)(1), and subordinate Farmington's rights under the SMA.

### FIFTH CAUSE OF ACTION – MONEY JUDGMENT ON PROMISSORY NOTE

#### (OVI)

38.     The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

39.     Based on the allegations above, the Lender is entitled to a money judgment against OVI for breach of contract and on the Promissory Note, including but not limited to the amount of any deficiency after foreclosure.

### SIXTH CAUSE OF ACTION – MONEY JUDGMENT ON THE GUARANTIES

#### (Guarantors)

40.     The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

{00698869.DOC;6}
COMPLAINT- 10

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

41.    Based on the allegations above, the Lender is entitled to a money judgment against each of the Guarantors for breach of contract and on the Guaranties, jointly and severally, including but not limited to the amount of any deficiency after foreclosure.

### SEVENTH CAUSE OF ACTION – RECEIVERSHIP

(OVI; OVP; Henry; Sugarman; Carburton; Burgess)

42.    The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

43.    The Lender's collateral includes the Real Property, buildings and building improvements, fixtures, the Personal Property, the Assigned Rights, and the Management Agreement.  The appointment of a receiver is reasonably necessary to protect the value of the Lender's collateral and facilitate its sale.  Other remedies are not available or will not be adequate to protect its value.

44.    Based on the allegations above, the Lender is entitled to the appointment of a general or custodial receiver with respect to all of the Real Property, buildings and building improvements, fixtures, the Personal Property, the Assigned Rights, and the Management Agreement or a general receiver with respect to OVI, OVP, Henry, Sugarman, Carburton, and Burgess, including but not limited to pursuant to RCW 7.60.005 et seq.

### EIGHTH CAUSE OF ACTION – ACCOUNTING

(Each and Every Defendant)

45.    The Lender incorporates and realleges the foregoing paragraphs hereof as if fully set forth herein.

46.    Based on the allegations above, the Lender is entitled to an accounting from each of the Defendants.

### PRAYER FOR RELIEF

WHEREFORE, the Lender prays for judgment as follows:

{00698869.DOC;6}
COMPLAINT- 11

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit B**
**Page 11 of 36**

On its First Cause of Action, a declaration that the Lender's interest in the Real Property, buildings and building improvements, fixtures, and other realty described in the Instruments is superior to any claim, right, title, or interest of the Defendants, and foreclosure in any manner authorized by law;

On its Second Cause of Action, a declaration that the Lender's interest in the Assigned Rights is superior to any claim right, title, or interest of the Defendants, and collection and enforcement in any manner authorized by law.

On its Third Cause of Action, a declaration that the Lender's interest in the Personal Property, including any described in the Instruments, is superior to any claim, right, title, or interest of the Defendants, replevin of the collateral directing the sheriff of Clark County or any other county to recover and deliver the collateral to Lender, and foreclosure in any manner authorized by law;

On its Fourth Cause of Action, a declaration that the Lender's interest in the Management Agreement is superior to any claim, right, title, or interest of the Defendants, replevin of the Management Agreement directing the sheriff of Clark County or any other county to recover and deliver the collateral to Lender, including without limitation, at the Lender's option, to replace or delegate to a receiver the right to notify Farmington of subordination or otherwise terminate Farmington's services, and enforcement and foreclosure in any manner authorized by law;

On its Fifth Cause of Action, money judgment against OVI in the principal amount of $11,535,160.98, plus interest, fees, costs, and charges as authorized under the Instruments and applicable law;

On its Sixth Cause of Action, money judgment against each of the Guarantors on the Guaranties, jointly and severally, in the principal amount of $11,535,160.98, plus interest, fees, costs, and charges as authorized under the Instruments and applicable law;

On its Seventh Cause of Action, appointment of a custodial receiver over the collateral described above or a general receiver with respect to OVI, OVP, Henry, Sugarman, Carburton,

{00698869.DOC;6}
COMPLAINT- 12

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit B**
**Page 12 of 36**

and Burgess, including but not limited to under RCW 7.60.005 et seq. and on such terms for

which good cause may be shown;

On its Eighth Cause of Action, an accounting from each and every one of the Defendants;

The Lender's reasonable attorneys' fees, costs, and disbursements incurred herein; and

Such other relief as the Court deems just and equitable.

DATED this 10th day of July, 2008.

CAIRNCROSS & HEMPELMANN, P.S.

John R. Rizzardi, WSBA No. 9388
John R. Knapp, Jr., WSBA No. 29343
524 Second Ave., Suite 500
Seattle, WA 98104-2323
Telephone: (206) 587-0700
Facsimile: (206) 587-2308
Email: jrizzardi@cairncross.com;
       jknapp@cairncross.com

Attorneys for Bank of Wyoming

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

WHEN RECORDED RETURN TO:

NAME: Orchards Village Investments, LLC
        5100 SW Macadam Ave, Suite 360
        Portland, OR  97236

DOCUMENT TITLE(s)
   Commercial Lease

GRANTOR(s):
   Orchards Village Investments, LLC

GRANTEE(s):
   Ochards Village Properties, LLC

TRUSTEE:

Abbreviated Legal Description:  Section: 34  Township: 3  Range: 2 East

Assessor's Tax Parcel No.(s): 200144-000, 200146-000, 200156-000

* additional legal description is within document

The Recorder will rely on the information provided on the form.  The staff will not read the document to
verify the accuracy or completeness of the indexing information provided herein

I am requesting an emergency non-standard recording for an additional fee as provided in RCW 36.18.010.
I understand that the recording processing requirements may cover up or otherwise obscure some part of
the text of the original document.

_____

Signature of Requesting Party

# COMMERCIAL LEASE
# ORCHARDS VILLAGE FACILITY

Effective Date: June  15, 2005

Between:     ORCHARDS VILLAGE INVESTMENTS, LLC          ("Landlord")
             an Oregon limited liability company
             5100 SW Macadam Avenue
             Suite 360
             Portland, OR 97239


And:         ORCHARDS VILLAGE PROPERTIES, LLC          ("Tenant")
             an Oregon limited liability company
             5100 SW Macadam Avenue
             Suite 360
             Portland, OR 97239

Landlord leases to Tenant and Tenant leases from Landlord the following described real and
personal property (the "Premises") on the terms and conditions stated below:

> The senior living community at Vancouver, Washington commonly known as
> "Orchards Village" (the "Real Property") as described in EXHIBIT "A", attached
> hereto. All personal property presently on the Real Property including, without
> limitation the personal property described in EXHIBIT "B", attached hereto (the
> "Personal Property") is included in this Lease, but at no charge to Tenant. The Real
> Property and the Personal Property compose the Facility.

## 1. OCCUPANCY.

1.1 **Original Term**. The term of this Lease shall commence on the Effective Date above
and shall continue for one hundred eighty (180) months (fifteen years) thereafter.

1.2 **Possession**. Tenant's right to possession and obligations under the Lease (the
"Possession Date") shall commence on the earlier of (a) the date that is twenty four months
after the Effective Date and (b) the date that the improvements to the Real Property are
substantially completed and the Landlord has obtained customary occupancy permits.

1.3 **Termination**. Unless sooner terminated as provided herein, this Lease shall terminate
on the last day of the one hundred eightieth (180th) month after the Effective Date (that is,
5/30/2020).

## 2. RENT.

2.1 **Base Rent Abated**. From the Effective Date through and including the last day of the

1  Orchards Village Lease 2005

calendar month in which the Facility achieves Stabilization (the "Stabilized Date"), the Base Rent shall abate and the base rent owing shall be zero. Stabilization will occur when the ratio of the monthly income from normal operations of the Facility divided by the monthly expenses of the normal operations of the Facility equals or exceeds 1.15% for a period of one or more trailing calendar quarters. In calculating the income and expenses of the normal operations of the Facility, Landlord shall utilize Tenant's accrual method of accounting, consistently applied. All items of extraordinary income shall be excluded. All capital expenditures as well as depreciation and amortization shall be excluded.

2.2 **Stabilized Rent.** From the Stabilized Date until the date twenty-four (24) months after the Effective Date (which period may be zero), Tenant shall pay to Landlord as base rent a monthly amount equal to the sum of (a) the monthly installment of interest and principal owing by Landlord to the First State Bank of Thermopolis (the "Bank") pursuant to a promissory note dated September 7, 2005 in the original principal amount of Eleven Million Five Hundred Fifty Thousand Dollars ($11,550,000.00 ) made by Orchards Village Investments, LLC payable to the Bank (the " Thermopolis Note") plus (b) the monthly installment of interest and principal owing by Landlord to the Pinnacle Bank of Oregon (the "Junior Bank") pursuant to a promissory note dated September 7, 2005 in the original principal amount of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00) made by Orchards Village Investments, LLC payable to the Junior Bank (the " Junior Bank Note") plus (c) the result of multiplying the cash and land capital contributed to Landlord and invested in the improvements to the Real Property multiplied by eleven percent (11%) per annum divided by twelve (12) plus (d) the amount of the lease payments under the Triple Net Land Leases whereby Landlord is leasing a portion of the Real Property.

2.3 **Operations Rent.** Commencing with the end of the period described in subsection 2.2 above through and including the date 60 months thereafter, Tenant shall pay to Landlord as base rent a monthly amount equal to the sum of (a) the monthly installment of interest and principal owing by Landlord to the Bank pursuant to the Thermopolis Note (b) the monthly installment of interest and principal owing by Landlord to the Junior Bank pursuant to Junior Bank Note plus (c) the result of multiplying the cash and land capital contributed to Landlord and invested in the improvements to the Real Property multiplied by nine percent (9%) per annum divided by twelve (12) plus (d) the amount of the lease payments under the Triple Net Land Leases whereby Landlord is leasing a portion of the Real Property.

2.4 **Long Term Rent.** Commencing with the end of the period described in subsection 2.3 above and continuing for the balance of the Term of the Lease, Tenant shall pay to Landlord as base rent a monthly amount equal to the sum of (a) the monthly installment of interest and principal owing by Landlord to the Bank pursuant the Thermopolis Note plus (b) the monthly installment of interest and principal owing by Landlord to the Junior Bank pursuant to Junior Bank Note plus (c) the result of multiplying the cash and land capital contributed to Landlord and invested in the improvements to the Real Property multiplied by eleven percent (11%) per annum divided by twelve (12) plus (d) the amount of the lease payments under the Triple Net Land Leases whereby Landlord is leasing a portion of the Real Property.

2.5 **Thermopolis Note.** In the event that Landlord satisfies, modifies or refinances the Thermopolis Note or replaces all or part of the obligations evidenced by the Thermopolis Note with one or more successor promissory notes, the monthly Base Rent owing by Tenant to Landlord hereunder shall, unless agreed otherwise, be re-calculated based on the increased or decreased monthly payment of interest and principal of the Thermopolis Note (and/or its successor notes) then due and payable in accordance with such satisfied, modified and refinanced terms. Rent shall be payable on the first day of each month in advance at such place as may be designated by Landlord. All of the base rent to be paid by Tenant hereunder is allocated to the Real Property; no base rent is required of Tenant for the Personal Property.

