Below is an Opinion of the Court.

_Randall L. Dunn_
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re:                              )  Bankruptcy Case
                                    )  No. 09-30893-rld11
ORCHARDS VILLAGE INVESTMENTS, LLC   )
                                    )  MEMORANDUM OPINION
                        Debtor.     )

On April 6, 2009, I heard evidence and argument at the final evidentiary hearing ("Hearing") on Pivotal Solutions, Inc.'s ("Receiver") Motion to Dismiss Bankruptcy Case, or in the Alternative, to Excuse Compliance with 11 U.S.C. § 543[1] ("Motion to Dismiss"), in which the Bank of Wyoming ("Bank") joined. At the Hearing, I also heard evidence and argument on the debtor Orchards Village Investments, LLC's ("Debtor") Motion for Interim Authority to Use Cash Collateral ("Cash Collateral Motion"). The Debtor, joined by the Burgess Family Trust, Henry's Orchards Village, LLC, and Sugarman's Orchard, LLC (collectively, the "TIC Investors"), opposed the Motion to Dismiss. The Receiver and the

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure ("FRBP"), Rules 1001-9037.

Page 1 - MEMORANDUM OPINION

Bank opposed the Cash Collateral Motion. Following the completion of witness testimony, I closed the record.

Having carefully considered the parties' arguments in light of the evidentiary record from the Hearing and relevant legal authorities, this Memorandum Opinion sets forth the court's findings of fact and conclusions of law under FRCP 52(a), applicable with respect to these contested matters under FRBP 9014 and 7052.

## Factual Background

Orchards Village is a senior living community, located in Clark County, Washington. Orchards Village provides independent living, assisted living and memory care services to its residents. Orchards Village has approximately 80 elderly residents, living in a combination of independent living, assisted living and memory care units.

Orchards Village is owned as follows:

| Owner | Real Property Percentage Owned as Tenants in Common | Building/ Improvements Percentage Owned |
|---|---|---|
| Debtor | 23.51% | 72.51% |
| Henry's Orchards Village, LLC | 20.36% | 0.00% |
| Sugarman's Orchard, LLC | 28.64% | 0.00% |
| Carburton Properties 8, LLC | 17.87% | 17.87% |
| Burgess Family Trust | 9.62% | 9.62% |
| TOTALS | 100.00% | 100.00% |

The Debtor entered into a Construction Loan Agreement, Promissory Note, and Construction and Permanent Deed of Trust and Security Agreement and Fixture Filing, for the funding of construction of Orchards Village on or about September 28, 2005 with First State Bank of Thermopolis, the Bank's predecessor in interest. The original amount of the loan financing ("Loan") was $11,550,000. Thereafter, Orchards

Page 2 – MEMORANDUM OPINION

1  Village was duly constructed, and all parties agree that it is an
2  excellent, generally well-maintained facility of its type.

3      The Debtor leased its interest in the real property and
4  improvements to Orchards Village Properties, LLC ("OVP"), pursuant to a
5  Commercial Lease (the "Lease") dated June 1, 2005, with an original term
6  of 15 years.  The Receiver has not rejected the Lease.  OVP's agent for
7  management of Orchards Village under the Lease was Farmington Centers,
8  Inc. ("Farmington"), under a Management Agreement ("Management
9  Agreement").

10      The Debtor ultimately was unable to pay its Loan obligations to
11  the Bank.  On February 8 and March 21, 2008, counsel for the Bank sent
12  notices of default to the Debtor, advising of the following Loan
13  defaults: 1) failure to make the January 20 and February 20, 2008 Loan
14  installment payments; 2) failure to pay real property taxes, interest and
15  penalties for the 2007 tax year totaling $106,840; and 3) failure to pay
16  LRS Architects, resulting in a mechanics lien being placed on the
17  Orchards Village property and a lien foreclosure action being commenced.
18  Significantly, during the period of the Debtor's default of its Loan
19  obligations to the Bank, Farmington continued to make distributions to
20  some of the Debtor's equity investors.  Debtor's Loan defaults are on-
21  going and uncured.

22      On July 10, 2008, in light of the Debtor's Loan defaults, the
23  Bank sent a Notice of Acceleration to the Debtor, Farmington and
24  guarantors of the Loan.  On July 11, 2008, the Bank filed a Complaint in
25  the Clark County, Washington Superior Court ("Washington Superior Court")
26  against the Debtor, OVP, Farmington, the TIC Investors and others

Page 3 - MEMORANDUM OPINION

requesting the following relief: 1) foreclosure of the Bank's security interests in the Orchards Village real and personal property and the Management Agreement; 2) money damages for breach of the Loan agreements; 3) appointment of a receiver; and 4) an accounting.

On July 31, 2008, the Bank moved for an order appointing a general receiver for the Debtor, OVP and the TIC Investors. The Receiver was proposed as general receiver because of its extensive experience serving as a receiver for many types of properties and businesses, including its experience as a receiver for assisted living communities. On August 22, 2008, the Washington Superior Court entered its Order Appointing General Receiver ("Appointment Order"), appointing the Receiver as general receiver for the Debtor, OVP, the TIC Investors and Carburton Properties 8, LLC ("Carburton") and their respective assets and business operations.