2.6 **Junior Note.** In the event that Landlord satisfies, modifies or refinances the Junior Note or replaces all or part of the obligations evidenced by the Junior Note with one or more successor promissory notes, the monthly Base Rent owing by Tenant to Landlord hereunder shall, unless agreed otherwise, be re-calculated based on the increased or decreased monthly payment of interest and principal of the Junior Note (and/or its successor notes) then due and payable in accordance with such satisfied, modified and refinanced terms. Rent shall be payable on the first day of each month in advance at such place as may be designated by Landlord. All of the base rent to be paid by Tenant hereunder is allocated to the Real Property; no base rent is required of Tenant for the Personal Property.

2.7 **Additional Rent.** All taxes, insurance costs, utility charges that Tenant is required to pay by this Lease, and any other sum that Tenant is required to pay to Landlord or third parties shall completely abate during the period prior to the Possession Date and shall be additional rent upon such date and thereafter.

## 3. USE OF THE PREMISES.

3.1 **Permitted Use.** The Premises shall be used as a senior living community and related uses.

3.2 **Restrictions On Use.** In connection with the use of the Premises, Tenant shall:

3.2.(a) Conform to all applicable laws and regulations of any public authority affecting the Premises and the use, and correct at Tenant's own expenses any failure of compliance created through Tenant's fault or by reason of Tenant's use, but Tenant shall not be required to make any structural changes to effect such compliance.

3.2.(b) Refrain from any activity that would make it impossible to insure the Premises against casualty, would increase the insurance rate, or would prevent Landlord from taking advantage of any ruling of the Oregon insurance rating bureau, or similar agency, allowing Landlord to obtain reduced premium rates for long-term fire insurance policies, unless Tenant pays the additional cost of the insurance.

3.2.(c) Refrain from any use that would be reasonably offensive to other tenants or

3  Orchards Village Lease 2005

owners or users of neighboring premises or that would tend to create a nuisance or damage the reputation of the Premises.

3.2.(d) Refrain from loading the electrical system or floors beyond the point considered safe by a competent engineer or architect selected by Landlord.

3.2.(e) Refrain from making any marks on or attaching any sign, insignia, antenna, aerial, or other device to the exterior or interior walls, windows, or roof of the Premises without the written consent of Landlord.

3.3 **Hazardous Substances**. Tenant shall not cause or permit any Hazardous Substance to be spilled, leaked, disposed of, or otherwise released on or under the Premises. Tenant may use or otherwise handle on the Premises only those Hazardous Substances typically used or sold in the prudent and safe operation of the business specified in Section 3.1. Tenant may store such Hazardous Substances on the Premises only in quantities necessary to satisfy Tenant's reasonably anticipated needs. Tenant shall comply with all Environmental Laws and exercise the highest degree of care in the use, handling, and storage of Hazardous Substances and shall take all practicable measures to minimize the quantity and toxicity of Hazardous Substances used, handled, or stored on the Premises. Upon the expiration or termination of this Lease, Tenant shall remove all Hazardous Substances from the Premises. The term Environmental Law shall mean any federal, state, or local statute, regulation, or ordinance or any judicial or other governmental order pertaining to the protection of health, safety or the environment. The term Hazardous Substance shall mean any hazardous, toxic, infectious or radioactive substance, waste, and material as defined or listed by any Environmental Law and shall include, without limitation, petroleum oil and its fractions, explosives and combustible, corrosive or erosive materials.

4. **REPAIRS AND MAINTENANCE.**

4.1 **Landlord's Obligations**. Landlord shall be under no obligation to make or perform any repairs, maintenance, replacements, alterations, or improvements on the Premises.

4.2 **Tenant's Obligations**. The following shall be the responsibility of Tenant:

4.2.(a) Repair, maintenance and replacement of the roof and gutters, exterior walls (including painting), bearing walls, structural members, floor slabs, and foundation and landscaping.

4.2.(b) Repair, maintenance and replacement of sidewalks, driveways, curbs and parking areas.

4.2.(c) Repair, maintenance and replacement of exterior water, sewage, gas, and electrical services up to the point of entry to the Premises.

4.2.(d) Repair, maintenance and replacement of interior walls, ceilings, doors, windows, and related hardware, light fixtures, switches, and wiring and plumbing from the

point of entry to the Premises.

4.2.(e) Any repairs necessitated by the negligence of Tenant, its agents, employees, and invitees.

4.2.(f) Repair, maintenance and replacement of the heating and air conditioning system, including ordinary maintenance. Ordinary maintenance shall be deemed to mean maintenance performed by a reliable heating and air conditioning service company under a maintenance service contract that provides for scheduled maintenance typically provided by such companies in Clark County, Washington.

4.2.(g) Any repairs, maintenance, replacements or alterations required under Tenant's obligation to comply with laws and regulations as set forth in Section 3.2.

4.2.(h) All other repairs, maintenance, replacements to the Premises in order to maintain the Premises in first-class repair, operating condition, working order and appearance.

4.2.(i) Tenant shall replace Personal Property that becomes worn, unsightly or inoperable with equipment of the same or better quality that existed on the Commencement Date, and all such Personal Property, and additions thereto, shall become the property of Landlord upon the expiration or termination of this Lease.

4.3 **Reimbursement for Repairs Assumed.** If Tenant fails or refuses to make repairs that are required by this Section 4, Landlord may make the repairs and charge the actual costs of repairs to Tenant. Such expenditures by Landlord shall be reimbursed by Tenant, on demand, together with an interest at the rate of 10 percent per annum from the date of expenditure by Landlord. Except in an emergency creating an immediate risk of personal injury or property damage, Landlord shall not perform repairs which are the obligation of Tenant and charge Tenant for the resulting expense unless, at least 15 days before work is commenced: i) Tenant is given notice, in writing, outlining with reasonable particularity the repairs required; and ii) Tenant fails within that time to initiate such repairs in good faith.

4.4 **Inspection of Premises.** Landlord shall have the right to inspect the Premises at any reasonable time or times to determine the necessity of repair.

5. **ALTERATIONS; WORKING CAPITAL.**

5.1 **Alterations Prohibited.** Tenant shall make no improvements or alterations on the Premises of any kind without first obtaining Landlord's written consent, which consent shall not be unreasonably withheld. All alterations shall be made in a good and workmanlike manner, and in compliance with applicable laws and building codes. As used herein, "alterations" includes the installation of computer and telecommunications wiring, cables, and conduit.

5.2 **Ownership and Removal of Alterations.** All improvements and alterations performed

on or made to the Premises shall be the property of Landlord when installed, unless the applicable Landlord's consent or work sheet specifically provides otherwise. Improvements and alterations installed by Tenant shall, at Landlord's request, be removed by Tenant within thirty (30) days of such request and the Premises restored unless the applicable Landlord's consent or work sheet specifically provides otherwise.

5.3 **Acceptance of Premises; Alterations**. Upon Tenant taking possession of the Premises, Tenant acknowledges that Tenant accepts the Premises, AS IS, WITH ALL FAULTS.

## 6. PROPERTY INSURANCE.

6.1 **Property Insurance Required**. Tenant shall keep the Premises insured at Tenant's expense against fire, casualty and other risks covered by a standard fire insurance policy with an endorsement for extended coverage. The policy shall be written for full replacement value, and shall cover rent losses of the Landlord for a period of not less than 6 months. The policy shall not contain a deductible in excess of $25,000.00. The insurance company providing such insurance coverage shall be reasonably acceptable to Landlord. Landlord and Landlord's lenders/mortgagees shall be named as insured parties on such policy and certificates evidencing such insurance coverage shall be provided to them upon commencement of the term of this Lease. The certificates will provide that such insurance coverage cannot be modified or canceled without a minimum of 30 days prior written notice to the insured parties. Landlord and Landlord's lenders/mortgagees shall be entitled to receive the proceeds in the event of loss. In the event of loss, Tenant shall give immediate notice to Landlord. Landlord may make proof of loss if Tenant fails to do so within 15 days of the date of the casualty.

6.2 **Waiver of Subrogation**. Neither party shall be liable to the other (or to the other's successors or assigns) for any loss or damage caused by fire or any of the risks enumerated in a standard fire insurance policy with an extended coverage endorsement, and in the event of insured loss, neither party's insurance company shall have a subrogated claim against the other. This waiver shall be valid only if the insurance policy in question expressly permits waiver of subrogation or if the insurance company agrees in writing that such a waiver will not affect coverage under the policies. Each party agrees to use best efforts to obtain such an agreement from its insurer if the policy does not expressly permit a waiver of subrogation.

## 7. TAXES; UTILITIES.

7.1 **Property Taxes**. Tenant shall pay as due all taxes on the personal property located on the Premises. Tenant shall pay as due all real property taxes and special assessments levied against the Premises. As used herein, real property taxes includes any fee or charge relating to the ownership, use, or rental of the Premises, other than taxes on the net income of Landlord or Tenant.

7.2 **Special Assessments**. If an assessment for a public improvement is made against the Premises, Landlord shall attempt to cause such assessment to be paid in installments, in

6  Orchards Village Lease 2005

which case all of the installments payable with respect to the lease term shall be treated the same as general real property taxes for purposes of Section 7.1

7.3 **Contest of Taxes**. Tenant shall be permitted to contest the amount of any tax or assessment as long as such contest is conducted in a manner that does not cause any risk that Landlord's interest in the Premises will be foreclosed for nonpayment.

7.4 **Proration of Taxes**. Tenant's share of real property taxes and assessments for the years in which this Lease commences or terminates shall be prorated based on the portion of the tax year that this Lease is in effect.

7.5 **New Charges or Fees**. If a new charge or fee relating to the ownership or use of the Premises or the receipt of rental therefrom or in lieu of property taxes is assessed or imposed, then, to the extent permitted by law, Tenant shall pay such charge or fee. Tenant, however, shall have no obligation to pay any income, profits, or franchise tax levied on the net income derived by Landlord from this Lease.

7.6 **Payment of Utilities Charges**. Tenant shall pay when due all charges for services and utilities incurred in connection with the use, occupancy, operation, and maintenance of the Premises, including (but not limited to) charges for fuel, water, gas, electricity, sewage disposal, refrigeration, air conditioning, telephone, electronic data transmission, garbage and refuse disposal, cable television and janitorial services.

## 8. DAMAGE AND DESTRUCTION.

8.1 **Partial Damage**. If the Premises are partly damaged and Section 8.2 does not apply, the Premises shall be repaired by Tenant at Tenant's expense. Repairs shall be accomplished with all reasonable dispatch subject to interruptions and delays from labor disputes and matters beyond the control of Tenant.

8.2 **Destruction**. If the Premises are destroyed or damaged such that the cost of repair exceeds 50 percent of the value of the structure before the damage, and if Tenant is not in default hereunder, and if the damages to the Premises are insured for replacement cost, Tenant may elect to terminate the Lease as of the date of the damage or destruction by notice given to the other in writing not more than 45 days following the date of damage. In such event all rights and obligations of the parties shall cease as of the date of termination, and Tenant shall be entitled to the reimbursement of any prepaid amounts paid by Tenant and attributable to the anticipated term, and Landlord shall be entitled to all insurance proceeds paid as a result of such damage or destruction. If Tenant does not elect or is not entitled to terminate, Tenant shall proceed to restore the Premises to substantially the same form as prior to the damage or destruction. Work shall be commenced as soon as reasonably possible and thereafter shall proceed without interruption except for work stoppages on account of labor disputes and matters beyond Landlord's reasonable control.

8.3 **Rent Abatement**. Rent shall not abate during the repair of any damage.