Upon its appointment as general receiver under the Appointment Order, the Receiver negotiated and entered into an Occupancy and Services Agreement with Regency Pacific, Inc. ("Regency"). When the Occupancy and Services Agreement was entered into, OVP relinquished its license to operate Orchards Village, and the Washington Department of Social and Health Services ("DSHS") issued a provisional license to Regency to operate Orchards Village.

Since that time, Regency has been operating Orchards Village under the supervision of the Receiver. By all accounts, the operations of Orchards Village by Regency under the supervision of the Receiver have improved materially over operations by Farmington under the Management Agreement. Since the Receiver took over management of Orchards Village,

Page 4 - MEMORANDUM OPINION

there is a registered nurse full-time at the facility; the food service has improved, with increased options for Orchards Village residents; and there are a full-time activity director and bus driver at the facility. In addition, occupancy at Orchards Village has increased as a result of increased marketing efforts by the Receiver.

Under the Appointment Order, if income from operations is inadequate to fund Orchards Village operations fully, the Bank is required to lend any funds required to cover the shortfall to the Receiver. During the first two months of Receiver operations, the Bank advanced a total of $91,935.26 to cover costs of Orchards Village operations. No further such loans have been required, and $75,000 was repaid to the Bank by the Receiver in February 2009.

The Receiver has initiated efforts to sell Orchards Village, and the equity investors in Orchards Village became concerned that a sale would be approved in the receievership that would pay secured debt in full but leave a shortfall to unsecured creditors and pay nothing to equity holders. These concerns culminated in the Debtor's chapter 11 bankruptcy filing on February 13, 2009. The Receiver filed the Motion to Dismiss on February 17, 2009, and the Debtor filed the Cash Collateral Motion later on the same day. I scheduled the Hearing at a preliminary hearing on February 20, 2009.

<u>Jurisdiction</u>

I have core jurisdiction to decide the Motion to Dismiss and the Cash Collateral Motion under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (E) and (M).

Page 5 - MEMORANDUM OPINION

## Issues

1) Did the Appointment Order preclude the Debtor's Manager and members from filing for bankruptcy protection?

2) Was the filing of Debtor's chapter 11 petition by the Debtor's Manager properly authorized by the Debtor's members?

3) Even if the Debtor's bankruptcy filing was authorized, and the Debtor's chapter 11 case continues, should the Receiver remain in place and not be required to turn over the management and operation of Orchards Village to the Debtor?

4) Should the Debtor be authorized to use the Bank's cash collateral?

## Discussion

The Receiver and the Bank primarily seek dismissal of the Debtor's chapter 11 case under § 305(a), which provides in relevant part that a bankruptcy court, "after notice and a hearing, may dismiss a case under this title...if--(1) the interests of creditors and the debtor would be better served by such dismissal...." Alternatively, the Receiver and the Bank seek dismissal of the Debtor's chapter 11 case for "cause" under § 1112(b).

The Receiver and the Bank assert that the Debtor's chapter 11 filing was not properly authorized and argue two grounds that I will discuss in turn.

a) <u>The Debtor's chapter 11 filing was not precluded by the Appointment Order</u>.

The Receiver argues that its broad authority to manage the affairs and operations of the Debtor under the terms of the Appointment Order preclude the Debtor's Manager and members from initiating a

Page 6 - MEMORANDUM OPINION

bankruptcy filing without the Receiver's consent, which was not given.

The Appointment Order provides in relevant part that:

> 3.  The Receivership Defendants and their members, managers, partners, officers, agents, employees, representatives, trustees, beneficiaries, and attorneys are hereby prohibited from:
>
> (a)  Interfering with the Receiver, directly or indirectly, in the management and operation of the Receivership Defendants' assets and operations, or otherwise directly or indirectly taking any actions or causing any such action to be taken which would dissipate the assets or negatively affect the operations of the Receivership Defendants;
>
> (b)  Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, or otherwise disposing of the whole or any part of the Receivership Defendants' assets and the proceeds thereof; and
>
> (c)  Doing any act which will, or which will tend to, directly or indirectly, impair, defeat, prevent, or prejudice the preservation of the Receivership Defendants' assets and operations.
>
> . . .
>
> 7.  Unless and until otherwise ordered by the Court, the Receiver shall be a general receiver with exclusive possession and control over the assets and the business of the Receivership Defendants with the power, authority, and duty to preserve, protect, and liquidate such assets during the pendency of this case.  This authority includes, without limitation, the following:
>
> (a)  the authority to sell all of the real and personal property of the Receivership Defendants;
>
> (b)  the authority to incur and pay when due all expenses incurred by the Receivership Defendants in the ordinary course of business, to the extent they accrue after the Receiver's appointment;
>
> (c)  the authority to pay any and all other expenses, regardless of when the debt was incurred, that the Receiver determines in good faith are necessary or beneficial to the operation or winding down of the Receivership Defendants' business operations and the liquidation of the Receivership Defendants' assets.
>
> The Receiver shall have exclusive possession and control over all assets of the Receivership Defendants (subject to the rights of secured creditors, including

Page 7 - MEMORANDUM OPINION

the [Bank]), with the power and authority to preserve, protect, and liquidate those assets and to distribute the proceeds thereof to the party or parties legally entitled thereto.
                                                    . . .
9.  The Receiver hereby is vested with all powers afforded a receiver under the laws of the State of Washington. . . .