8.4 **Application of Insurance**. If Tenant is obligated to repair and restore the Premises, all insurance proceeds paid as a result of damage or destruction of the Premises shall be held by Landlord, in trust, to be applied to the cost incurred by Tenant for repair and restoration.

8.5 **Damage Late in Term**. If damage or destruction to which Section 8.1 would apply occurs within 60 days before the end of the then-current lease term, Tenant may elect to terminate the Lease by written notice to Landlord given within 30 days after the date of the damage. Such termination shall have the same effect as termination by Tenant under Section 8.2.

## 9. EMINENT DOMAIN.

9.1 **Partial Taking**. If a portion of the Premises is condemned and Section 9.2 does not apply, the Lease shall continue on the following terms:

9.1.(a) Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

9.1.(b) Landlord shall proceed as soon as reasonably possible to make such repairs and alterations to the Premises as are necessary to restore the remaining Premises to a condition as comparable as reasonably practicable to that existing at the time of the condemnation.

9.1.(c) After the date on which title vests in the condemning authority or an earlier date on which alterations or repairs are commenced by Landlord to restore the balance of the Premises in anticipation of taking, the rent shall be reduced in proportion to the reduction in value of the Premises as an economic unit on account of the partial taking. If the parties are unable to agree on the amount of the reduction of rent, the amount shall be determined by arbitration in the manner provided in Section 17.

9.1.(d) If a portion of Landlord's property not included in the Premises is taken, and severance damages are awarded on account of the Premises, or an award is made for detriment to the Premises as a result of activity by a public body not involving a physical taking of any portion of the Premises, this shall be regarded as a partial condemnation to which Sections 9.1(a) and 9.1(c) apply, and the rent shall be reduced to the extent of reduction in rental value of the Premises as though a portion had been physically taken.

9.2 **Total Taking**. If a condemning authority takes all of the Premises or a portion sufficient to render the remaining premises reasonably unsuitable for the use that Tenant was then making of the Premises, the Lease shall terminate as of the date the title vests in the condemning authorities. Such termination shall have the same effect as a termination by Tenant under Section 8.2. Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

**Exhibit B**
**Page 22 of 36**

9.3 **Sale in Lieu of Condemnation**. Sale of all or part of the Premises to a purchaser with the power of eminent domain in the face of a threat or probability of the exercise of the power shall be treated for the purposes of this Section 9 as a taking by condemnation.

## 10. LIENS, INDEMNIFICATION & LIABILITY INSURANCE.

10.1 **Liens**.

10.1.(a) Tenant shall pay as due all claims for work done on and for services rendered or material furnished to the Premises, and shall keep the Premises free from any liens. If Tenant fails to pay any such claims or to discharge any lien, Landlord may do so and collect the cost as additional rent. Any amount so added shall bear interest at the rate of 10 percent per annum from the date expended by Landlord and shall be payable on demand. Such action by Landlord shall not constitute a waiver of any right or remedy which Landlord may have on account of Tenant's default.

10.1.(b) Tenant may withhold payment of any claim in connection with a good faith dispute over the obligation to pay, as long as Landlord's property interests are not jeopardized. If a lien is filed as a result of nonpayment, Tenant shall, within 10 days after knowledge of the filing, secure the discharge of the lien or deposit with Landlord cash or sufficient corporate surety bond or other surety satisfactory to Landlord in an amount sufficient to discharge the lien plus any costs, attorney fees, and other charges that could accrue as a result of a foreclosure or sale under the lien.

10.2 **Indemnification**. Tenant shall indemnify and defend Landlord from any claim, loss, or liability arising out of or related to any activity of Tenant on the Premises or any condition of the Premises in the possession or under the control of Tenant, including any such claim, loss, or liability that may be caused or contributed to in whole or in part by Landlord's own negligence or failure to effect any repair or maintenance required by this Lease. Landlord shall have no liability to Tenant for any injury, loss, or damage caused by third parties, or by any condition of the Premises, except to the extent caused by Landlord's negligence or breach of duty under this Lease.

10.3 **Liability Insurance**. Before going into possession of the Premises, Tenant shall procure and thereafter during the term of this Lease shall continue to carry at Tenant's cost the following insurance issued by a responsible company: (a) comprehensive general liability insurance with combined limits of not less than $1,000,000 for injury to one person, for injury to two or more persons in one occurrence, and for damage to property; (b) commercial malpractice/errors and omissions liability insurance with a limit of not less than $1,000,000 per occurrence; and (c) comprehensive vehicle casualty and liability insurance with combined limits of not less than $1,000,000 for injury to one person, for injury to two or more persons in one occurrence, and for damage to property. Such insurance shall cover all risks arising directly or indirectly out of Tenant's activities on or any condition of the

Premises whether or not related to an occurrence caused or contributed to by Landlord's negligence. Such insurance shall protect Tenant against the claims of Landlord on account of the obligations assumed by Tenant under Section 10.2, and shall name Landlord as an additional insured. Certificates evidencing such insurance and bearing endorsements requiring 10 days' written notice to Landlord prior to any change or cancellation shall be furnished to Landlord prior to Tenant's occupancy of the Premises.

## 11. QUIET ENJOYMENT; MORTGAGE PRIORITY.

11.1 **Landlord's Warranty**. Landlord warrants that it is the owner of the Premises and has the right to lease them. Subject to these exceptions, Landlord will defend Tenant's right to quiet enjoyment of the Premises from the lawful claims of all persons during the Lease term.

11.2 **Mortgage Priority**. The Premises are subject to a real estate mortgage given to the Bank to secure payment of the Thermopolis Note. Any deed of trust, mortgage or other lien ("Mortgage") granted by Landlord which affects the Premises shall be and remain, as it may be modified or extended, at all times, a lien or charge on the Premises prior and superior to the lien or charge of this Lease.

11.3 **Attornment**. In the event the holder of any mortgage forecloses its lien, exercises of any power of sale, or exercises of any other remedy under any loan documents encumbering the Premises, or in the event of conveyance of title to the Premises by deed in lieu of foreclosure, Tenant agrees to accept and attorn to the purchaser of the Premises, and its successors and assigns as the new Landlord of the Premises, and, until terminated pursuant to its provisions, this Lease shall continue in full force and effect as a direct lease between such purchaser and its successors and assigns and Tenant, with privity of contract and with the same force and effect as if this Lease had initially been entered into between them.

11.4 **Self Operative Provisions**. The foregoing provisions of Sections 11.2 and 11.3 shall be self-operative and effective without the execution of any further instruments on the part of any party hereto.

11.5 **Estoppel Certificate**. Either party will, within 20 days after notice from the other, execute and deliver to the other party a certificate stating whether or not this Lease has been modified and is in full force and effect and specifying any modifications or alleged breaches by the other party. The certificate shall also state the amount of monthly base rent, the dates to which rent has been paid in advance, and the amount of any security deposit or prepaid rent. Failure to deliver the certificate within the specified time shall be conclusive upon the party from whom the certificate was requested that the Lease is in full force and effect and has not been modified except as represented in the notice requesting the certificate.

## 12. ASSIGNMENT AND SUBLETTING.

10  Orchards Village Lease 2005

12.1 No part of the Premises may be assigned, mortgaged, or subleased, nor may a right of use of any portion of the property be conferred on any third person by any other means, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. This provision shall apply to all transfers by operation of law. If Tenant is a corporation or partnership, this provision shall apply to any transfer of a majority voting interest in stock or partnership interest of Tenant. No consent in one instance shall prevent the provision from applying to a subsequent instance

## 13. DEFAULT.

13.1 The following shall be events of default:

13.1.(a) **Default in Rent**. Failure of Tenant to pay any rent or other charge within 10 days after written notice that it is due.

13.1.(b) **Default in Other Covenants**. Failure of Tenant to comply with any term or condition or fulfill any obligation of the Lease (other than the payment of rent or other charges) within 20 days after written notice by Landlord specifying the nature of the default with reasonable particularity. If the default is of such a nature that it cannot be completely remedied within the 20-day period, this provision shall be complied with if Tenant begins correction of the default within the 20-day period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practicable.

13.1.(c) **Insolvency**. Insolvency of Tenant; an assignment by Tenant for the benefit of creditors; the filing by Tenant of a voluntary petition in bankruptcy; an adjudication that Tenant is bankrupt or the appointment of a receiver of the properties of Tenant; the filing of any involuntary petition of bankruptcy and failure of Tenant to secure a dismissal of the petition within 30 days after filing; attachment of or the levying of execution on the leasehold interest and failure of Tenant to secure discharge of the attachment or release of the levy of execution within 10 days shall constitute a default. If Tenant consists of two or more individuals or business entities, the events of default specified in this Section 13.3 shall apply to each individual unless within 10 days after an event of default occurs, the remaining individuals produce evidence satisfactory to Landlord that they have unconditionally acquired the interest of the one causing the default. If the Lease has been assigned, the events of default so specified shall apply only with respect to the one then exercising the rights of Tenant under the Lease.

13.1.(d) **Abandonment**. Failure of Tenant for 10 or more consecutive days to occupy the Premises for one or more of the purposes permitted under this Lease, unless such failure is excused under other provisions of this Lease.

## 14. REMEDIES ON DEFAULT.

14.1 **Termination**. In the event of a default the Lease may be terminated at the option of

11 Orchards Village Lease 2005



Landlord by written notice to Tenant. Whether or not the Lease is terminated by the election of Landlord or otherwise, Landlord shall be entitled to recover damages from Tenant for the default, and Landlord may reenter, take possession of the Premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages and without having accepted a surrender.

14.2 **Reletting**. Following reentry or abandonment, Landlord may relet the Premises and in that connection may make any suitable alterations or refurbish the Premises, or both, or change the character or use of the Premises, but Landlord shall not be required to relet for any use or purpose other than that specified in the Lease or which Landlord may reasonably consider injurious to the Premises, or to any tenant that Landlord may reasonably consider objectionable. Landlord may relet all or part of the Premises, alone or in conjunction with other properties, for a term longer or shorter than the term of this Lease, upon any reasonable terms and conditions, including the granting of some rent-free occupancy or other rent concession.

14.3 **Damages**. In the event of termination or retaking of possession following default, Landlord shall be entitled to recover immediately, without waiting until the due date of any future rent or until the date fixed for expiration of the Lease term, the following amounts as damages:

14.3.(a) The loss of rental from the date of default until a new tenant is, or with the exercise of reasonable efforts could have been, secured and paying out.

14.3.(b) The reasonable costs of reentry and reletting including without limitation the cost of any cleanup, refurbishing, removal of Tenant's property and fixtures, costs incurred under Section 14.5, costs of obtaining a replacement of tenant and any other expense occasioned by Tenant's default including but not limited to, any remodeling or repair costs, attorney fees, court costs, broker commissions, and advertising costs.

14.3.(c) Any excess of the value of the rent and all of Tenant's other obligations under this Lease over the reasonable expected return from the Premises for the period commencing on the earlier of the date of trial or the date the Premises are relet, and continuing through the end of the term. The present value of future amounts will be computed using a discount rate equal to the prime loan rate of major Oregon banks in effect on the date of trial.

14.4 **Right to Sue More than Once**. Landlord may sue periodically to recover damages during the period corresponding to the remainder of the Lease term, and no action for damages shall bar a later action for damages subsequently accruing.