(emphasis added).

As noted by the Receiver, state law generally determines who has authority to file a bankruptcy petition.  Price v. Gurney, 324 U.S. 100, 106-07 (1944); In re Monterey Equities-Hillside, 73 B.R. 749, 752 (Bankr. N.D. Cal. 1987).  However, that general principle simply recognizes the reality that "entities," other than "individuals," who may be "debtors" for purposes of §§ 101(15), 101(41) and 109, including corporations, limited liability companies, partnerships and trusts, are creatures of state rather than federal law, and their governance structures are determined under state law.  For example, in Price, the issue was who had authority to file for bankruptcy relief in behalf of a corporation.  Price v. Gurney, 324 U.S. at 106-07.

The larger issue is whether the Bank's invocation of remedies under Washington's receivership law precludes the Debtor from pursuing relief under the federal Bankruptcy Code.  Article I, § 8, Cl. 4 of the Constitution provides that Congress has the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States."  The impetus behind adoption of the Bankruptcy Clause in the Constitution apparently was to remedy injustices arising from nonuniform insolvency laws among the states.  "Foremost on the minds of those who adopted the Clause were the intractable problems, not to mention the injustice,

Page 8 - MEMORANDUM OPINION

created by one State's imprisoning of debtors who had been discharged (from prison and of their debts) in and by another State." *Central Va. Community College v. Katz*, 546 U.S. 356, 363 (2006). When Congress exercises its constitutional authority to adopt bankruptcy laws, "it preempts and supersedes all state bankruptcy and insolvency laws and other state law remedies that might interfere with the uniform federal bankruptcy system." *In re Corporate and Leisure Event Productions, Inc.*, 351 B.R. 724, 728 (Bankr. D. Ariz. 2006), citing *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122 (1819).

As noted by the bankruptcy court during the course of an in-depth historical analysis in *In re Corporate and Leisure Event Productions, Inc.*, "in the Bankruptcy Act of 1867,...Congress...amended the Judiciary Act of 1793 to expressly permit federal district courts sitting in bankruptcy to stay proceedings in state courts." 351 B.R. at 729. In *Struthers Furnace Co. v. Grant*, 30 F.2d 576, 577 (6th Cir. 1929), the Sixth Circuit interpreted that grant of authority to conclude that state court receivership orders cannot preclude debtors from seeking relief in bankruptcy, even though the debtor in *Struthers Furnace Co.* had consented to the receivership that had been pending for more than two years, and the state court had "issued the usual injunction against interference." Also *see, e.g., Merritt v. Mt. Forest Fur Farms of Am., Inc.*, 103 F.2d 69, 71 (6th Cir. 1939); *In re Klein's Outlet, Inc.*, 50 F. Supp. 557, 559 (S.D.N.Y. 1942) ("The appointment by a state court of a permanent receiver with full power to act for the corporation does not affect the right of directors to act on behalf of the corporation in federal bankruptcy proceedings.").

Page 9 – MEMORANDUM OPINION

This "common law" interpretation was incorporated by statute by Congress "when the Chandler Act of 1938 made explicit [in § 2a(21) of the Bankruptcy Act of 1939] that a bankruptcy case would ordinarily supersede a state receivership and that a state receiver would ordinarily be required to turn over the estate assets to a debtor in possession or trustee." In re Corporate and Leisure Event Productions, Inc., 351 B.R. at 732. The successor provision in the Bankruptcy Code, § 543, generally requires that a state court receiver "shall...deliver to the trustee [or debtor-in-possession] any property of the debtor held by or transferred to" such receiver. § 543(b)(1).

In In re Corporate and Leisure Event Productions, Inc., the bankruptcy court denied the state court receiver's motion to dismiss, based on the alleged lack of authority of the corporation's principals to file a bankruptcy petition in its behalf, in spite of the provisions of the receivership order that 1) authorized the receiver to remove "any director, officer, independent contractor, employee or agent of any of the Receivership Defendants, from control, management of, or participation in, the affairs of the Receivership Defendants;" 2) enjoined the Receivership Defendants from acting to interfere with the receiver's custody and management of receivership assets; and 3) further specifically enjoined them from filing "any petition on behalf of the Receivership Defendants for relief under the United States Bankruptcy Code...without prior permission from" the state court. Id. at 726-27. However, while denying the receiver's "first motion to dismiss," the bankruptcy court made clear that its ruling was without prejudice to its consideration of the receiver's further motion to dismiss based on "bad

faith" grounds, the receiver's motion to abstain or suspend, and the competing motions for turnover and to excuse turnover of the debtor's assets. Id. at 727 n.6 and 733.