14.5 **Landlord's Right to Cure Defaults**. If Tenant fails to perform any obligation under this Lease, Landlord shall have the option to do so after 30 days' written notice to Tenant. All of Landlord's expenditures to correct the default shall be reimbursed by Tenant on demand with interest at the rate of 10 percent per annum from the date of expenditure by

12  Orchards Village Lease 2005

Landlord. Such action by Landlord shall not waive any other remedies available to Landlord because of the default.

14.6 **Remedies Cumulative**. The foregoing remedies are cumulative and shall be in addition to and shall not exclude any other remedy available to Landlord under applicable law.

## 15. SURRENDER AT EXPIRATION.

15.1 **Condition of Premises**. Upon expiration of the Lease term or earlier termination on account of default, Tenant shall deliver all keys to Landlord and surrender the Premises in first-class condition and broom clean. Unless the terms of Landlord's permission provide otherwise, or unless Landlord requires removal by notice to Tenant prior to the expiration of the Lease term, alterations, improvements and additions to the Premises constructed or added by Tenant shall not be removed or restored to the original condition. Depreciation and wear from ordinary use for the purpose for which the Premises are leased shall be excepted but repairs for which Tenant is responsible shall be completed to the latest practical date prior to such surrender. Tenant's obligations under this section shall be subordinate to the provisions of Section 8 relating to destruction.

15.2 **Fixtures, Furnishings and Furniture**.

15.2.(a) All fixtures, furnishings and furniture placed upon the Premises during the term shall become the property of Landlord. If Landlord so elects, Tenant shall remove any or all of such property that would otherwise remain the property of Landlord, and shall repair any physical damage resulting from the removal. If Tenant fails to remove such fixtures, Landlord may do so and charge the cost to Tenant with interest at the legal rate from the date of expenditure.

15.3 **Holdover**.

15.3.(a) If Tenant does not vacate the Premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month to month, subject to all of the provisions of this Lease except the provisions for term and renewal, or to eject Tenant from the Premises and recover damages caused by wrongful holdover. Failure of Tenant to remove fixtures, furniture, furnishings, or trade fixtures that Tenant is required to remove under this Lease shall constitute a failure to vacate to which this section shall apply if the property not removed will substantially interfere with occupancy of the Premises by another tenant or with occupancy by Landlord for any purpose including preparation for a new tenant.

15.3.(b) If a month-to-month tenancy results from a holdover by Tenant under this Section 15.3, the tenancy shall be terminable at the end of any monthly rental period on written notice from Landlord given not less than 10 days prior to the termination date which shall be specified in the notice. Tenant waives any notice

13  Orchards Village Lease 2005

that would otherwise be provided by law with respect to a month-to-month tenancy.

## 16. OPTION TO PURCHASE PROPERTY

16.1 **Grant of Option.** Landlord, in consideration of Tenant's execution of the Lease for the Property, grants to Tenant the sole and exclusive Option to purchase the Property in the manner and for the price stated in this Option section.

### 16.2 **Option Terms**

16.2.(a) **Term.** The term of the Option ("Term") shall commence on the first day of the seventh (7th) year of the Lease (that is, June 1, 2012) and shall continue until the expiration or termination of the Lease.

16.2.(b) **Exercise of Option.** Tenant's right to exercise the Option is conditioned upon there being no default by Tenant in Tenant's performance of all terms and conditions of this Agreement and the Lease. This Option shall be exercised, if at all, by written notice (the "Exercise Notice") given by Tenant to Landlord at any time during the Term, which notice shall state that Tenant has elected to exercise this Option. This Option may be exercised only with respect to the entirety of the Property, and nothing contained herein shall be construed as permitting Tenant to purchase less than all of the Property pursuant to this Option. Upon exercise of this Option, Tenant shall be obligated to purchase the Property from Landlord, and Landlord shall be obligated to sell the Property to Tenant, for the price and in the manner herein set forth.

16.2.(c) **Failure to Exercise Option.** If Tenant fails for any reason to exercise this Option in the manner set forth herein, Tenant shall have no further claim against or interest in the Property. In the event of the failure to exercise the Option, Tenant shall provide Landlord with any instruments that Landlord reasonably may deem necessary for the purpose of removing from the public record any cloud on title to the Property which is attributable to the grant or existence of this Option.

16.2.(d) **Option Consideration.** Tenant's execution of the Lease is the consideration for the grant of this Option by Landlord.

16.2.(e) **Acceptance of Property.** Tenant accepts the condition of the Property in its present condition, AS IS, WITH ALL FAULTS. As a result of Tenant's obligations under the Lease, Tenant, upon its purchase of the Property pursuant to this Option, will be deemed to have accepted the Property in its then condition, AS IS, WITH ALL FAULTS.

16.2.(f) **Purchase Price**

16.2.(g) **Purchase Price.** Landlord and Tenant agree that for purposes of calculating the

purchase price for the Option, the initial "Value of the Property" is Sixteen Million four Hundred Twenty One Thousand Dollars ($16,421,000.00) less the amount of the cost of purchasing the tenant in common interests, if any, under the Land Leases of even date herewith outstanding on the date of the exercise of this Option. Effective on the first day of the second year of the term of the Lease, and on the first day of each year thereafter during the term of the Lease, the Value of the Property effective during the preceding year shall be increased by three percent (3%). The value determined at the beginning of the year shall continue unchanged until the last day of the year. The Value of the Property at the time of the exercise of the Option shall be the "Purchase Price" of the Property. Landlord and Tenant agree that the Purchase Price, determined in the manner provided above, will be equivalent to the fair market value of the Property as of the date of the exercise of the Option.

16.2.(h) **Payment of Purchase Price.** The entire balance of the purchase price shall be paid in cash at closing.

16.2.(i) **Conditions Precedent to Closing** In addition to any other conditions contained in this Option, it is a condition precedent for the benefit of Tenant (the "Condition") that, on or before the Closing Date, Landlord shall have performed all of the covenants, conditions, agreements, and promises to be performed by it under this Option. The Condition is intended solely for the benefit of Tenant, and Tenant shall have the right to waive, by written notice, the Condition, at its sole discretion; giving the Exercise Notice shall not constitute such a waiver. In the event the Condition is not satisfied or waived on or before the deadline for satisfaction specified herein, then Tenant shall have the right to terminate this Option, at its sole election, by giving Landlord notice of termination before the deadline expires and to exercise any remedy available to Tenant. If Tenant does not give Landlord notice of termination before the applicable deadline, then Tenant shall be deemed to have waived the termination privilege with respect to the Condition.

16.2.(j) **Title** Except as hereinafter provided, Tenant accepts the condition of title to the Property as of the date of this Agreement and agrees to accept title to the Property subject to all presently existing exceptions, those created, or suffered to be created, by Tenant and all liens for real and personal property taxes and assessments. Except for liens for real and personal property taxes and assessments, Landlord shall be obligated to remove, at or before Closing, any exception to title created or suffered to be created by Landlord that is security for payment of a sum of money (including mortgages, deeds of trust, and judgment liens) and any exception created, or suffered to be created, by Landlord after the Effective Date. Exceptions to title which Tenant is obligated to accept, are referred herein to as the "Permitted Exceptions."

16.2.(k) **Closing**

15  Orchards Village Lease 2005

16.2.(k).i **Time and Place.** Closing of the sale and purchase of the Property (the "Closing") shall occur on the date (the "Closing Date") stated in the Exercise Notice. The escrow for the Closing shall be established at the office of a title company licensed to do business in the State of Oregon selected by Landlord (the "Title Company").

16.2.(k).ii **Closing Obligations.** On the Closing Date, Landlord and Tenant shall deposit the following documents and funds in escrow, and the Title Company shall close escrow in accordance with the instructions of Landlord and Tenant.

16.2.(k).iii Landlord shall deposit the following:

16.2.(k).iii.(A) The conveyance documents, duly executed and acknowledged;

16.2.(k).iii.(B) Such documents as Tenant or the Title Company may require to evidence the authority of Landlord to consummate this transaction; and

16.2.(k).iii.(C) Such other documents and funds, including (without limitation) escrow instructions, as are required of Landlord to close the sale in accordance with this Agreement.

16.2.(k).iv Tenant shall deposit the following:

16.2.(k).iv.(A) The cash payment;

16.2.(k).iv.(B) Such documents as Landlord or the Title Company may require to evidence the authority of Tenant to consummate the transaction contemplated; and

16.2.(k).iv.(C) Such other documents and funds, including (without limitation) escrow instructions, as are required of Tenant to close the sale and purchase of the Property in accordance with this Agreement.

16.2.(l) **Costs.** Tenant shall pay all of the escrow fee of the Title Company with respect to the Closing. Tenant shall pay the premium for the title insurance policy to be provided to Tenant, and for all conveyance or excise taxes payable by reason of the purchase and sale of the Property. Tenant shall pay the fee for recording the conveyance documents referred to herein.

16.2.(m) **Prorations.** Rent shall be prorated as of the Closing Date. All real property taxes and assessments incurred or accrued prior to the Closing Date shall be paid by Tenant and shall not be subject to pro-ration.

16.2.(n) **Title Insurance Policies.** As soon as practicable after Closing, the Title

16  Orchards Village Lease 2005

Company shall issue to Tenant its standard form owner's Title Insurance Policy in the amount of the Purchase Price, insuring fee simple title to the Property vested in Tenant, subject only to the Permitted Exceptions.

16.2.(o) **Conveyance**  At the Closing, Landlord shall execute, acknowledge, and deliver to Tenant a Statutory Warranty Deed conveying the Property to Tenant, subject only to the Permitted Exceptions.

16.2.(p) **Possession**  Tenant shall be entitled to exclusive possession of the Property on and after the Closing Date.

16.2.(q) **Landlord's Loans.**  Landlord will use its best efforts to obtain for Tenant, upon the exercise of the Option, the right to assume Landlord's obligations under any loan or loans secured by the Real Estate upon Landlord's re-finance or other re-negotiation of such loans.

## 17. MISCELLANEOUS.

17.1 **Nonwaiver**.  Waiver by either party of strict performance of any provision of this Lease shall not be a waiver of or prejudice the party's right to require strict performance of the same provision in the future or of any other provision.

17.2 **Attorney Fees**.  If suit, action or arbitration is instituted in connection with any controversy arising out of this Lease, the prevailing party shall be entitled to recover in addition to costs such sum as the court or arbitrator may adjudge reasonable as attorney fees at trial, arbitration, on petition for review, and on appeal.

17.3 **Notices**.  Any notice required or permitted under this Lease shall be given when actually delivered or 48 hours after deposited in United States mail as certified mail addressed to the address first given in this Lease or to such other address as may be specified from time to time by either of the parties in writing.

17.4 **Succession**.  Subject to the above-stated limitations on transfer of Tenant's interest, this Lease shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

17.5 **Recordation**..  Landlord shall execute and acknowledge a memorandum of this Lease in a form suitable for recording, and Tenant may record the memorandum.

17.6 **Entry for Inspection**.  Landlord shall have the right to enter upon the Premises at any time to determine Tenant's compliance with this Lease, to make necessary repairs to the building or to the Premises, or to show the Premises to any prospective tenant or purchaser, and in addition shall have the right, at any time during the last two months of the term of this Lease, to place and maintain upon the Premises notices for leasing or selling of the Premises.