In support of their argument, the Receiver and the Bank rely primarily on Oil & Gas Co. v. Duryee, 9 F.3d 771 (9th Cir. 1993), and there is some support for their argument in the Ninth Circuit's opinion in Duryee.

> [T]he state court order appointing Fabe as Oil & Gas's rehabilitator said "[t]he Rehabilitator shall have all the powers of the directors, officers, and managers of Defendant, whose authorities are hereby suspended." Order Appointing Rehabilitator, ER 8, exh. 1.
> The only person, then, who could go to court on behalf of Oil & Gas was Fabe. And he not only failed to authorize these actions; he opposed them. Therefore, when Becker-Jones [the former president of Oil & Gas] purported to file the bankruptcy petition on behalf of Oil & Gas, he was an impostor; his action was null and void....We therefore remand to the district court for dismissal of the petition as fraudulently filed.

Id. at 773.

However, Duryee is not dispositive and is distinguishable from the case before me for three reasons: First, as a substantive matter, the debtor in Duryee was an insurance company and was not eligible for bankruptcy relief under § 109(b)(2). The Ninth Circuit agreed with this conclusion of the bankruptcy court at the trial level and the district court on appeal. Id.

Second, the debtor's bankruptcy petition was filed by its "former president." Id. at 772. Nothing in the Duryee decision gives any indication as to what authority the debtor's "former president" would have to file a bankruptcy petition in behalf of the debtor corporation,

Page 11 - MEMORANDUM OPINION

whether or not there was a receiver or "rehabilitator" in the picture.

Finally, the appellant in <u>Duryee</u> never even addressed the authority issue in order to make an adequate record at any level:

> [O]ur mysterious appellant tried to sweep the issue under the rug. Fabe raised the lack of authority issue in his motion for a temporary restraining order in Ohio state court, Tr. exh. 3 at 3, but there was no response. Fabe again raised the issue in his motions to dismiss the bankruptcy petition, Tr. exh. 8 at 24, and the appeal to the district court; still no response. Finally, the State of Illinois briefed the issue for this court, but the mystery appellant did not file a reply brief, and when questioned at oral argument [counsel] offered no legal basis for his client's authority to act on behalf of Oil & Gas.

<u>Id.</u> at 773. In that vacuum, the Ninth Circuit determined that the debtor's bankruptcy petition was filed "fraudulently" and remanded the case for imposition of sanctions. <u>See also</u> <u>Chitex Communication, Inc. v. Kramer</u>, 168 B.R. 587, 589-91 (S.D. Tex. 1994) (In the context of an apparently difficult divorce proceeding, the district court affirmed the bankruptcy court's decision to abstain and dismiss a chapter 11 bankruptcy case filed in behalf of the debtor corporation by the husband/president/managing co-owner on two grounds: lack of authority to file and lack of good faith.); <u>In re Crescent Capital Partners, L.P.</u>, Bankruptcy Court for the Central District of California case no. SA05-14215JR (Unpublished Aug.26, 2005) (In an apparent battle between the two 50% members of the limited liability company general partner in a limited partnership, the bankruptcy court, considering state law to be controlling, granted a motion to dismiss a chapter 11 case filed in behalf of the limited partnership as not authorized in light of the breadth of the Order Appointing Receiver.).

Page 12 - MEMORANDUM OPINION

1        Considering the cited authorities in light of the general
turnover and accounting requirements for "custodians" in § 543, including
receivers pursuant to § 101(11)(A), I agree with the bankruptcy court's
analysis in <u>In re Corporate and Leisure Event Productions, Inc.</u> and
conclude that a state court receivership proceeding cannot be used to
preclude a debtor from seeking federal bankruptcy protection, in spite of
the broad authority granted to receivers in their appointment orders,
such as the Appointment Order in this case.  Allowing terms dictated in a
state receivership or insolvency proceeding to determine the availability
of federal bankruptcy relief is fundamentally inconsistent with the
constitutional grant to Congress of the right to enact uniform laws on
the subject of bankruptcy.  Accordingly, I reject the argument of the
Receiver and the Bank that the Debtor's bankruptcy filing must be
dismissed because the Debtor's Manager and members had no authority to
file in light of the broad grant of authority to the Receiver under the
terms of the Appointment Order.

b)  <u>As a matter of limited liability company law, the Debtor's bankruptcy
filing was authorized under the forgiving standards of the Debtor's
Operating Agreement</u>.

        The Debtor is an Oregon limited liability company ("LLC").  As
I noted in <u>In re Avalon Hotel Partners, LLC</u>, 302 B.R. 377, 380 (Bankr. D.
Or. 2003):

> LLCs are hybrid business entities, with attributes
> both of corporations and partnerships.  They provide
> their equity holders or "members" with the liability
> shield of corporations while giving them the benefit
> of partnership tax treatment.  (citation omitted).
> Oregon LLCs are governed by the provisions of Oregon
> Revised Statutes ("ORS") Chapter 63 and by the terms
> of their organizational documents, their Articles of
> Organization and Operating Agreements.