17.7 **Interest on Rent and Other Charges**. Any rent or other payment required of Tenant by this Lease shall, if not paid within 10 days after it is due, bear interest at the rate of eight percent (8%) per annum except where otherwise provided (but not in any event at a rate greater than the maximum rate of interest permitted by law) from the due date until paid. In addition, if Tenant fails to make any rent or other payment required by this Lease to be paid to Landlord within five days after it is due, Tenant shall pay Landlord a late charge of five cents per dollar of the overdue payment to reimburse Landlord for the costs of collecting the overdue payment. Tenant shall pay the late charge upon demand by Landlord. Landlord may levy and collect a late charge in addition to all other remedies available for Tenant's default, and collection of a late charge shall not waive the breach caused by the late payment.

17.8 **Proration of Rent**. In the event of commencement or termination of this Lease at a time other than the beginning or end of one of the specified rental periods, then the rent shall be prorated as of the date of commencement or termination and in the event of termination for reasons other than default, all prepaid rent shall be refunded to Tenant or paid on its account.

17.9 **Time of Essence**. Time is of the essence of the performance of each of Tenant's obligations under this Lease.

17.10 **Written Modification or Termination**. This Lease may be changed, waived, discharged or terminated only by written agreement executed by Landlord and Tenant.

17.11 **Integration**. This lease contains the entire agreement of Landlord and Tenant and supersedes all prior agreements between them with respect to the lease of the Premises.

17.12 **Governing Law; Venue; Jurisdiction** This Lease has been made entirely within the State of Oregon. This Lease shall be governed by and construed in accordance with the laws of the State of Washington. If any suit, action or arbitration is filed by any party to enforce this Lease or otherwise with respect to the subject matter of this Lease, venue shall be in the Oregon State Courts in Multnomah County, Oregon.

17.13 **Counterparts** This Lease may be executed by the parties in separate counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

17.14 **Status of Parties**.

17.14.(a) Nothing in this Lease shall be construed to render or constitute Landlord in any way or for any purpose a partner, joint venturer or associate in any relationship with Tenant other than that as Landlord and Tenant; nor shall this Lease be construed to authorize either party to act as agent for the other party except as expressly provided to the contrary in this Lease.

17.14.(b) Landlord and Tenant covenant each for itself that each has full right, power and authority to enter into this Lease upon the terms and conditions herein set forth. If Tenant signs as a limited liability company, the person executing this Lease on behalf of Tenant does hereby covenant and warrant that Tenant is a duly authorized and existing company, qualified to do business in the State of Oregon, that the company has full right and authority to enter into this Lease, and that the person signing on behalf of the company was authorized to do so.

## 18. DISPUTE RESOLUTION.

18.1 **Meet and Confer**. In the event of any dispute concerning this Lease, excepting disputes involving non-payment of rent or the right to maintain an action for forcible entry and wrongful detainer, the parties shall, at the request of either of them, meet and confer in an effort to resolve the dispute. If the parties cannot resolve the dispute within fifteen (15) days following the initial request to meet and confer, the dispute shall be submitted to arbitration as provided in Section 18.2, below.

18.2 **Arbitration**. Except for claims and controversies involving disputes involving non-payment of rent or the right to maintain an action for forcible entry and wrongful detainer, all controversies or claims arising out of or relating to this Lease, which are not resolved as provided in Section 18.1 above, including without limitation the making, performance, or interpretation of this Lease, shall be settled by binding arbitration. Unless otherwise agreed, the arbitration shall be conducted in Multnomah County, Oregon, in accordance with the procedures for arbitration established in and pursuant to Oregon Court Mandatory Arbitration Rules as hereafter amended, except there shall be no right to appeal the decision or award of the arbitrator or to have a trial de novo and the arbitrator shall be selected as provided below. The decision of the arbitrator shall be a judgment, binding upon the parties and entered as a judgment. Unless otherwise agreed by the parties, the arbitration shall be held before a single arbitrator selected by Tenant from a list of not less than five proposed arbitrators given to Tenant by Landlord. The proposed arbitrators shall be attorneys knowledgeable in the field of real property law. The parties agree that the arbitrator shall have no jurisdiction to consider evidence with respect to or render any award or judgment for punitive damages (or any other amount awarded for the purpose of imposing a penalty). The parties agree that all facts and other information relating to any arbitration arising under this Lease shall be kept confidential to the fullest extent permitted by law. Except as otherwise provided for herein, the cost of arbitration shall be shared equally between the parties; however, the prevailing party shall be entitled to recover attorney's fees as provided in Section 16.2.

ORCHARDS VILLAGE INVESTMENTS, LLC
an Oregon limited liability company

By _____

19  Orchards Village Lease 2005

**Exhibit B**
**Page 33 of 36**

Jeffrey L. Chamberlain, Manager
"Landlord"

ORCHARDS VILLAGE PROPERTIES, LLC
Oregon limited liability company

By _____
Jeffrey L. Chamberlain, Manager
"Tenant"

20   Orchards Village Lease 2005

STATE OF OREGON          )
                         ) ss.
COUNTY OF MULTNOMAH      )


The foregoing instrument was acknowledged before me this _3rd_ day of October, 2005, by Jeffrey L. Chamberlain, the Manager of ORCHARDS VILLAGE INVESTMENTS, LLC, an Oregon limited liability company, on behalf of the limited liability company.



_____
Notary Public

My Commission Expires: _7-19-2009_


STATE OF OREGON          )
                         ) ss.
COUNTY OF MULTNOMAH      )


The foregoing instrument was acknowledged before me this _3rd_ day of October, 2005, by Jeffrey L. Chamberlain, the Manager of ORCHARDS VILLAGE PROPERTIES, LLC, an Oregon limited liability company, on behalf of the limited liability company.



_____
Notary Public

My Commission Expires: _7-19-2009_


21  Orchards Village Lease 2005

Exhibit "A"

PARCEL I

The South half of the East half of the West 330 feet of the East 991.11 feet of the South half of the Southeast quarter of the Southwest quarter of Section 34, Township 3 North, Range 2 East of the Willamette Meridian, Clark County, Washington.

EXCEPT that portion lying within NE 99th Street.

PARCEL II

The North half of the East half of the West 330 feet of the East 991.11 feet of the South half of the Southeast quarter of the Southwest quarter of Section 34, Township 3 North, Range 2 East of the Willamette Meridian, Clark County, Washington.

PARCEL III

The West half of the West 330 feet of the East 991.11 feet of the South half of the Southeast quarter of the Southwest quarter of Section 34, Township 3 North, Range 2 East of the Willamette Meridian, Clark County, Washington.

EXCEPTING THEREFROM that portion lying within NE 99th Street.

1
2
3
4
5

SUPERIOR COURT OF WASHINGTON

6

COUNTY OF CLARK

7

BANK OF WYOMING, a Wyoming state-
chartered bank,

8

NO.  08-2-04250-6

9

Plaintiff,

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER

10

v.

11

ORCHARDS VILLAGE INVESTMENTS,
LLC, an Oregon limited liability company;
ORCHARDS VILLAGE PROPERTIES, LLC,
an Oregon limited liability company;
FARMINGTON CENTERS, INC., an Oregon
corporation; HENRY'S ORCHARDS
VILLAGE, LLC, a Washington limited liability
company; SUGARMAN'S ORCHARD, LLC,
an Oregon limited liability company;
CARBURTON PROPERTIES 8, LLC, a
Delaware limited liability company; JACK
BURGESS and TERESA BURGESS, CO-
TRUSTEES OF THE BURGESS FAMILY
TRUST DATED 7/31/1992, an Oregon trust;
JEFFREY L. CHAMBERLAIN, an individual;
DONNA J. CHAMBERLAIN, an individual;
THEADORE J. CHAMBERLAIN, an
individual; FAYE M. CHAMBERLAIN, an
individual; ZALTA III, LLC, an Oregon limited
liability company; PINNACLE BANK OF
OREGON, an Oregon state-chartered bank; and
CLARK COUNTY, a political subdivision of
the State of Washington,

12
13
14
15
16
17
18
19
20
21
22
23
24

25

Defendants.

26

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 1

{00855520.DOC;3}

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit C**
**Page 1 of 10**

**I.      Relief Requested.**

Pursuant to RCW 7.60.005 et seq., plaintiff Bank of Wyoming, a Wyoming state-chartered bank (the "Lender"), moves the Court for appointment of a general receiver for defendants Orchards Village Investments, LLC ("OVI"), Orchards Village Properties, LLC ("OVP"), Henry's Orchards Village, LLC ("Henry"), Sugarman's Orchard, LLC ("Sugarman"), Carburton Properties 8, LLC ("Carburton"), and Jack Burgess and Teresa Burgess as Co-Trustees of the Burgess Family Trust dated 7/31/1992 ("Burgess") (collectively, the "Receivership Defendants") and their assets and business operations.

**II.     Statement of Facts.**

As more fully described below and in the Complaint, the Lender is a secured creditor of the Receivership Defendants.  As a result of certain defaults by OVI, the balance owing to the Lender, which exceeds $11,535,160.98, is now due, and the Lender is entitled to possession of or foreclosure on the Real Property, buildings and building improvements, fixtures, the Personal Property, the Assigned Rights, and the Management Agreement (the "Collateral").  The appointment of a receiver is reasonably necessary to protect the value of the Collateral and facilitate its sale.  Other remedies are not available or will not be adequate to protect the Collateral's value.

On September 28, 2005, the Lender and OVI entered into that certain Construction Loan Agreement (the "Construction Loan Agreement") concerning certain terms and provisions of a secured construction loan being made by Lender to OVI (the "OVI Indebtedness").  See Complaint, Ex. A.  The OVI Indebtedness was incurred for the purpose of building a senior assisted living facility called Orchards Village, in or near Vancouver, Washington.  Disbursements under the Construction Loan Agreement were made pursuant to the terms of that certain Disbursing Agreement dated September 28, 2005, by and between Lender, OVI, and Chicago Title Insurance Company.  See Complaint, Ex. FF.

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 2 of 10**

On September 28, 2005, to evidence the OVI Indebtedness, OVI made and delivered that certain Promissory Note in the principal amount of $11,550,000.00. See Complaint, Ex. B.

On September 28, 2005, to secure the OVI Indebtedness, OVI, Henry, and Sugarman entered into that certain Construction and Permanent Deed of Trust and Security Agreement and Fixture Filing (the "Deed of Trust"), granting to the Lender, among other things, a security interest in the Real Property, buildings and improvements thereon, and personal property of OVI. The Deed of Trust was recorded with the Clark County Auditor on October 5, 2005. See Complaint, Ex. C. On October 24, 2005, the Lender perfected its security interest in OVI's personal property by filing a financing statement with the Oregon Secretary of State. See Complaint, Ex. E.

On September 28, 2005, as further security for the OVI Indebtedness, OVI executed and delivered to the Lender that certain Assignment of Rents and Lease(s) (the "Assignment of Rents"). The Assignment of Rents was recorded with the Clark County Auditor on October 5, 2005. See Complaint, Ex. D. The Assignment of Rents covers Assigned Rights (as defined therein), including, among other things, that certain Commercial Lease Orchards Village Facility dated June 1, 2005 (the "Lease") between OVI as Landlord and OVP as Tenant. See Complaint, Ex. P.