Page 13 - MEMORANDUM OPINION

1    ORS § 63.130(4)(f) provides:

2        Unless otherwise provided in the articles of
3        organization or any operating agreement, the following
         matters of a member-managed or a manager-managed
         limited liability company require the consent of a
4        majority of the members:...(f) The conversion of the
         limited liability company into any other type of
5        entity.

6    In the Avalon case, I concluded that the filing of a chapter 11 petition

7    converted an LLC into another type of entity--a debtor-in-possession,

8    bearing the fiduciary duties of a trustee in bankruptcy under § 1107(a).

9    302 B.R. at 380-81.  Accordingly, an LLC decision to file a chapter 11

10   bankruptcy petition requires the consent of a majority of the LLC's

11   members under Oregon law.

12       The Debtor is a manager-managed LLC.  However, consistent with

13   the requirement of ORS § 63.130(4)(f), Section 4.10(4) of the Debtor's

14   Operating Agreement provides:

15       Each Manager shall not have the authority to, and
         covenants and agrees that it shall not, do any of the
16       following acts without the consent of a Majority of
         the Ownership Units:...(4) Cause the LLC to
17       voluntarily take any action that would cause
         Bankruptcy of the LLC....
18
     Exhibit 142, at p. 11.
19

20       The Debtor's chapter 11 petition was signed by Mr. Jeffrey

21   Chamberlain, Farmington's President, as Manager.  Exhibit 159, at p. 3.

22   However, under Oregon law and the Debtor's Operating Agreement, he had no

23   authority to file a bankruptcy petition in the Debtor's behalf without

24   the consent of a majority of the Debtor's member ownership interests.

25       The record reflects that members of the Debtor met on a number

26   of occasions in October and November 2008 to discuss options for Orchards

Page 14 - MEMORANDUM OPINION

Village, including the possibility of a chapter 11 filing.  <u>See</u> Exhibits 144-49.  No contemporaneous documentation approving Mr. Chamberlain's signing and filing the Debtor's chapter 11 petition on February 13, 2009 has been provided.  However, consent resolutions ("Consent Resolutions"), purportedly signed in behalf of 78.76% of the Debtor's members during March 2009, have been submitted ratifying the actions of Mr. Chamberlain as Manager in signing and filing the Debtor's chapter 11 petition, effective November 20, 2008.  <u>See</u> Exhibit 200.

There is nothing in ORS Chapter 63 that precludes the members of an LLC from approving actions by consent resolution, whether executed before the subject action or ratifying the subject action after the fact, as apparently occurred in this case.  I confirmed the effectiveness of such after-the-fact consent resolutions to approve a chapter 11 filing in the <u>Avalon</u> decision.  302 B.R. at 381.

The Bank and the Receiver question whether the Consent Resolutions in fact were approved by a majority of the Debtor's ownership units.[2]  Neither the Debtor's LLC counsel, Mr. James Oberholtzer, in his testimony nor Debtor's chapter 11 counsel in argument could explain the

_____

[2] The Bank's standing as a creditor to argue that the Debtor has not met LLC governance requirements for approval of the Debtor's bankruptcy filing, that were not designed to protect creditor interests, is questionable.  However, the Receiver stands on a different footing.  Under Washington law, the Receiver is an officer of the court, "acting under its direction for the benefit of all parties in interest."  <u>State ex rel. Ewing v. Morris</u>, 120 Wash. 146, 153, 207 P. 18 (Wash. 1922) (internal statutory citation omitted).  <u>See</u> <u>Gloyd v. Rutherford</u>, 62 Wash. 2d 59, 60-61 (Wash. 1963) (internal citations omitted).  The Receiver accordingly acts for the benefit of equity as well as creditor interests and has standing to raise the question of the appropriate exercise of LLC authority in this case.

Page 15 - MEMORANDUM OPINION

inconsistencies with respect to the Debtor's member ownership records reflected in the exhibits admitted at the Hearing.  Compare Exhibits 201; 151; 159, at p. 8; and 160, at p. 6.  However, Mr. Oberholtzer testified that as of the effective date of the Consent Resolutions, Exhibit 201 accurately reflects who the Debtor's members are and their respective units owned.  Comparing that record with the numbers of units owned and their respective ownership percentages, as specified in the Consent Resolutions (see Exhibit 200), even though the unit ownership numbers specified in the Consent Resolutions do not coincide entirely with the unit ownership numbers set forth in Exhibit 201, I conclude that the Consent Resolutions were approved by a majority of the Debtor's ownership units.  I further note that no member of the Debtor joined in the Motion to Dismiss.  Under the forgiving standard for approval by the Debtor's members of a bankruptcy filing by the Debtor, and in spite of the obviously sloppy LLC record keeping by the Debtor (which I will address in another context infra), I find that the Debtor's chapter 11 filing was properly authorized as a matter of LLC law by the Debtor's members.

c) Dismissal is not appropriate at this time, but neither is turnover.