On September 28, 2005, Henry and Sugarman executed that certain Subordination and Standstill Agreement in favor of the Lender. See Complaint, Ex. J.

Upon information and belief, on or about January 24, 2006, OVI and Carburton entered into that certain Orchards Village Tenants in Common Agreement. On February 28, 2006, the Lender, OVI, and the Guarantors entered into that certain Amendment to Loan Documents for the purpose, among other things, of adding Carburton as a tenant in common on Schedule 6.9(a) to the Construction Loan Agreement. See Complaint, Ex. CC. On March 2, 2006, a Warranty Deed dated March 1, 2006, was recorded with the Clark County Auditor, conveying a 17.87% tenant in common interest in the Real Property from OVI to Carburton. See Complaint, Ex. Y.

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 3

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 3 of 10**

On March 7, 2006, a Subordination and Standstill Agreement dated February 28, 2006, was recorded, pursuant to which Carburton subordinated any and all right to payment as a tenant in common and to the Real Property in favor of the Lender. See Complaint, Ex. W.

Upon information and belief, on or about July 7, 2006, OVI and Burgess entered into that certain Orchards Village Tenants in Common Agreement.  On August 22, 2006, the Lender, OVI, and the Guarantors entered into that certain Second Amendment to Loan Documents ("Second Amendment") for the purpose, among other things, of adding Burgess as a tenant in common on Schedule 6.9(a) to the Construction Loan Agreement. See Complaint, Ex. DD.  On August 24, 2006, a Warranty Deed dated August 22, 2006, was recorded with the Clark County Auditor, conveying a 9.62% tenant in common interest in the Real Property from OVI to Burgess. See Complaint, Ex. Z.  On September 11, 2006, a Subordination and Standstill Agreement dated August 25, 2006, was recorded, pursuant to which Burgess subordinated any and all right to payment as a tenant in common and to the Real Property in favor of the Lender. See Complaint, Ex. X.

On September 28, 2005, Farmington entered into a Subordination of Management Agreement ("SMA"), agreeing, among other things, that its interest under the Management Agreement is subject and subordinate to the lien of the Deed of Trust, including any rights to payment on Operator Receivables (as defined therein), which are fully subordinated upon receipt of written notice from the Lender. See Complaint, Ex. L.  The Lender has not yet given that written notice, but reserves the right to do so or to delegate such right to any receiver.  Also, on September 28, 2005, OVP executed and delivered to the Lender that certain Collateral Assignment of Management Agreement ("CAMA"), which relates to and grants to the Lender a security interest in that certain Management Agreement for services relating to the operation of the facility at the Real Property. See Complaint, Exs. M & Q.  On June 5, 2008, the Lender perfected its security interest in the Management Agreement by filing a UCC-1 financing statement with the Oregon Secretary of State. See Complaint, Ex. V.

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 4

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 4 of 10**

The ownership of the Real Property is subject to that certain Orchards Village Tenants in Common Agreement dated August 31, 2005, among Henry, Sugarman, and OVI (the "TIC Agreement"), see Complaint, Ex. S, as well as an Orchards Village Tenants in Common Agreement dated January 24, 2005 [sic], between Carburton and OVI; and an Orchards Village Tenants in Common Agreement dated July 7, 2006, between Burgess and OVI. Henry and Sugarman as landlords have leased their tenant in common interests to OVI as tenant. See Complaint, Exs. T & U. The common ownership of the Real Property excludes Improvements as defined in the TIC Agreement. Improvements are the property of OVI as described in the Lease; however, the Second Amendment describes OVI, Carburton, and Burgess sharing 72.51%, 17.87%, and 9.62% interests, respectively, therein.

The OVI Indebtedness and obligations under the Promissory Note, Deed of Trust, and Assignment of Rents are now in default, and all sums owed by OVI are now due and payable and declared to be due and payable. Not including interest, fees, costs, and other charges, the amount owed as of July 10, 2008, is $11,535,160.98. On March 21, 2008, the Lender mailed a Notice of Default, by certified mail, return receipt requested, to OVI, with a copy to Farmington. See Complaint, Ex. EE. On July 10, 2008, the Lender sent a Notice of Acceleration to OVI, Farmington, and the Guarantors. See Complaint, Ex. GG hereto. Defaults are ongoing and uncured and, without limitation, include OVI's failure to make the monthly payments due on the Promissory Note on January 20, 2008, and on the 20th day of each subsequent month, OVI's failure to pay certain real property taxes, interest, and penalties, and special assessments affecting the Real Property for 2007 and 2008, due April 30, 2008, in the amount of $126,447.25, and OVI's suffering and permitting to attach to the Real Property a mechanic's lien in favor of LRS Architects and the related foreclosure action relating to that mechanic's lien, and OVI's failure to discharge that lien. OVI's defaults have also given rise to the Lender's right to enforce the CAMA and the SMA.

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 5

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 5 of 10**

On July 10, 2008, as a result of the foregoing, the Lender filed the above-captioned action to enforce its rights and remedies, including foreclosure and appointment of a receiver. In connection with appointment of the receiver, the Lender requests that no bond be required so long as the proposed receiver maintains an E&O insurance policy with policy limits of $1,000,000. The cost of a bond would ultimately be borne by OVI and the Guarantors in any event.

The Lender proposes appointment of Pivotal Solutions, Inc. ("PSI"), with principals Richard Hooper and Marcia Frey, as the general receiver. PSI is experienced and has been successful as a receiver for assisted living facilities, including in the recent case of <u>U.S. Bank National Association v. Long Beach Retirement Community</u>, Case No. 07-2-00139-7, in Pacific County Superior Court, as well as for real property and all types of personal property in general.

**III.    Statement of Issues.**

Whether a general receiver should be appointed pursuant to RCW 7.60.005 <u>et</u> <u>seq.</u>

**IV.    Evidence Relied Upon.**

The Lender relies upon the Declarations of Brian Yarrington and Richard Hooper.

**V.    Authority.**

RCW 7.60.005 <u>et</u> <u>seq.</u>, RCW 7.60.025(1)(b); and RCW 7.60.025(3).

**VI.    Discussion.**

By its Complaint, the Lender seeks appointment of a general receiver over the Receivership Defendants, and other relief including foreclosure of the Deed of Trust and its security interests.

A receiver may be appointed by this Court

> [p]rovisionally, during the pendency of any action to foreclosure upon any lien against or for forfeiture of any interest in real or personal property . . . upon application of any person, when the interest in the property that is the subject of foreclosure or forfeiture of the person seeking the receiver's appointment is determined to be probable and either:

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 6

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 6 of 10**

       (i)  The property or its revenue-producing potential is in danger of being lost or materially injured or impaired; or

       (ii)  The appointment of a receiver with respect to the real or personal property that is the subject of the action . . . is provided for by agreement or is reasonably necessary to effectuate or enforce an assignment of rents or other revenues from the property[.]

RCW 7.60.025(1)(b).

    A receiver should be appointed under RCW 7.60.0125(1)(b)(ii).  The above-captioned lawsuit is an action to foreclose upon liens on real and personal property.  The Lender's interest in the real and personal property that is the subject of the action is not just probable, but certain, based on the documents described above, including without limitation the Deed of Trust, the Assignment of Rents, the Subordination and Standstill Agreements, and the CAMA.  The Receivership Defendants have agreed to appointment of a receiver as follows: (a) OVI, specifically in Sections 5.3 and 7.3(c) of the Deed of Trust and Section 6.1 of the Assignment of Rents; (b) OVP's, under Section 11.2 of its Lease with OVI, which has been assigned to the Lender under the Assignment of Rents; and (c) Henry, Sugarman, Carburton, and Burgess, in subordinating to the Lender's rights pursuant to Section 2(a) of their respective Subordination and Standstill Agreements.  Consequently, all of the Receivership Defendants have agreed to appointment of a receiver.

    In addition to having obtained the agreement of the Receivership Defendants to appointment of a receiver, such appointment is reasonably necessary to effectuate or enforce the Assignment of Rents.  There are a number of choke points between collection of revenues and payment to the Lender, which appointment of a receiver would relieve.  OVI, Henry, Sugarman, Carburton, and Burgess own to varying extents the real property and improvements subject to the Lender's security interest and, through OVI, have leased them to OVP.  OVI has assigned that Lease to the Lender.  OVP has entered into the Management Agreement with Farmington to collect essentially all of the revenues generated by the facility.  OVP has granted the Lender a security interest in the Management Agreement.  In order to see that revenues are appropriately

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 7

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 ▪ Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 7 of 10**

1  collected and rent paid over to the Lender, which under the current multilayered contractual

2  configuration has not been happening, the appointment of a receiver over the Receivership

3  Defendants will establish control over the collection and payment of rents and a method for

4  carrying out OVP's rights to review and/or replace Farmington under OVP's Management

5  Agreement.  The key to payment of the Lender's debt, to the extent the facility remains a going

6  concern, is collection of rent.  To the extent there is an entity left out of the stream of payments,

7  the ability to collect rents is impaired; there is a short in the circuit.  The documents described

8  above are drafted to permit the Lender to take over the collection process.  A single receiver over

9  the Receivership Defendants will streamline the enforcement of this right considerably.

10      Alternatively, under the circumstances of a lawsuit like this, even if there were no

11  agreement to a receiver or reason to appoint one in connection with assignment of rents, a

12  receiver may be appointed by this Court when "[t]he property or its revenue-producing potential

13  is in danger of being lost or materially injured or impaired[.]"  RCW 7.60.025(1)(b)(i).  If a

14  receiver is sought on those grounds, it must also be shown that appointment "is reasonably

15  necessary and that other remedies either are not available or are inadequate."  RCW 7.60.025(1).

16      The property or its revenue-producing potential is in danger of being lost or materially

17  injured or impaired.  The Defendants have failed to provide basic financial information

18  notwithstanding their contractual obligations and the Lender's repeated requests.  In addition,

19  efforts by OVI to refinance the OVI Indebtedness have fallen through, and OVI has also not been

20  able to establish a definitive agreement for the sale of the facility.  OVI has recently experienced

21  management upheaval, including the termination of its CEO.  The ongoing nondisclosure, failed

22  efforts to solve financial problems through refinance or sale, and management instability all

23  evidence danger of financial loss.

24      Based on the documents attached to the Complaint and the nature of the defaults alleged

25  therein, appointment is reasonably necessary.  By way of summary, OVI's (and its affiliated

26  contracting parties' and agents') default on the OVI Indebtedness is substantial and demonstrates

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 8

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 8 of 10**

an inability to operate the business effectively as a going concern under the current configuration.

The business being operated is an assisted living facility. In the absence of a receiver who can stabilize the financial operations of the facility, the health and welfare of its resident disabled senior citizens would be at risk. Moreover, to the extent the residents have options, they may choose to relocate and further reduce revenues. The property and business need to be managed and supervised under the control of a person experienced in the area of assisted living. PSI would be such a receiver.