As noted above, the Receiver and the Bank are requesting that I abstain and dismiss this case pursuant to § 305(a).  They also seek dismissal for "cause" under § 1112(b), although they do not focus on any of the specific "causes" identified in § 1112(b)(4).

Dismissal pursuant to § 305(a) is an extraordinary remedy, in part because it is generally not appealable beyond the level of the District Court or, in the Ninth Circuit, the Bankruptcy Appellate Panel. § 305(c); In re Eastman, 188 B.R. 621, 624 (9th Cir. BAP 1995).  Courts

Page 16 - MEMORANDUM OPINION

have suggested a number of factors that appropriately should be considered in evaluating whether to abstain and dismiss a bankruptcy case.

> Such factors generally include: (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

In re Fax Station, Inc., 118 B.R. 176, 177 (Bankr. D.R.I. 1990). However, ultimately, "dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that <u>both</u> 'creditors and the debtor' would be 'better served' by a dismissal." In re Eastman, 188 B.R. at 624 (emphasis added) (citations omitted). See 2 Collier on Bankruptcy ¶¶ 305.01 and 305.02 (15th ed. rev. 2009).

Focusing on economy of administration, the Receiver and the Bank note that the receivership has been in place since August 2008, and the Washington receivership statutes provide a mechanism for the equitable distribution of Orchards Village assets outside of bankruptcy. If the Debtor's chapter 11 case continues, the administration of the Debtor's affairs will be in the hands of two courts, necessarily entailing some duplication of work and increased expenses of administration. Regency has improved operations and occupancy at

Page 17 - MEMORANDUM OPINION

Orchards Village under the supervision of the Receiver, and the Receiver and the Bank are concerned that the Debtor's bankruptcy filing could destabilize operations at Orchards Village and upset residents and staff.

The Receiver has expressed the belief that the Debtor's chapter 11 filing was strategically designed "to slow down the Receiver's efforts to liquidate the assets, which the Receiver is required to do" under the Appointment Order. Memorandum of Law in Support of the Motion to Dismiss, at p. 11. That belief is supported by the record. See Exhibit 144, at p. 1:

> The receiver advises us that it intends to solicit bids for an auction type sale. The receiver will likely hire an independent consultant to establish a minimum sales price for the facility. Preliminary estimates are that the receiver may sell the facility for as low as $14.5 million. A[] sale at this price would pay the secured debt but leave nothing for the unsecured debt or the owners.

The Debtor's concerns about recoveries for unsecured creditors and equity holders in a "quick sale" scenario are underlined in a letter dated February 6, 2009 from the Receiver to the Bank:

> Originally it was our intention to have our auction completed about this time and closing moving forward. However, as we have discussed the markets for new loans collapsed in September and October of last year. That collapse created a delay since the potential buyers and potential stalking horse candidates all reported the lenders were just not making any new loan commitments, or the loan commitments were so restrictive as to make a new purchase unreasonable. Things have loosened up a great deal and it now appears we have some progress.

Exhibit 215, at p. 1. Despite the note of optimism in the last sentence quoted above, Mr. Richard Hooper, the President of the Receiver, testified at the Hearing that he has refused offers to sell Orchards

Page 18 - MEMORANDUM OPINION

Village for the amount of total secured debt or less and is looking forward to the appointment of a broker in the receivership who could bring in 15-20 additional parties that might be interested in buying the facility or investing in Orchards Village. He mentioned nothing about any viable offers to purchase Orchards Village for any amount in excess of secured debt.

Although the Debtor has asserted a value for the Orchards Village real and personal property in its amended Schedules A and B that projects to be in excess of $21,500,000 (see Exhibit 204, at pp. 1, 4), Mr. James Guffee, Farmington's vice president for asset management, testified at the Hearing that Farmington's current efforts to find investors and/or buyers for Orchards Village have produced no buyer interest at a level higher than the total of secured debt or below.

In these circumstances, while a relatively rapid sale in the receivership may benefit secured creditors, from the record before me, it appears that such a sale would leave unsecured creditors with a shortfall and equity holders with nothing. What the Debtor wants through the chapter 11 process is the opportunity to propose a plan, on a timetable less rapid than a receivership sale, with potentially three components: 1) possible sale of Orchards Village; 2) possibly obtaining take-out financing to satisfy all secured claims against Orchards Village; and/or 3) a reorganization of Orchards Village affairs that provides for satisfaction or payment over time of all Orchards Village claims, including residents' entrance fee deposits.

Based on the record of management of Orchards Village by Farmington under the Management Agreement and OVP Lease prior to the

Page 19 - MEMORANDUM OPINION

receivership, I find the prospects for a reorganization along the lines
of item 3 above dubious, but in light of the sale and financing situation
reflected in the Receiver's own analysis, as discussed above, I conclude
that it is in the best interests of the Debtor to give the Debtor an
opportunity to propose and attempt to confirm a plan in chapter 11.
Accordingly, I will deny the Motion to Dismiss under § 305(a) as not in
the interests of creditors and the Debtor, and I do not find "cause" to
dismiss under § 1112(b) at this time.