Other available remedies either are not available or are inadequate. The problem needs immediate attention. While the Lender is pursuing its foreclosure, breach of contract, and other remedies, they are either unavailable or inadequate to address the current need to fix the Receivership Defendants' management of facility and collection of revenue. Foreclosure of the Lender's collateral in a way that maximizes value may be difficult to accomplish if done in a piecemeal fashion. Breach of contract claims will result in judgments, but leave the problems of collection and operations unsolved. All of these remedies will not produce any concrete result until the dispositive motions stage, at the earliest. The best way to pay off the OVI Indebtedness, maintain the facility, and protect its residents is through a sale as a going concern or refinancing so that operations are maintained by competent and stable management. The Receivership Defendants have no ability to accomplish such a result. Although the Lender is entitled to possession of its collateral, it is not in the business of running assisted living facilities. An experienced receiver would serve the needs of all interested parties. Ultimately, a comprehensive disposition of the property owned by multiple tenants in common through a sale free and clear and simplification or modification of intertwined contractual relationships requires appointment of a general receiver over all of the Receivership Defendants.

///

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 9

*Cairncross & Hempelmann, P.S.*
Law Offices
524 Second Avenue, Suite 500
Seattle, Washington 98104-2323
Phone: 206-587-0700 • Fax: 206-587-2308

**VII.    Prayer for Relief.**

For the foregoing reasons, the Lender respectfully requests that the Court appoint PSI as general receiver over the Receivership Defendants and their assets and business operations.

DATED this 30th day of July, 2008.

John R. Rizzardi, WSBA No. 9388
John R. Knapp, Jr., WSBA No. 29343

Attorneys for Plaintiff Bank of Wyoming

PLAINTIFF'S MOTION FOR ORDER
APPOINTING GENERAL RECEIVER - 10

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00855520.DOC;3}

**Exhibit C**
**Page 10 of 10**

COPY
ORIGINAL FILED

AUG 22 2008

Sherry W. Parker, Clerk, Clark Co.

SUPERIOR COURT OF WASHINGTON

COUNTY OF CLARK

BANK OF WYOMING, a Wyoming state-chartered bank,

Plaintiff,

v.

ORCHARDS VILLAGE INVESTMENTS, LLC, an Oregon limited liability company; ORCHARDS VILLAGE PROPERTIES, LLC, an Oregon limited liability company; FARMINGTON CENTERS, INC., an Oregon corporation; HENRY'S ORCHARDS VILLAGE, LLC, a Washington limited liability cLC, an Oregon limited liability company; PINNACLE BANK OF OREGON, an Oregon state-chartered bank; and CLARK COUNTY, a political subdivision of the State of Washington,

Defendants.

NO. 08-2-04250-6

ORDER APPOINTING GENERAL RECEIVER

This matter came before the Court on plaintiff Bank of Wyoming's (the "Lender") motion to appoint a general receiver for defendants Orchards Village Investments, LLC ("OVI"), Orchards Village Properties, LLC ("OVP"), Henry's Orchards Village, LLC ("Henry"), Sugarman's Orchard, LLC ("Sugarman"), Carburton Properties 8, LLC ("Carburton"), and Jack Burgess and Teresa Burgess as Co-Trustees of the Burgess Family Trust dated 7/31/1992 ("Burgess") (collectively, the "Receivership Defendants") and their assets and business

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 1

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

operations. The Washington State Department of Social and Health Services ("DSHS")

appeared at the hearing. The Court having reviewed the motion, the declarations of Brian

Yarrington and Richard A. Hooper, the exhibits attached thereto, and the files and records herein,

and finding that good and sufficient grounds for appointment of a receiver exist, and that such

appointment is proper pursuant to RCW 7.60 et seq., now, therefore, it is hereby

ORDERED that the Lender's motion is GRANTED.

It is further ORDERED that:

1.    Pivotal Solutions, Inc. (the "Receiver"), is appointed as a general receiver with

respect to (a) all real property, and all tangible and intangible personal property, interests, or

assets of any nature of the Receivership Defendants, and (b) the assisted living business

operated by the Receivership Defendants, commonly known as Orchards Village, in or near,

Vancouver, Washington. Notwithstanding the foregoing, the Receivership shall not be effective

as to OVP until such time as DSHS has issued a provisional license to the new provider

designated by the Receiver. In the event a hearing on the foregoing is needed it shall take place

on August 28, 2008 at 2:30 p.m.

2.    The Receivership Defendants and their members, managers, partners, officers,

agents, employees, representatives, trustees, beneficiaries, and attorneys hereby are directed to

cooperate fully with the Receiver in carrying out the Receiver's duties. Without limiting the

foregoing, the Receivership Defendants are required to do the following:

(a)    Assist and cooperate fully with the Receiver in the administration of the

assets and the business operations of the Receivership Defendants and the discharge of

the Receiver's duties and comply with all orders of the Court;

(b)    Supply the Receiver with information necessary to enable the Receiver to

complete any schedules that the Receiver may be required to file and otherwise assist the

Receiver in the completion of the schedules;

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

(c)    Deliver to the Receiver all of the Receivership Defendants' property in the person's or entity's possession, custody, or control, including, but not limited to, all accounts, books, papers, records, and other documents; and

(d)    Submit to examination by the Receiver, or by any other person, upon order of the Court, under oath, concerning the acts, conduct, property, liabilities, and financial condition of the Receivership Defendants, or any matter relating to the Receiver's administration of the assets and business operation of the Receivership Defendants.

3.    The Receivership Defendants and their members, managers, partners, officers, agents, employees, representatives, trustees, beneficiaries, and attorneys are hereby prohibited from:

(a)    Interfering with the Receiver, directly or indirectly, in the management and operation of the Receivership Defendants' assets and operations, or otherwise directly or indirectly taking any actions or causing any such action to be taken which would dissipate the assets or negatively affect the operations of the Receivership Defendants;

(b)    Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, or otherwise disposing of the whole or any part of the Receivership Defendants' assets and the proceeds thereof; and

(c)    Doing any act which will, or which will tend to, directly or indirectly, impair, defeat, prevent, or prejudice the preservation of the Receivership Defendants' assets and operations.

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 3

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

4.    The Receiver is not required to post a bond at this time.  The Receiver shall maintain E&O insurance with a policy limit of $1,000,000.00.

5.    Within 20 days following the entry of this Order, the Receiver shall file with this Court the schedule of creditors and assets of the Receivership Defendants as required by RCW 7.60.090(2) and RCW 7.60.090(3).

6.    Within 20 days of entry of this Order, the Receiver shall send notice to creditors of the Receivership Defendants as required by RCW 7.60.200.

7.    Unless and until otherwise ordered by the Court, the Receiver shall be a general receiver with exclusive possession and control over the assets and the business of the Receivership Defendants with the power, authority, and duty to preserve, protect, and liquidate such assets during the pendency of this case.  This authority includes, without limitation, the following:

(a)    the authority to sell all of the real and personal property of the Receivership Defendants;

(b)    the authority to incur and pay when due all expenses incurred by the Receivership Defendants in the ordinary course of business, to the extent they accrue after the Receiver's appointment;

(c)    the authority to pay any and all other expenses, regardless of when the debt was incurred, that the Receiver determines in good faith are necessary or beneficial to the operation or winding down of the Receivership Defendants' business operations and the liquidation of the Receivership Defendants' assets.

The Receiver shall have exclusive possession and control over all assets of the Receivership Defendants (subject to the rights of secured creditors, including the Lender), with

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 4

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

the power and authority to preserve, protect, and liquidate those assets and to distribute the proceeds thereof to the party or parties legally entitled thereto.

8.     The Receiver shall not be required to file tax returns on behalf of the Receivership Defendants. Upon reasonable notice to the Receiver, the Receiver shall provide to the owners (or their authorized agents) of each of the Receivership Defendants reasonable access to the financial information necessary for each of the Receivership Defendants to prepare tax returns.

9.     The Receiver hereby is vested with all powers afforded a receiver under the laws of the State of Washington including, but not limited to, the power and authority to do the following things:

(a)     To incur expenses, and to use the Receivership Defendants' cash to pay expenses, incidental to the Receiver's preservation and use of the property with respect to which the appointment applies, and otherwise in the performance of the Receiver's duties, provided that the funds used for this purpose are not subject to any lien or right of setoff in favor of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

(b)     To do all things that the Receivership Defendants might do in the ordinary course of the operation of its assisted living business as a going concern, or in the use of its property, including, but not limited to, purchasing and selling goods or services in the ordinary course of such business and incurring and paying expenses of the business in the ordinary course;

(c)     To assert any rights, claims, or interests of the Receivership Defendants; to maintain in the Receiver's name or in the name of the Receivership Defendants any action to enforce any right, claim, or interests; and to intervene in actions in which any of the Receivership Defendants is a party for the purpose of exercising the powers under this subsection;

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 5

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 ● Fax: 206-587-2308*

(d)     To intervene in any action in which a claim is asserted against the Receivership Defendants for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court;

(e)     To assert rights, claims, or choses in action of the Receiver arising out of transactions in which the Receiver is a participant;

(f)     To pursue in the name of the Receiver any claim under RCW 19.40 assertable by any creditor of the Receivership Defendants, if pursuit of the claim is determined by the Receiver to be appropriate;

(g)     To seek and obtain advice or instruction from the Court with respect to any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers, or the discharge of the Receiver's duties;

(h)     To obtain appraisals with respect to property in the hands of the Receiver;

(i)     To sell all or substantially all of the assets of the Receivership Defendants as a going concern, or as non-operating assets, with the Court's approval after notice and a hearing;

(j)     To obtain unsecured credit and incur unsecured debt in the ordinary course of business as an administrative expense of the Receiver without order of the Court;

(k)     To compel, by subpoena, any person to submit to an examination under oath in the manner of a deposition in a civil case with respect to estate property or any other matter that may affect the administration of the receivership; and

(l)     To exercise such rights and remedies of the Lender as the Lender may delegate to the Receiver in writing.

(m)    To enter into an Occupancy and Services Agreement with Regency Pacific, Inc. or its affiliate for the purpose of acting as licensee of the boarding home portion of the premises.

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 6

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

9A.    The Receiver shall comply with all laws applicable to operation of licensed boarding homes, including Chapter 18.20 RCW and Washington Administrative Code Chapter 388-78A. All funds received by the Receiver that are related to the operation of the boarding home shall be first used to pay for necessary care and services to the facility residents, including staff salaries. If money on hand, or income from OVP's business, is not sufficient to fund the ongoing expenses of the boarding home, the Plaintiff shall underwrite and advance the shortfall.

9B.    Nothing in this Order precludes DSHS from taking any enforcement actions against the facility that it determines to be necessary and appropriate under its licensing authority.

9C.    OVP must immediately give the notices of this order and the proposed change in control of Orchard Villages to DSHS and to the residents of the facility and, if appropriate, to their families. Notices shall include all the information required by WAC 388-78A-2780.

10.    The Receiver shall file with the Court a monthly report with respect to the Receivership Defendants' assets, operations, and financial affairs, unless otherwise ordered by the Court. Each such report shall be due by the last day of the subsequent month and shall include:

    (a)    a balance sheet of each Receivership Defendant;

    (b)    a statement of income and expenses of each Receivership Defendant;

    (c)    a statement of cash receipts and disbursements of each Receivership Defendant;

    (d)    a statement of accrued accounts receivable of each Receivership Defendant, disclosing amounts considered to be uncollectible;

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 7

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

(e)     a statement of accounts payable of each Receivership Defendant, including professional fees, listing the name of each creditor and the amounts owing and remaining unpaid over thirty days; and

(f)     a tax disclosure statement, which shall list post filing taxes due or tax deposits required, the name of the taxing agency, the amount due, the date due, and an explanation for any failure to make payments or deposits.