That does not mean, however, that I am prepared to require
"turnover" of the Orchards Village assets and business to the Debtor as a
debtor-in-possession under § 543(a), (b) and (c). Section 543(d)(1)
provides that turnover compliance may be excused "if the interests of
creditors and, if the debtor is not insolvent, of equity security holders
would be better served by permitting a custodian [the Receiver in this
case] to continue in possession, custody, or control of such property. .
. ."

Reorganization policy generally favors turnover of business
assets to the debtor in a chapter 11 case.  See 5 Collier on Bankruptcy ¶
543.05 (15th ed. rev. 2009).  If turnover is opposed, courts consider a
number of factors in determining whether to order turnover, including
"(1) whether there will be sufficient income to fund a successful
reorganization; (2) whether the debtor will use the property for the
benefit of its creditors; and (3) whether there has been mismanagement by
the debtor."  Id. at 543-12.  See, e.g., Dill v. Dime Savings Bank, FSB
(In re Dill), 163 B.R. 221, 225 (E.D.N.Y. 1994), and cases cited therein.

In this case, considering any of those three factors in light

of the evidentiary record of the Hearing, requiring turnover of the assets and business operations of Orchards Village by the Receiver to the Debtor is not appropriate. As to the availability of income to fund a reorganization, the receivership action was precipitated by the Debtor's failure to make payments on the Loan, failure to pay property taxes and failure to pay the Orchards Village architects, who are owed over $100,000 (see Exhibit 162, at p. 10), resulting in a mechanics lien being placed on the Orchards Village property and a foreclosure action on that lien being initiated. None of these Loan defaults has been cured.

Uncontradicted evidence was presented that Orchards Village operations by Regency under the supervision of the Receiver have improved substantially over operation by Farmington prior to the receivership. Some of the improvements include 1) employment of a full-time registered nurse "on call," as opposed to contracting for registered nurse services through a staffing service; 2) employing two persons for marketing, as opposed to Farmington's use of a single person for phone solicitations and tours, who also performed maintenance and other services as needed; and 3) employment under the receivership of a full-time activity director and a full-time bus driver. This evidence tends to indicate that Orchards Village under Farmington management simply did not have adequate available revenue and working capital to run the facility as it should be run.

Under the terms of the Appointment Order, the Bank is obligated to advance funds to cover any shortfall in revenue from Orchards Village to pay operating expenses. In fact, the Bank has advanced over $91,000 during the receivership proceedings to fund Orchards Village operations.

Page 21 - MEMORANDUM OPINION

When asked at the beginning of the Hearing whether the Debtor would present any evidence of available financing for its operation of Orchards Village as a debtor-in-possession, Debtor's counsel advised the court that the Debtor had no such financing, and no such evidence in fact was presented.

The Debtor's own projections show Orchards Village operating at a loss for the rest of 2009 and well into 2010. <u>See</u> Exhibit 207, at p. 1.

Regarding whether the Debtor would run Orchards Village for the benefit of its creditors, the evidence tends to indicate that while the Debtor would like to see all creditors paid, the primary motivation for its chapter 11 filing is to protect the interests of equity holders. <u>See</u> Exhibits 144, at pp. 1-2; Exhibit 145, at p. 2.

Finally, the evidentiary record reflects mismanagement of Orchards Village prior to the receivership. First and foremost, during the period that the Debtor was in default of its Loan obligations to the Bank and was not paying other creditor obligations, including unpaid real property taxes that by the time of the Debtor's bankruptcy filing had accumulated to $299,009.38 (<u>see</u> Exhibit 162, at p. 10), Farmington continued to make payments equating to an 11% return to some equity investors that totaled over $74,000 during 2008. Mr. Chamberlain admitted during his testimony that continuing to make those payments was a "mistake." It certainly was not a reasonable exercise of business judgment where the Debtor was not paying its debts as they became due in the ordinary course of its business, as it obviously was not.

In addition, this case includes evidence of the regrettable

Page 22 - MEMORANDUM OPINION

tendency toward proliferation of "special purpose entities." Such entities have multiplied for several reasons: They provide expanded opportunities to attract additional individual investors or investor groups to invest in pieces of the action that would be more limited in unitary transactions, and they also provide a web of entity shields to protect individuals and assets from various liabilities. When handled in sophisticated fashion, they can prove very useful, but handled less artfully, they can create a mess. A case in point: Orchards Village residents entered into "Residence Agreements" in the form of Exhibit 23, pursuant to which they leased units at Orchards Village for a term that may continue "for the lifetime of the RESIDENT." See Exhibit 23, at p. 2. The residents in some cases made substantial up-front payments pursuant to these agreements: Eugene Rizzo testified that he paid $200,000 under his Residence Agreement. The residents rely on the party with which they contract to provide the services that they are paying for, possibly for the rest of their lives. The only catch here is the Residence Agreements that Farmington had residents sign identify the "OWNER" leasing the unit to the resident as "Orchards Village, LLC." See Exhibit 23, at p. 1. Orchards Village, LLC is not the Debtor; it is not OVP; and it is not Farmington, although Farmington purports to act as its agent. Id. Mr. Chamberlain testified that as far as he knew, Orchards Village, LLC, the lessor to residents at Orchards Village under the Residence Agreements, does not even exist!