11.     Subject to the qualifications contained in paragraph 12 of this order regarding the employment of professionals, the Receiver in the performance of the Receiver's duties may employ such persons or entities as the Receiver deems appropriate, including current employees of the Receivership Defendants, or Farmington Centers, Inc. (which currently is the manager of the assisted living facility) in connection with the Receiver's management and operation of the Receivership Defendants and their assets. All such persons or entities shall be subject to the management and direction of the Receiver in connection with their performance of any duties associated with such employment by the Receiver. The Receiver shall be free at all times to terminate the employment of any such person or entity (including, but not limited to, Farmington Centers, Inc.).

12.     If the Receiver wishes to employ attorneys, accountants, or other professionals that the Receiver believes to be necessary in connection with the proper performance of the Receiver's duties hereunder, the Receiver shall file a motion seeking the Court's approval of such employment pursuant to RCW 7.60.180.

13.     The Receiver's compensation for the Receiver's services in this case shall be based on the standard rate of Mr. Hooper and Marcia Frey, which for each currently is $200 per hour. The billing rates for each of the officers of the Receiver are subject to periodic review and adjustment.

14.     The Receiver and the Receiver's authorized attorneys and other professionals may request to be compensated for fees and expenses on an interim or final basis to the extent such

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 8

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

fees and expenses accrue in connection with, or after, the Receiver's appointment. In support of any such request, the applicant shall file an itemized billing statement with the Court indicating the time spent, billing rates of all persons who performed work to be compensated, and a detailed list of expenses incurred by the applicant for which compensation is sought. The Receiver (or attorney or other professional) shall serve copies of such materials on the Lender, any person or entity that has been joined as a party in this action, and any person or entity requesting copies of pleadings and other materials filed in this proceeding. Those materials shall be accompanied by a notice indicating that unless objections to the proposed compensation are filed with the Court within 10 days, the Receiver may make the payments requested in the compensation notice. If an objection is filed to the proposed compensation, the Receiver or professional whose compensation is affected may request the Court to hold a hearing on the objection on five days' notice to each person or entity that filed an objection thereto. The Receiver shall have a lien, subject only to the lien of Clark County for property taxes, to secure the payment of any of the Receiver's costs, expenses and professional fees, as approved by the Court.

15.    If the assisted living business does not generate revenue following the appointment of the Receiver sufficient to pay the operating expenses and approved charges of the Receiver (including, but not limited to, those described in paragraph 7) and the fees and expenses of any attorneys, accountants, or other professionals employed by the Receiver in accordance with the preceding paragraph of this order and RCW 7.60.180, the Receiver shall borrow money from the Lender to enable the Receiver to pay such expenses and the Lender shall lend the amount in question to OVI on the basis described in paragraph 17 of this order.

16.    Within 30 days of the Receiver's appointment hereunder, the Receiver shall present to the Lender a report identifying any capital expenditures the Receiver believes need to be made immediately in order to preserve and protect the value of the assets of the Receivership Defendants, and the assisted living business operated on the property. If the Lender agrees regarding the necessity and cost of the proposed capital expenditures identified by the Receiver,

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 9

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

the Receiver may make such expenditures from cash of the Receivership Defendants available to the Receiver. If there is not sufficient cash of the Receivership Defendants available to the Receiver to make capital expenditures approved by the Lender, the Receiver may request the Lender to make an advance to OVI (in accordance with paragraph 17 of this order) in an amount sufficient to pay for the capital expenditures in question. If the Lender in its sole and absolute discretion agrees to advance funds to OVI to enable the Receiver to make protective capital expenditures, and the aggregate amount of such advances by the Lender (determined by aggregating all such advances made by the Lender on or after the date of entry of this Order) is less than or equal to $25,000, then the Lender can advance such amounts to the Receiver without notice or a hearing by the Court. If the aggregate amount the Lender agrees to advance to the Receiver in respect of protective capital expenditures is greater than $25,000, the Receiver shall file a motion under RCW 7.60.140(2) seeking authority to have the Lender advance the funds in question (with such advance to be secured in accordance with paragraph 17 of this order). All parties to this action shall be provided at least five (5) business days notice of the hearing on such a motion. In limitation of the preceding sentence, if the Receiver, in the Receiver's reasonable discretion, determines that: (a) there is a material and immediate risk of impairment to the health or safety of any person (including but not limited to a resident of the Orchards Village facility), or of immediate, serious, material and irreparable harm to property of the Receivership Estate; and (b) a reasonably prudent response to such risk requires that the Receiver obtain funds in less than five (5) days, then the Receiver shall be authorized to apply to the Lender for such amount of funds as the Receiver reasonably determines to be appropriate and the Lender shall be authorized to advance such amount, without regard to the $25,000 limitation set out above, without notice or a hearing by the Court.

17.   All funds borrowed by the Receiver from the Lender shall be deemed to be borrowings by OVI. The Receiver may execute and issue in favor of the Lender promissory notes or other instruments evidencing the indebtedness with respect to all sums borrowed by the

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 10

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 ● Fax: 206-587-2308*

Receiver from the Lender on behalf of OVI. All sums advanced by the Lender to the Receiver pursuant to paragraphs 15 and 16 of this order, together with interest thereon at the non-default contract rate, shall be secured by the Lender's existing lien and security interest in the assets of the Receivership Defendants, and otherwise shall constitute a first lien against such assets.

18.    The Receiver may not sell all or any portion of the assets of the Receivership Defendants outside of the ordinary course of business without (a) prior entry of a Procedures Order and (b) the Court's approval of such sale, after notice and a hearing, in accordance with RCW 7.60.260. Such notice shall include a description of the assets proposed to be sold, the price offered, and the proposed time of closing of the sale. At 1:30 p.m. on September 19, 2008, this Court shall hold a hearing to consider the terms of a Procedures Order, if proposed, setting out procedures (including but not limited to notice requirements) which shall apply in the event of a sale of all or any portion of the assets of the Receivership, as set out in this paragraph. If there is a hearing, Plaintiff shall send five (5) days advance notice of such hearing to approve a proposed Procedures Order to all parties in this case.

19.    The Receiver promptly shall deposit all proceeds resulting from the sale, collection, or other disposition of any assets of the Receivership Defendants in which the Lender has or claims to have a lien or security interest into an account maintained by the Receiver on behalf of the Receivership Defendants at the Lender or another bank acceptable to the Lender in its sole discretion.

20.    The Receiver may distribute to the Lender as soon as reasonably practicable all surplus cash, as well as proceeds resulting from the sale or other disposition of assets of the Receivership Defendants in which the Lender has a security interest or lien, after such notice and hearing as may be required by the Court and RCW Chapter 7.60.

21.    Any motion by the Receiver for court approval of any act of the Receiver requiring court approval shall be served on the Lender and each other person who has filed and served on the Receiver a written notice of appearance.

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 11

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 ● Fax: 206-587-2308*

22.    Nothing in this order operates to determine the status of the Lender as a secured creditor of the Receivership Defendants, other than as a holder of a valid and perfected holder of a first position security interest in the collateral described in the Deed of Trust, Assignment of Rents and Lease(s), and Collateral Assignment of Management Agreement, and nothing in this order operates to modify, alter, or limit any right or remedy available to the Lender.

23.    The Receiver or the Lender at any time may apply to the Court for further or other instructions, for a modification of this order, for further powers necessary to enable the Receiver properly to perform its duties, for a termination of the Receiver's appointment as receiver for the Receivership Defendants and its assets, or for other relief.

24.    The automatic stay of RCW 7.60.110 shall be in effect upon entry of this order except as to the Lender, including without limitation the continuance of the above-captioned action. Nothing herein shall preclude any party from asserting claims in this proceeding, provided that adjudication of such claims shall be subject to any agreements executed by or affecting any party, including but not limited to any subordination agreements. All defenses to such claims are reserved and unaffected by this paragraph.

DATED this ___ day of August, 2008.

_Robert Alarro_
Judge

Presented By:

CAIRNCROSS & HEMPELMANN, P.S.

_John R. Rizzardi_
John R. Rizzardi, WSBA No. 9388
John R. Knapp, Jr., WSBA No. 29343

Attorneys for Plaintiff Bank of Wyoming

{00739172.DOC;4}
ORDER APPOINTING GENERAL RECEIVER - 12

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**COPY**
ORIGINAL FILED

AUG 28 2008

Sherry W. Parker, Clerk, Clark Co.

1
2
3
4

SUPERIOR COURT OF WASHINGTON

5

COUNTY OF CLARK

6

7  BANK OF WYOMING, a Wyoming state-
   chartered bank,
8
                                                    NO.  08-2-04250-6
9                       Plaintiff,
                                                    NOTICE OF GRANTING OF PROVISIONAL
                                                    LICENSE TO REGENCY PACIFIC, INC. BY
10     v.                                           THE WASHINGTON DEPARTMENT OF
                                                    SOCIAL AND HEALTH SERVICES
11 ORCHARDS VILLAGE INVESTMENTS,
   LLC, an Oregon limited liability company;
12 ORCHARDS VILLAGE PROPERTIES, LLC,
   an Oregon limited liability company;
13 FARMINGTON CENTERS, INC., an Oregon
   corporation; HENRY'S ORCHARDS
14 VILLAGE, LLC, a Washington limited liability
   company; SUGARMAN'S ORCHARD, LLC,
15 an Oregon limited liability company;
   CARBURTON PROPERTIES 8, LLC, a
16 Delaware limited liability company; JACK
   BURGESS and TERESA BURGESS, CO-
17 TRUSTEES OF THE BURGESS FAMILY
   TRUST DATED 7/31/1992, an Oregon trust;
18 JEFFREY L. CHAMBERLAIN, an individual;
   DONNA J. CHAMBERLAIN, an individual;
19 THEADORE J. CHAMBERLAIN, an
   individual; FAYE M. CHAMBERLAIN, an
20 individual; ZALTA III, LLC, an Oregon limited
   liability company; PINNACLE BANK OF
21 OREGON, an Oregon state-chartered bank; and
   CLARK COUNTY, a political subdivision of
22 the State of Washington,
23
                       Defendants.
24

25

26

{00877380.DOC;1}
NOTICE OF GRANTING OF PROVISIONAL
LICENSE TO REGENCY PACIFIC INC.- 1

**FILE COPY**

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit E**
**Page 1 of 2**

Comes now the Washington State Department of Social and Health Services ("DSHS"), by and through its attorneys, Robert M. McKenna, Attorney General, and Donna Turner Cobb and Angela D. Coats, Assistant Attorneys General, and, pursuant to Paragraph 1 of the Order Appointing General Receiver entered by this Court dated August 22, 2008, provides this Notice that DSHS has now issued a provisional license to Regency Pacific, Inc. as of this 28 day of August, 2008, thus invoking the Receivership for Orchards Village Properties, LLC ("OVP").

Dated this 28 day of August, 2008

ROBERT M. MCKENNA
Attorney General


Angela D. Coats, WSBA No. 35547
Donna Turner Cobb, WSBA No. 11201
Assistant Attorney General

Attorneys for Department of Social and Health Services

{00877380.DOC;1}
NOTICE OF GRANTING OF PROVISIONAL
LICENSE TO REGENCY PACIFIC INC.- 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

**Exhibit E**
**Page 2 of 2**