        In addition, Mr. Hooper testified that the Receiver never was able to obtain all of the requested financial records from the pre-receivership management of Orchards Village, and as noted above, the

Page 23 - MEMORANDUM OPINION

Debtor cannot even keep its unit ownership records straight, during a period when there was no evidence presented that any ownership units in the Debtor were being bought and sold.

Mr. Chamberlain testified that the Debtor's bankruptcy filing was not intended to disrupt the progress made by Regency and the Receiver at Orchards Village, and his intent in behalf of the Debtor was to leave them in place. Concerns have been expressed by the Debtor as to the costs of the receivership, but a mechanism has been in place to object to the fees and costs of the Receiver and its professionals in Washington Superior Court each month during the receivership, and there was no evidence presented at the Hearing that any objection to the Receiver's fees and costs ever had been submitted to the Washington Superior Court.

The evidence submitted at the Hearing is more than ample to deny turnover of the assets and business operations of Orchards Village from the Receiver to the Debtor pursuant to § 543(d).

d) <u>The Debtor's Cash Collateral Motion will be denied</u>.

Under the Cash Collateral Motion, the Debtor requests interim approval of use of the Bank's cash collateral to maintain the Receiver and to pay for Regency's services in operating Orchards Village, while precluding use of cash collateral to pay the Receiver and its professionals for fees and costs generated by them in proceedings before this court. To provide adequate protection to the Bank, the Debtor proposes that the Bank receive a replacement lien on postpetition cash collateral. The Debtor does not propose any adequate protection to the second lien holder, the successor in interest to Pinnacle Bank, Clark County for delinquent real property taxes, or LSR Architects for its

Page 24 - MEMORANDUM OPINION

mechanics lien.  As previously noted, the Debtor did not present any evidence at the Hearing that it had any source of financing for its operations other than revenues from Orchards Village.  In addition, the Debtor's own projections reflect continuing losses from operations at Orchards Village through the end of 2009 and into 2010.

In the absence of a court order authorizing a debtor-in-possession to use a secured creditor's cash collateral, a debtor-in-possession may not use such cash collateral without the secured creditor's consent.  § 363(c)(2).  In this case, the Bank opposes the Debtor's use of its cash collateral.

As a threshold matter, the Bank argues that there is no "cash collateral" for the Debtor to use because the Debtor's only right to payments from operations of Orchards Village would be its right to receive rent under the Lease with OVP.  However, under Section 2.1 of the Lease, the obligation of OVP to pay rent to the Debtor is abated until Orchards Village achieves "Stabilization," under a formula set forth therein.  See Exhibit 118, at pp. 2-3.  All parties agree that Orchards Village to date has not achieved "Stabilization" for purposes of the Lease, and the Debtor's right to receive rent under the Lease continues abated.  Accordingly, the Debtor may be hoist on the petard of its OVP special purpose entity.

However, even if the Debtor could get around the problems inherent in the complicated ownership structure of Orchards Village, on the evidentiary record before me, the Debtor has not met its burden to establish that it can provide adequate protection for the use of secured creditors' cash collateral if I authorize such use.  See 3 Collier on

Page 25 - MEMORANDUM OPINION

Bankruptcy ¶ 363.03[4] at 363-33 (15th ed. rev. 2009). I will deny the Cash Collateral Motion, and consistent with my decision not to require turnover, I will leave the Receiver in place to manage the assets and operations of Orchards Village as authorized under the Appointment Order, subject to the Debtor's right to propose and seek confirmation of a plan in chapter 11.

I realize that this decision leaves the Debtor without a readily available source of funds to pay administrative expenses in its chapter 11 case. In effect, the equity owners of the Debtor will be required to "pay to play" in bankruptcy court, unless and until the Debtor can get a chapter 11 plan confirmed. I do not find this result inequitable because it leaves the Receiver and Regency in place to continue their effective management and operation of Orchards Village, and the record reflects that the Debtors' members have considered already the possibility that they might be required to contribute "a significant amount of new capital." See Exhibit 144, at p. 2; Exhibit 145, at p. 2.

## Conclusion

Based on the foregoing findings of fact and conclusions of law, I will deny the Motion to Dismiss to the extent that it requests dismissal of the Debtor's chapter 11 case, but I will not require the Receiver to turn over the assets and business operations of Orchards Village to the Debtor. I further will deny the Cash Collateral Motion. The court will enter an order consistent with this Memorandum Opinion. I will hold a case management conference for this case on May 7, 2009 at 9:00 a.m.

### 

Page 26 - MEMORANDUM OPINION

cc:     Teresa H. Pearson
        Anita G. Manishan
        Richard T. Anderson
        James K. Hein
        John R. Knapp
        Howard M. Levine
        U.S. Trustee

Page 27 - MEMORANDUM OPINION