Below is an Opinion of the Court.

*Randall L. Dunn*
_____
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re:                          ) Bankruptcy Case
                                ) No. 09-30893-rld11
ORCHARDS VILLAGE INVESTMENTS, LLC,  )
                                ) MEMORANDUM OPINION
                     Debtor.    )

The confirmation hearing ("Confirmation Hearing") in this chapter 11 case took place over two days, starting on December 9, 2009.[1] Originally, the Confirmation Hearing was scheduled to consider confirmation of three competing plans: the plan proposed by the debtor, Orchards Village Investments, LLC ("Debtor"); the plan ("Joint Plan") proposed jointly by National Servicing and Administration, LLC ("NSA") and Pivotal Solutions, Inc. ("Receiver"); and the plan ("TIC Plan") proposed by Burgess Family Trust, Henry's Orchards Village, LLC and Sugarman's Orchard, LLC (collectively, the "TIC Investors"). However, at the beginning of the Confirmation Hearing, the Debtor, recognizing that

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Page 1 - MEMORANDUM OPINION

its plan could not meet the test for feasibility, withdrew its reorganization plan from consideration. Thereafter, the proponents of the Joint Plan and the TIC Plan presented evidence and argument in support of their respective plans, and I heard evidence and argument supporting objections to the opposing plans.

In advance of the Confirmation Hearing, I reviewed the confirmation memoranda filed in support of the Joint Plan and the TIC Plan and the objections to the plans filed by interested parties. I also reviewed the proposed exhibits submitted by NSA and the Receiver and the Tenant in Common Investors. I have reviewed carefully the authorities cited to me by the various interested parties and other authorities that I consider relevant. I further have taken judicial notice of the docket and documents filed in this case for the purposes of ascertaining and confirming facts not reasonably in dispute. Fed. R. Evid. 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). I listened closely to the testimony of the witnesses presented at the Confirmation Hearing, and I have considered carefully and analyzed the arguments presented by counsel for the various interested parties.

In light of the foregoing preparations, review and analyses, I have reached a decision and am prepared to make the required findings of fact and conclusions of law on plan confirmation issues, pursuant to the requirements of Fed. R. Civ. P. 52(a), applicable with respect to this contested matter under Rules 9014 and 7052. I will confirm the Joint Plan and deny confirmation of the TIC Plan for the following reasons.

A. Confirmation Standards

The requirements for confirmation of a plan in chapter 11 are

set forth in § 1129.  The court has an affirmative duty to make sure that all applicable requirements for confirmation under § 1129 have been met. In re Ambanc La Mesa Ltd. Partnership, 115 F.3d 650, 653 (9th Cir. 1997). The court will confirm a plan if the plan proponents prove by a preponderance of the evidence either 1) that all applicable requirements of § 1129(a) have been met, or 2) if the only condition to confirmation that is not satisfied is § 1129(a)(8), that the plan satisfies "cramdown" standards under § 1129(b), i.e., the plan "does not discriminate unfairly" against and is "fair and equitable" with regard to each impaired class that has not accepted the plan.  In addition, under § 1129(c), if more than one plan meets the confirmation standards of § 1129(a) and (b), the court must decide between or among them and confirm only one plan.

B.  Summary of The Joint Plan

The Joint Plan provides for a prompt sale (the "Sale") of the Debtor's real and personal property interests in the Orchards Village senior living community in Vancouver, Washington ("Orchards Village") to Merrill Gardens, L.L.C. ("Merrill Gardens"), or such other buyer as is approved following an auction on terms approved by the Clark County, Washington Superior Court ("Superior Court").  Receivership proceedings are pending before the Superior Court with respect to the Debtor and a number of other entities with interests in Orchards Village, including the Tenant in Common Investors.  Merrill Gardens has agreed to purchase Orchards Village for $16,250,000.

Proceeds from the Sale will be distributed to pay administrative expenses of this case and the Superior Court receivership,

Page 3 - MEMORANDUM OPINION

priority taxes and bankruptcy-related fees, outstanding real and personal
property taxes, the allowed lien claim of the City of Vancouver,
Washington, and the allowed construction lien claim of LSR Architects,
Inc. Sale proceeds also will be distributed to pay a settlement
negotiated with seven Orchard Village resident claimants ("Buy-In
Residents") of their claims for recovery of the substantial sums ("Buy-In
Payments") they paid at the times they began their resident status at
Orchards Village. The Buy-In Residents' settlement amount ("Settlement
Amount") will be paid in full on the effective date of the Joint Plan, in
whole or in part from funds that otherwise would be distributed to NSA on
its allowed secured claim. The principal amount of Washington Trust
Bank's ("Washington Trust") allowed secured claim also will be paid in
full on the effective date, in whole or in part from funds that would
otherwise be distributed to NSA on its allowed secured claim. NSA and
Washington Trust have agreed to waive default interest and late charges
against the Debtor if the Joint Plan is confirmed. However, NSA and
Washington Trust would retain any claims against third parties, including
claims against guarantors of the Debtor's obligations to them.

General unsecured creditors and equity interests potentially
could receive distributions under the Joint Plan if the Sale results in a
higher purchase price than the outstanding offer from Merrill Gardens,
but all parties recognize that the prospects for such a higher purchase
price are remote at best. The most likely result under the Joint Plan is
that general unsecured creditors and equity interests would receive no
distributions. After the closing of the Sale and the liquidation and
distribution of any remaining claims and other property of the Debtor,

Page 4 - MEMORANDUM OPINION

the Debtor would be deemed dissolved and would not continue in business.

C.  <u>Summary of the TIC Plan</u>

The TIC Plan provides for a change in management of Orchards Village but contemplates that ownership will be held by some new and some old investors.  Accordingly, the Debtor would continue as a reorganized entity after confirmation of the TIC Plan.

Like the Joint Plan, the TIC Plan provides that administrative expenses, bankruptcy-related fees, outstanding real and personal property taxes, and the allowed lien claim of the City of Vancouver, Washington will be paid in full on the effective date of the TIC Plan.  Priority tax claims, if any, would be paid over a term of five years with interest. It is not clear from the TIC Plan what is contemplated with respect to unpaid administrative expenses of the Superior Court receivership, but such expenses arguably could be considered and treated as "Administrative Expense Claims," as defined in the TIC Plan.  However, the TIC Plan provides that any allowed secured claim of the Receiver would be paid within 30 days following the date that such claim is allowed.

NSA's allowed secured claim would be paid in full with interest at 5% per annum on the following terms:  NSA would receive interest-only payments for three years; it further would receive payments of principal and interest amortized over thirty years for four years; and a balloon payment of the balance of NSA's allowed secured claim, together with any accrued and unpaid interest, would be due and payable at the end of seven years.  In order to resolve an objection by Washington Trust, which had elected to be treated in accordance with § 1111(b), Washington Trust would be paid the principal of its allowed secured claim in equal monthly

Page 5 - MEMORANDUM OPINION

installments of $11,000 each over seven years, with the balance due and
payable at the end of seven years.  The allowed secured claim of LSR
Architects, Inc. would be paid in monthly installments of interest only,
at 5% per annum, for seven years, with the entire principal and any
balance of interest due at the end of seven years.  Buy-In Residents
would be paid according to their contracts (collectively, "Buy-In
Contracts") in 20 equal quarterly installments starting on January 1,
2010.  According to terms of the Buy-In Contracts, the Buy-In Residents
each would be paid a total of 75% of their Buy-In Payments.  See, e.g.,
Ex. 203-Bishop, at p. 3.  General unsecured creditors would receive a
total of 30 percent of their allowed unsecured claims in 20 equal
quarterly payments, commencing on January 1, 2010.  Equity interests
would be extinguished, but the TIC Investors and Carburton Properties 8,
LLC ("Carburton") would have the option of retaining their prepetition
tenant in common interests in Orchards Village real and personal property
or converting those interests into membership interests in the
reorganized Debtor.  In addition, the TIC Investors, Carburton,
prepetition members of the Debtor, and any creditor with a claim against
the Debtor would be offered the opportunity to purchase equity in the
reorganized Debtor in increments of $10,000, up to a maximum of
$1,250,000, on a "first come, first served," private placement basis.

    The deadline for filing ballots accepting or rejecting the TIC
Plan was December 2, 2009.  On December 7, 2009, the TIC Investors filed
an Amended and Restated Motion to Modify the TIC Plan to reclassify and
create a separate class of claims from the class of general unsecured
claims for the unsecured claims of the TIC Investors and Carburton.  See

Page 6 - MEMORANDUM OPINION

Docket No. 376.

D. Evidence in Light of Objections

Over the first day and a half of the Confirmation Hearing, the plan proponents submitted exhibits and testimony in support of confirmation of their respective plans. At the conclusion of testimony, I closed the evidentiary record. Based on that record, I find that § 1129(a)(6) and (13) through (16) are inapplicable in this case.

With respect to the other requirements of § 1129(a) and (b), as applicable, objections were made by various parties to the Joint Plan and the TIC Plan on a number of grounds that I address in turn.

1. Objections to the Joint Plan

Objections to the Joint Plan were filed by the United States Trustee ("UST"), the TIC Investors and the Debtor.

a. UST Objection

The UST objected that the exculpation and indemnification provisions of the Joint Plan for the Receiver as "Plan Agent" and its employees, agents and representatives was too broad, as it shielded them from liability for all acts other than bad faith, willful misconduct, gross negligence and willful disregard of duties. The Joint Plan proponents resolved that objection by extending liability to breaches of fiduciary duty and negligence and represented to the court in their confirmation memorandum that the concerns of the UST had been satisfied. The UST did not appear at the Confirmation Hearing to raise any further objection.

b. TIC Investors Objections

The TIC Investors objected for two reasons: First they

argue that the Joint Plan is not feasible.  Since the Joint Plan is a "sale" or "liquidation" plan under which the Debtor will not continue in business and will be dissolved, the TIC Investors' arguments focused on the viability of the Sale.  They argue that since the Joint Plan proponents only request authority to sell the Debtor's interest in Orchards Village under the Joint Plan and have not sought authority to sell the interests of co-owners under § 363(h),[2] they have no authority to sell the interests of co-owners, including the TIC Investors.

It is not clear whether the proponents of the Joint Plan could claim the authority of a trustee (or a debtor in possession in chapter 11) under § 363(h) to sell the interests of co-owners of Orchards Village.  However, in any event, if the Joint Plan is confirmed, the Receiver would be authorized to sell the Debtor's tenant in common interests in the real and personal property of Orchards Village, and under the Superior Court's order appointing the Receiver, the Receiver

---

[2] Section 363(h) provides that,

the trustee may sell both the estate's interest . . . and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
    (1)  partition in kind of such property among the estate and such co-owners is impracticable;
    (2)  sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
    (3)  the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
    (4)  such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light or power.

Page 8 - MEMORANDUM OPINION

has "the authority to sell all of the real and personal property of the Receivership Defendants," including all of the other co-owners of real and personal property of Orchards Village. See Ex. 152, at p. 4. Based on the evidence presented at the Confirmation Hearing, I find that the proponents of the Joint Plan have the necessary authority to sell all real and personal property interests in Orchard Village.

The TIC Investors further argued that the Joint Plan proponents had offered no proof beyond an expired, non-binding letter of intent that Merrill Gardens was prepared to proceed as purchaser to close the sale.

Douglas Spear, Chief Financial Officer of Merrill Gardens, testified at the Confirmation Hearing. He confirmed Merrill Gardens' commitment to the Sale, pursuant to an Asset Purchase Agreement, dated November 11, 2009. See Ex. 178. He further stated that there was no financing contingency to Merrill Gardens proceeding with closing the Sale, as Merrill Gardens had cash available to pay the entire $16,250,000 purchase price from sales of 24 facilities in the eastern United States. Letters supporting Merrill Gardens' ability to close the sale were submitted by Bank of America Merrill Lynch and JP Morgan. See Exs. 180 and 192. Based on the evidence presented, I find that the Sale proposed in the Joint Plan is feasible.

Second, the TIC Investors argue that the Joint Plan is not "fair and equitable" because nonpriority unsecured creditors are not expected to receive any distribution under the Joint Plan. Since the class of nonpriority unsecured creditors did not vote to approve the Joint Plan, it would not be fair and equitable to cram down their claims

Page 9 - MEMORANDUM OPINION

under § 1129(b) to confirm the Joint Plan, when the TIC Plan provides for at least a partial distribution on allowed nonpriority unsecured claims over time.

Section 1129(b) provides that if all requirements of § 1129(a) are satisfied, other than § 1129(a)(8), which requires that each class of claims either have accepted the plan or be unimpaired by the provisions of the proposed plan, a chapter 11 plan may be confirmed in spite of rejection by an impaired class of unsecured claims if the plan does not discriminate unfairly and is "fair and equitable" in its treatment of such class. "Fair and equitable" is a term of art in chapter 11. It requires either: 1) that the holders of claims in a rejecting unsecured class receive or retain on account of their claims property equal to the allowed amounts of their respective claims; or 2) that no class of claims or interests junior to the subject class receive anything under the plan to be confirmed. § 1129(b)(2)(B).

As noted above, all parties concede that the possibility that nonpriority unsecured claimants will receive any distribution under the Joint Plan is remote at best. The Summary of Acceptances and Rejections ("Ballot Summary") filed in this case (Docket No. 378) reflects that the class of nonpriority unsecured creditors under the Joint Plan ("Class 8") did not accept the Joint Plan. However, no class junior to Class 8 under the Joint Plan will receive anything. Equity interests are treated as subordinate to all allowed claims and are to be cancelled and become null and void on the effective date of the Joint Plan.

"An alternate form of cramdown is to eliminate all junior

classes to the dissenting class . . . .  The test is simple: after establishing the existence of junior interests, show that they are eliminated."  7 <u>Collier on Bankruptcy</u> ¶ 1129.05[3][b], at 1129-156 (Alan N. Resnick & Henry J. Sommer eds, 15th ed. revised  2009).  In spite of the Class 8 vote to reject the Joint Plan, since equity interests receive nothing under the Joint Plan, I find that the "fair and equitable" test for cramdown of nonpriority unsecured claims under the Joint Plan is satisfied.

   c.  <u>Debtor Objections</u>

    The Debtor raised a number of objections to confirmation of the Joint Plan but participated only to a very limited extent in the presentation of evidence at the Confirmation Hearing and did not participate in argument.  While the Debtor's objections are stated under seven separate headings (<u>see</u> Docket No. 360), a number of Debtor's objections are essentially variations on the same point and will be discussed together, as appropriate.

    First, the Debtor summarily echoes the argument of the TIC Investors that the Joint Plan does not comply with applicable provisions of the Bankruptcy Code because the proponents of the Joint Plan did not obtain authority to sell all tenant in common interests in Orchards Village real and personal property under § 363(h).  As discussed above, the Debtor's tenant in common interests in Orchard Village can be sold pursuant to the Joint Plan, and the Receiver has authority to sell all tenant in common interests of other Orchards Village owners under the Superior Court order appointing the Receiver.  However, the Debtor further argues that the Receiver was not authorized by this court to

Page 11 - MEMORANDUM OPINION

employ the broker ("Broker") who assisted the Receiver in orchestrating the sale process that generated the proposed sale to Merrill Gardens and thus violated the provisions of the Bankruptcy Code governing the employment of professionals.  See, e.g., §§ 327, 328 and 330.

The Receiver was authorized to employ the Broker by order of the Superior Court in the receivership proceedings, entered on or about May 15, 2009.  See Exhibit 173.  No evidence was presented at the Confirmation Hearing that any party objected to the employment of the Broker by the Receiver.  In fact, from the testimony and other evidence presented at the Confirmation Hearing, the Broker did a phenomenal job in contacting and winnowing potential purchasers for Orchards Village and assisted in bringing Merrill Gardens to the table with an outstanding purchase offer.  While the Joint Plan contemplates a sale of Orchards Village, any such sale will be conducted under auction procedures determined by the Superior Court.  Accordingly, in this specific case, I find no violation of the Bankruptcy Code in the Receiver's conduct in employing the Broker.

The Debtor next focuses on arguments that the Joint Plan is unfairly discriminatory in its treatment of the Buy-In Residents, as opposed to other creditors with unsecured claims, including lessors with unassumed leases and "insider" creditors.  At the outset, I note that the Joint Plan does not separately classify "insider" claims.  In fact, the term "insider" is not even defined in the Joint Plan.

That a plan does not "discriminate unfairly" against any impaired class that does not accept the plan is a requirement for cramdown under § 1129(b)(1).  These Debtor arguments all boil down to a

Page 12 - MEMORANDUM OPINION

contention that the Joint Plan improperly classifies and prefers the claims of the Buy-In Residents to claims of other unsecured creditors, who likely will receive nothing under the Joint Plan.

Section 1123 requires classification of claims in a chapter 11 plan. Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Similar claims generally are placed in the same class unless there are legitimate business or other reasons for separate classification. See, e.g., In re Simon, No. 07-31414-KRH, 2008 WL 2953471, at *2 (E.D. Va. July 29, 2008)("If a plan proponent can articulate legitimate differences among otherwise substantially similar claims and if separate classification is in the best interest of creditors and will foster reorganization, then separate classification may be proper."); In re Trimm, Inc., 2000 WL 33673795, at *5 (Bankr. M.D.N.C. Feb. 17, 2000) ("Numerous courts have recognized that if there is a valid business justification then creditors which otherwise have the same priority status under the bankruptcy system may be classified and treated differently.").

The claims of the Buy-In Residents are different in some fundamental ways from the claims of general unsecured creditors in this case. The Buy-In Residents paid substantial sums from their life savings "up front" when they contracted with "Orchards Village, LLC," a nonexistent entity, to join the Orchards Village senior living community. While I have not made any final determinations as to the amounts of the respective claims of the Buy-In Residents, for voting purposes with

Page 13 - MEMORANDUM OPINION

respect to plan confirmation, the Debtor stipulated with counsel for the Buy-In Residents that their individual claims ranged from $102,000 to $180,000. See Docket No. 339. For projection purposes, the TIC Investors treated the Buy-In Residents' claims as ranging from $113,492 to $199,325. See Exhibit 201, at p. 8. In prior proceedings before this court, Eugene Rizzo, one of the Buy-In Residents, testified that he paid $200,000 under his Residence Agreement. See Memorandum Opinion, Docket No. 113, at p. 23.

The Buy-In Residents did not extend credit to the Debtor like trade creditors, with the expectation of repayment and future business, or like investors, with the expectation of a return on their investments. The Buy-In Residents expected to move into Orchards Village and remain there for the rest of their lives. See, e.g., Exhibit 203, at p. 2, paragraphs 1 and 2.

Since the Debtor's bankruptcy filing, the Buy-In Residents have filed an adversary proceeding ("Adversary Proceeding") before this court, asserting claims for unjust enrichment, fraud, an equitable lien against Orchards Village, constructive trust, conversion and breach of contract against the Debtor and a number of other parties, including the TIC Investors. See Amended Complaint, Docket No. 3 in Case No. 09-03186. Under the Joint Plan, the Adversary Proceeding would be settled by payment of the Settlement Amount to the Buy-In Residents. In the Debtor's own Disclosure Statement, the Debtor Stated: "If [Debtor] does not pay the [Buy-In Residents'] Allowed Unsecured Claims in full, it could cause harm to the reputation of [Orchards Village], jeopardize [Debtor's] reorganization, impact [Debtor's] ability to attract new

Page 14 - MEMORANDUM OPINION

residents, and could impact the general morale of the facility which could affect the attrition rate." Debtor-In-Possession's Second Amended Disclosure Statement, Docket No. 296, at p. 12, Lines 14-17. In other words, if the perceived result for the Buy-In Residents in this case is that they are "stiffed" on their Buy-In Claims, the reputation of Orchards Village likely would be materially harmed no matter who ends up owning and running it. Indeed, recognizing that reality, the claims of the Buy-In Residents are separately classified in the Debtor's plan (Class 12) and in the TIC Plan (Class 6), as well as in the Joint Plan, although the treatments of the Buy-In Residents' claims among the three plans are substantially different.

Once appropriate distinctions are recognized for separate classification of claims, the treatment of any particular class of claims is discretionary with the plan proponent so long as all class members are treated equally. See 7 Collier on Bankruptcy ¶ 1123.01[4][b], at 1123-10 ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and not to the plan's overall treatment of the creditors holding such claims or interests."). The Joint Plan documents and provides means for the implementation of a settlement with the Buy-In Residents that preserves value for Orchards Village and allows for a sale of Orchards Village at a premium price. That it recognizes distinctions and reasons for treating the claims of the Buy-In Residents differently and more generously than the claims of unsecured creditors generally does not make the Joint Plan unfairly discriminatory. I find that the Debtor's objections on those grounds are appropriately overruled.

Page 15 - MEMORANDUM OPINION

1    The Debtor further objects that the Joint Plan does not

2    provide that any separate assets of Orchard Village Properties, LLC

3    ("OVP") be sold for the benefit of OVP's creditors.  OVP is not in

4    bankruptcy and is not a debtor in this case.  OVP is an entity in

5    receivership under the jurisdiction of the Superior Court.  <u>See</u> Exhibit

6    152, at pp. 1-2.  If the Debtor has any objection to the liquidation and

7    distribution of OVP assets in a sale subject to the approval of the

8    Superior Court, I suggest that the Debtor raise any such objection before

9    the Superior Court.  Debtor's objection on this ground is overruled.

10    Debtor also objects that the indemnification clause in the

11    Joint Plan is overbroad, without specifying with any clarity any

12    particular defects that render the indemnification provision violative of

13    the Bankruptcy Code.  As noted above, the Joint Plan proponents have

14    agreed to amend the exculpation and indemnification provisions of the

15    Joint Plan to satisfy the objection of the UST, consistent with the

16    court's decision in <u>In re WCI Cable, Inc.</u>, 282 B.R. 457, 478-80 (Bankr.

17    D. Or. 2002).  Based on the agreed amendments to the indemnification

18    provisions in the Joint Plan, I will overrule Debtor's objection on this

19    ground.

20    Finally, Debtor objects to the Joint Plan on the ground

21    that it "may" violate the State of Washington's receivership statutes.

22    The Debtor cites no authority for this argument and presented no

23    supporting evidence or argument at the Confirmation Hearing.  I therefore

24    find that this objection lacks merit.

25          d.   <u>Confirmation Requirements</u>

26    Under § 1126(c), a class of creditors is deemed to accept a

Page 16 - MEMORANDUM OPINION

chapter 11 plan if "at least two-thirds in amount and more than one-half in number of the allowed claims" of voting class members vote to accept the plan. The impaired creditor classes under the Joint Plan, with the exception of the class of general unsecured claims, voted unanimously to accept the Joint Plan. The class of equity interests is impaired and was deemed to have rejected the Joint Plan. Based on the foregoing discussions of the requirements that the plan not "discriminate unfairly" and be "fair and equitable" with respect to dissenting classes, I find that the Joint Plan meets the test for cramdown of general unsecured claimants and equity interests under § 1129(b).

Based on the evidence presented at the Confirmation Hearing, as discussed in relevant part above, I find that the Joint Plan satisfies the applicable requirements for confirmation set forth in § 1129(a) and (b).

2. <u>Objections to the TIC Plan</u>

Objections to the TIC Plan were filed by Washington Trust, the Buy-In Residents, NSA and the Receiver.

a. <u>Washington Trust Objections</u>

Initially, Washington Trust objected to its treatment under the TIC Plan based upon its election to have its claim treated as fully secured pursuant to § 1111(b). The TIC Investors moved to amend the TIC Plan to pay the principal of Washington Trust's claim in full, in equal monthly installments of $11,000 over 84 months, with any unpaid balance due at the end of 84 months. Washington Trust agreed that its amended treatment in the TIC Plan would moot this objection.

Washington Trust further objects that the TIC Plan is not

feasible, being based on uncertain financial assumptions and projections. Part of Washington Trust's feasibility objection was based on the TIC Investors' initial failure to provide for the secured lien claim of the City of Vancouver, Washington in the TIC Plan. However, the TIC Investors have moved to amend the TIC Plan to provide that the allowed lien claim of the City of Vancouver, Washington would be paid in full on the effective date of the TIC Plan, mooting this portion of the objection. Each of the Buy-In Residents, NSA and the Receiver have joined with feasibility objections of their own to the TIC Plan, and I consider all of the feasibility objections together.

Under Section 1129(a)(11), in order to confirm a reorganization plan in chapter 11, I must find that the plan is feasible, with confirmation not likely to be followed by the liquidation or need for further financial reorganization of the debtor. I am not required to find that the future financial success of the reorganized debtor is guaranteed to make a finding of feasibility.

> Guaranteed success in the stiff winds of commerce
> without the protection of the Code is not the standard
> under § 1129(a)(11). Most debtors emerge from
> reorganization with a significant handicap. But a
> plan based on impractical or visionary expectations
> cannot be confirmed . . . . All that is required is
> that there be reasonable assurance of commercial
> viability.

In re Prudential Energy Co., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986). See also In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986); In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed

Page 18 - MEMORANDUM OPINION

plan than the debtor can possibly attain after confirmation."); and <u>In re</u>
<u>Sagewood Manor Assoc. Ltd. Partnership</u>, 223 B.R. 756, 762-63 (Bankr. D.
Nev. 1998) ("While a reviewing court must examine 'the totality of the
circumstances' in order to determine whether the plan fulfills the
requirements of § 1129(a)(11), . . . only 'a relatively low threshold of
proof [is] necessary to satisfy the feasibility requirement.' . . . The
key element of feasibility is whether there exists a reasonable
probability that the provisions of the plan of reorganization can be
performed.").

"Factors that the court should consider in evaluating
evidence as to feasibility include '(1) the adequacy of the financial
structure; (2) the earning power of the business; (3) economic
conditions; and (4) the ability of management.'" <u>In re WCI Cable, Inc.</u>,
282 B.R. at 486 (quoting <u>In re Agawam Creative Marketing Assoc. Inc.</u>, 63
B.R. 612, 619-20 (Bankr. D. Mass. 1986), which in turn was quoting <u>In re</u>
<u>Merrimack Valley Oil Co., Inc.</u>, 32 B.R. 485, 488 (Bankr. D. Mass. 1983)).

The TIC Investors' financial projections ("Projections")
for the reorganized Debtor following confirmation of the TIC Plan, and
the supporting assumptions for the Projections, are set forth in Exhibit
201.[3]  Mr. Peter S. Muhlbach, President and Chief Executive Officer of
Encore Senior Living, LLC ("Encore"), the proposed operator of Orchards
Village under the TIC Plan, testified as to the preparation and
underlying assumptions of the Projections.  Mr. Muhlbach has an

---

[3] The Projections in Exhibit 201 are revised from the projections
("TIC Disclosure Projections") included by the TIC Investors in their
approved Disclosure Statement.  <u>See</u> Exhibit 147.

Page 19 - MEMORANDUM OPINION

accounting background and testified from that experience, as well as his experience as a chief financial officer for a senior assisted living company. Mr. Muhlbach testified that he developed the Projections following a visit to Orchards Village, based on the Receiver's monthly reports filed with the Superior Court and his own knowledge from operating senior living communities. He noted that Orchards Village looks "brand new," and is clean and well-maintained. Accordingly, he assumed that no major capital expenditures would be required for Orchards Village in the short-run. He assumed a gradual increase in Orchards Village occupancy, based on the growth experienced during the Receiver's tenure, until stabilization at 108 units occupancy (approximately 95%) at the end of 2010. He assumed that rates charged to the residents would gradually increase over time, as residency turns over. Expenses likely would increase at a slightly greater rate than revenues until stabilization is achieved, and thereafter revenues likely would increase at a slightly greater rate than expenses. The Projections assume positive net cash flow ranging from $113,059 in 2010, increasing thereafter to a minimum of $304,358 per year through 2014. The Projections also assume an injection of $1,000,000 new investor money to provide working capital. New investors in fact have pledged a total of $1,220,000 if the TIC Plan is confirmed, including $400,000 from Encore. See Exhibit 200 and tabs thereunder and Exhibit 217. Mr. Muhlbach also assumed that a refinance of remaining TIC Plan debt would be viable after 84 months of Orchards Village operations under Encore management.

Various questions were raised about the Projections during cross-examination of Mr. Muhlbach and during the testimony of other

Page 20 - MEMORANDUM OPINION

witnesses. Exhibit 186 is a comparative analysis of the TIC Disclosure Projections for 2010 results (see Exhibit 147) with a straight-line projection for 2010 based on annualized actual operating results for October 2009 under the receivership. The notes to Exhibit 186 raise concerns that the Projections may be too optimistic for the following reasons. First, the Projections assume that 20 additional units could be rented at higher assisted living rates when their conversion from independent living unit status has not yet been approved. Second, the Projections assume a 2 units per month increase in the rate of occupancy until stabilization, while actual increases in occupancy for May through October 2009 averaged only 1.67 units. As a bottom-line matter, the Exhibit 186 comparative analysis posits a swing to 2010 net cash flow of -$664,706 from the TIC Disclosure Projections to the annualized October 2009 operating results.

On cross-examination, Mr. Muhlbach testified that he had not projected income as assisted living units for the 20 independent living units under application to convert to assisted living, even though the assumptions for the Projections specifically state that,

> The revenue and expense [Projections] assume conversion of independent living to assisted living is complete with 20 new assisted living apartments and that there will be no additional conversions.

See Exhibit 201, at p. 7 and Exhibit 147, at p. 2. Under cross-examination, Douglas Baynham, the current operations manager at Orchards Village, testified that the operating expenses for October 2009 were high at $178,000, compared to an approximate average of $152,000 per month in 2009.

Page 21 - MEMORANDUM OPINION

In addition, as noted in argument, the TIC Plan requires that distributions totaling approximately $600,000 be made on or about the effective date to pay outstanding real and personal property taxes, administrative expenses and the secured lien claim of the City of Vancouver, Washington, eating substantially into the reorganized Debtor's working capital, assuming that the subscribing investors meet their investment commitments.

I have considered all of the testimony and evidence submitted with respect to the question of feasibility of the TIC Plan. It is important to remember that projecting future financial results from the operations of a business is not an exact science. Projections never turn out exactly as forecast because there are too many variables in actual operations to allow for such accuracy. I found Mr. Muhlbach's testimony to be credible, and the assumptions that he discussed underlying the Projections appeared plausible. The opposing testimony and evidence focused on the possibilities that the Projections were too high in their estimates of net cash flow for Orchards Village; that the working capital to be raised from investors would be too small to meet Orchards Village's operating needs; and that financing to complete TIC Plan obligations would not be available when balloon obligations under the plan come due.

However, in light of the forgiving standard for feasibility under § 1129(a)(11), I find that the TIC Investors have met their evidentiary burden. The Projections for net cash flow from Orchards Village operations, particularly in 2010, may prove high, and Encore may have to spend more working capital than anticipated to keep Orchards

Page 22 - MEMORANDUM OPINION

Village operations running smoothly.  Nevertheless, even after the effective date distributions under the TIC Plan are made, there should be working capital from investments available to fund operating shortfalls in the range of $400,000-$600,000.  I found the testimony of the various investment subscribers who testified credible that they had ready money available to fulfill their investment pledges.  As to the prospects for refinancing at month 84, while plenty of evidence was presented to the effect that commercial lending for the acquisition and development of senior assisted living communities had essentially dried up for the present, I find the assumption reasonable, at least for feasibility purposes, that lending conditions ought to be more congenial when Orchards Village needs refinancing at the end of the TIC Plan term.  I conclude that the TIC Investors have met the test for feasibility under § 1129(a)(11).

        b.  <u>Buy-In Residents Objections</u>

        The Buy-In Residents add two twists to the feasibility issue that need to be addressed separately.  First, they quote from the TIC Investors' disclosure statement:

> If Debtor does not pay Buy-In Residents' Allowed
> Secured Claims in full, it will cause immeasurable
> harm to the reputation of [Orchards Village] and
> seriously jeopardize Reorganized Debtor's ability to
> attract new residents to the Facility, making it
> impossible for Debtor to reorganize its business.

TIC Investors' Second Amended Disclosure Statement, Docket No. 295, at p. 14.  Under the TIC Plan, the Buy-In Residents' claims will not be paid in full, and the payments they receive will be made in 20 quarterly installments commencing in 2010.  Accordingly, by the standard

Page 23 - MEMORANDUM OPINION

articulated by the TIC Investors themselves in their disclosure statement, the Buy-In Residents argue that it will be impossible for the Debtor to reorganize its business under the TIC Plan.

The Buy-In Residents' point provides a further basis for discounting the operating results posited in the Projections, but ultimately, I do not find that it materially undermines the court's previous analysis and finding of feasibility.

The Buy-In Residents further argue that in rejecting the OVP lease to operate Orchards Village, the TIC Plan ignores the ramifications of § 365(h)(1)(A),[4] where the Receiver arguably stands in the shoes of OVP as the Orchards Village lessee. Under current circumstances, I find that the OVP lease issue is a red herring. The Receiver was appointed as a general receiver for OVP, the Debtor and the other entities with ownership interests in Orchards Village on August 22, 2008. <u>See</u> Exhibit 152. I previously have found that following the Receiver's appointment by the Superior Court, OVP relinquished its license to operate Orchards Village, and the Washington Department of Social and Health Services issued a provisional license to Regency Pacific, Inc. to operate Orchards Village under the supervision of the Receiver. <u>See</u> Memorandum Opinion, Docket No. 113, at p. 4. The continuing receivership proceedings before the Superior Court certainly complicate arrangements for turnover of Orchards Village to Encore if I confirm the TIC Plan. However, no party has argued that in the event I

---

[4] The Buy-In Residents actually cite § 365(h)(2)(A), but that neighboring provision deals with the rejection of timeshare interests. It is not relevant to the argument that the Buy-In Residents are making.

Page 24 - MEMORANDUM OPINION

confirm the TIC Plan, the TIC Investors cannot move the Superior Court to terminate the receivership.  I will not speculate on what the Superior Court will do if such a motion is brought before it, but I do find that the fact that the receivership proceedings are on-going does not destroy the feasibility of the TIC Plan.  I will overrule the Buy-In Residents' objections.

        c.  <u>Receiver Objections</u>

        The Receiver raised a number of objections to the TIC Plan, some of which have been dealt with by the TIC Investors' proposed amendments to their plan.  For example, the Receiver objected to the TIC Plan because it did not classify or provide for the secured lien claim of the City of Vancouver, Washington.  The TIC Investors have amended the TIC Plan to provide that the allowed secured claim of the City of Vancouver, Washington will be paid in full on the effective date of the plan, rendering the Receiver's objection moot.

        Of greater significance is the Receiver's objection that no impaired class of claims accepted the TIC Plan, as required under § 1129(a)(10).  The TIC Investors' Second Amended Plan (Docket No. 294) that was distributed to creditors and other interested parties for balloting listed eight impaired classes, including Class 8 (Interests).  By the December 2, 2009 voting deadline, no impaired class of claims had voted in favor of the TIC Plan.  On December 7, 2009, the TIC Investors filed a motion to amend the TIC Plan to add a new Class 11 "consisting of the unsecured claims of TIC Investors."  <u>See</u> Docket No. 376, at p. 3.  NSA and the Receiver objected to the TIC Investors' motion, noting that only five creditors voted in favor of the TIC Plan.  Four of the five

Page 25 - MEMORANDUM OPINION

were the members of the proposed new impaired Class 11.  <u>See</u> Docket No.
379, at p. 2.  NSA and the Receiver argue that the TIC Investors are
acting in bad faith to gerrymander their plan votes "to artificially
create an impaired consenting class."  <u>Id.</u>

While plan proponents have substantial flexibility under
§ 1123 to classify claims based on differentiating business and other
circumstances, they go too far when a class of claims is "plainly
contrived and engineered solely to create an accepting impaired class."
<u>In re Daly</u>, 167 B.R. 734, 736 (Bankr. D. Mass. 1994).

> This contrived and artificial impairment can be viewed
> either as a violation of the requirement of an
> accepting impaired class, § 1129(a)(10), or as a
> violation of the requirement that the plan be proposed
> in good faith, § 1129(a)(3), or as both.  Whichever
> way it is viewed, it prevents confirmation of the
> plan.

<u>Id.</u> at 737.  <u>See also</u> <u>Connecticut General Life Ins. Co. v. Hotel Assoc.</u>
<u>(In re Hotel Assoc.)</u>, 165 B.R. 470, 475 (9th Cir. BAP 1994) ("[T]he act
of impairment in an attempt to gerrymander a voting class of creditors is
indicative of bad faith" for purposes of § 1129(a)(3).).

Section 1129(a)(10) is designed to require a showing in
support of plan confirmation that a meaningful group of creditors other
than the plan proponent support the plan.  "The purpose of § 1129(a)(10)
is to provide some indicia of support by affected creditors and prevent
confirmation where such support is lacking."  <u>In re Lettick Typographic,</u>
<u>Inc.</u>, 103 B.R. 32, 38 (Bankr. D. Conn. 1989).  As noted by NSA and the
Receiver, only the TIC Investors, Carburton, and one unsecured creditor

Page 26 - MEMORANDUM OPINION

voted in favor of the TIC Plan.  <u>See</u> Ballot Summary, Docket No. 371.[5]

The TIC Investors respond to the objections of NSA and the Receiver that their amendment to create the new Class 11 for the unsecured claims of the TIC Investors and Carburton conforms the TIC Plan to the requirements of § 1123(a)(4) and thus cannot be inappropriate gerrymandering of class votes as a matter of law.  Section 1123(a)(4) provides that a chapter 11 plan "shall . . . (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The TIC Investors point out accurately that there are real differences between general unsecured creditors and the TIC Investors because of the TIC Investors' ownership interests independent of the Debtor in assets of Orchards Village that are essential to the success of any plan in this case.  While I find that the argument that § 1123(a)(4) "mandates" placing the unsecured claims of the TIC Investors and Carburton in a separate class overstates the case, the differences between the TIC Investors and Carburton, and general unsecured creditors are real and material, justifying separate classification.  But for the timing, I doubt that the TIC Investors' designation of their new Class 11 would be controversial.

The Ninth Circuit standard for the designation of impaired classes of claims is relatively liberal.  <u>See</u> <u>L&J Anaheim Assoc. v.</u>

---

[5] The TIC Investors have filed their own ballot summary, on a postamendment basis, that is not materially different from the Ballot Summary, Docket No. 371, <u>except</u> that it reflects 100% votes to accept the TIC Plan by the new Class 11 as an impaired class of claims.  <u>See</u> TIC Investors' Ballot Summary, Docket No. 378.

Page 27 - MEMORANDUM OPINION

<u>Kawasaki Leasing Int'l, Inc. (In re L&J Anaheim Assoc.)</u>, 995 F.2d 940, 942-43:

> "Congress define[d] impairment in the broadest possible terms." <u>In re Madison Hotel Associates</u>, 749 F.2d 410, 418 (7th Cir. 1984) (quoting <u>In re Taddeo</u>, 685 F.2d 24, 28 (2d Cir. 1982)). Indeed, we ourselves have suggested that under this broad definition, "any alteration of the rights constitutes impairment even if the value of the rights is enhanced." <u>In re Acequia</u>, 787 F.2d at 1363 (dictum) (quoting 5 <u>Collier on Bankruptcy</u> ¶ 1124.03, at 1124-13 (15th ed. 1985)) . . . . In any event, the plain language of section 1124 says that a creditor's claim is "impaired" unless its rights are left "unaltered" by the Plan.

In the circumstances of this case, I find that the TIC Investors' designation of their new Class 11 is appropriate. However, I also find the timing of the TIC Plan amendment to designate the new class after the balloting deadline had passed is questionable, and this discussion highlights the very limited number of claimants, both affiliated with the TIC Investors and unaffiliated, that voted to accept the TIC Plan.

The remaining objections of the Receiver cause me to return to the well-plowed ground of feasibility. The Receiver raises several arguments to the effect that the on-going receivership proceedings before the Superior Court effectively preclude the TIC Investors from implementing the TIC Plan if it is confirmed. As I noted in addressing the objections of the Buy-In Residents above, the receivership proceedings undoubtedly would complicate the transfer of Orchards Village operations from the Receiver and Regency Pacific, Inc. to Encore, but there is nothing to preclude the TIC Investors from moving to terminate the receivership proceedings if the TIC Plan is confirmed. The vigor with which this case has been contested suggests that any such motion

Page 28 - MEMORANDUM OPINION

would be actively opposed, and I do not know how the Superior Court might rule in such circumstances. However, once again, I find that the present existence of the receivership proceedings does not destroy feasibility for the purposes of § 1129(a)(11).

            d. <u>NSA Objections</u>

            Beyond the objections to the TIC Plan raised by other parties as well as NSA and previously discussed above, NSA raises two principal additional objections.

            First, NSA argues that the TIC Investors have not met their burden to establish that the TIC Plan "has been proposed in good faith and not by any means forbidden by law," as required by § 1129(a)(3). This argument raised in NSA's filed objections (Docket Nos. 351 and 361) was elaborated on in final argument after the presentation of evidence at the Confirmation Hearing.

            "Good faith" is not defined in the Bankruptcy Code.
            "A plan is proposed in good faith where it achieves a
            result consistent with the objectives and purposes of
            the Code." <u>In re Sylmar Plaza, L.P.</u>, 314 F.3d 1070,
            1074 (9th Cir. 2002). Accord <u>In re Madison Hotel
            Assoc.</u>, 749 F.2d 410, 425 (7th Cir. 1984) (good faith
            "is generally interpreted to mean that there exists 'a
            reasonable likelihood that the plan will achieve a
            result consistent with the objectives and purposes of
            the Bankruptcy Code.'"). It "requires a fundamental
            fairness in dealing with one's creditors." <u>In re
            Jorgensen</u>, 66 B.R. 104, 109 (9th Cir. BAP 1986). In
            making that determination, the court considers the
            totality of the circumstances. <u>Sylmar Plaza, LP</u>, 314
            F.3d at 1074. Purposes of the Code "include
            facilitating the successful rehabilitation of the
            debtor, and maximizing the value of the bankruptcy
            estate." <u>In re Gen. Teamsters, Warehousemen and
            Helpers Union, Local 890</u>, 265 F.3d 869, 877 (9th Cir.
            2001).

Amended Memorandum Opinion re Confirmation of Plan, <u>In re Carolina</u>

Page 29 - MEMORANDUM OPINION

1  <u>Tobacco Co.</u>, Case No. 05-34156, Docket No. 507, at p. 25.

2          I previously have discussed the issue of the TIC Investors'
3  amendment to the TIC Plan after the balloting deadline to create a new
4  Class 11 as an additional impaired class of claims that voted unanimously
5  to accept the TIC Plan and thus resolved the TIC Investors' § 1129(a)(10)
6  problem.  NSA and the Receiver also question the TIC Investors'
7  compliance with law in soliciting subscriptions for investments in the
8  reorganized Debtor.

9          Under the Securities Act of 1933, 15 U.S.C. §§ 77a et seq.
10 (the "1933 Act"), an entity that offers or sells its securities must
11 register its securities with the Securities and Exchange Commission
12 ("SEC") pursuant to the registration requirements of the 1933 Act unless
13 an exemption applies.  Section 1145 provides such an exemption for offers
14 of securities of the debtor "in exchange for a claim against, an interest
15 in, or a claim for an administrative expense in the case concerning, the
16 debtor . . . . "  § 1145(a)(1)(A).

17         Under the TIC Plan, the interests of equity holders in the
18 Debtor (Class 8) would be cancelled.  However, the TIC Investors and
19 Carburton (Class 11), in exchange for cancellation of their unsecured
20 claims against the Debtor, have the option of retaining their tenant in
21 common ownership interests in real and personal property assets of
22 Orchards Village or exchanging their tenant in common interests for
23 membership interests in the reorganized Debtor.  It would appear that the
24 registration exemption provided by § 1145 would cover such exchanges.

25         However, as noted in the summary of the TIC Plan included
26 above, the TIC Investors, Carburton, prepetition members of the Debtor

Page 30 - MEMORANDUM OPINION

and creditors also are offered the opportunity to invest in new membership interests in the reorganized Debtor in cash increments of $10,000 up to a total of $1,250,000, and the exemption provided by § 1145 does not apply to such offerings. The TIC Investors need another exemption(s) to avoid the registration requirements of the 1933 Act. See, e.g., In re Friedman's, Inc., Case No. 05-40129, 2005 Bankr. LEXIS 3140, at *31-*32 (Bankr. S.D. Ga. November 23, 2005):

> Distributions of New Common Stock as contemplated by the Plan by the Debtors is exempt from the requirements of section 5 of the [1933 Act] and state registration requirements (1) by virtue of section 1145 of the Bankruptcy Code, as to distributions to holders of Class 1 Lender Claims and Class 4(b) Participating Vendor Claims, and (2) by virtue of section 4(2) of the [1933 Act], as to distributions to the Plan Investor that are made in exchange for the Plan Investor's other cash investments.

Also see In re Bally Total Fitness, Case No. 07-12395, 2007 Bankr. LEXIS 4279, at *33-*34 (Bankr. S.D.N.Y. September 17, 2007).

The Unit Subscription Agreements signed by investors subscribing to purchase member interests in the reorganized Debtor under the TIC Plan require investors to state whether they are or are not "accredited investors." See Exhibits 200 and 217, in each case on page 2, section 3(g). All of the subscribing investors characterized themselves individually as "accredited investors," or in the case of entities, as having all "accredited investors" as equity holders, except Kenneth Waldroff, who subscribed individually for $50,000 but stated that he was not an "accredited investor." See Exhibit 200, at p. 20.

SEC Regulation D in Rule 501 defines an "accredited investor," in relevant part, as:

Page 31 - MEMORANDUM OPINION

5.  a business in which all of the equity owners are accredited investors;
6.  a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the [investment] purchase;
7.  a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year; or
8.  a trust with assets in excess of $5 million, not formed to acquire the securities offered, whose purchases a sophisticated person makes.

SEC Regulation D Rule 506 provides an exemption from registration in nonpublic, private placement securities offerings for sales to accredited investors and up to thirty-five nonaccredited investors.[6]  The rationale for not requiring registration of securities to be offered to "accredited investors" is the assumed sophistication of such investors to evaluate the risks of prospective investments.  "We adopted the $1,000,000 net worth and $200,000 income standards in 1982 based on our view that these tests would provide appropriate and objective standards to meet our goal of ensuring that only such persons who are capable of evaluating the merits and risks of an investment in private offerings may invest in one."  Securities Act Release No. 6389 (March 16, 1982).  In other words, only individuals with adequate net worth or income to be able to withstand the risk of the loss of their securities investments could be characterized as "accredited investors."

At the Confirmation Hearing, John Schnell, Phil DeNardis

---

[6] Regulation D implements Section 4(2) of the 1933 Act that provides:  "the provisions of Section 5 shall not apply to . . . (2) transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(2).

and Jack Burgess testified individually and James Oberholtzer testified in behalf of CP8A, LLC as to their respective unit subscriptions with respect to the reorganized Debtor.  Mr. Muhlbach testified in behalf of Encore.  All of these witnesses confirmed the availability of the subscribed funds to invest in Debtor member units if the TIC Plan is confirmed.  They further confirmed their accredited status as individuals, or in the case of entities, the accredited investor status of all equity owners.  They also confirmed that they had received and reviewed the plan and disclosure statement documents.  Kenneth Waldroff did not testify, and he was the only individual investment subscriber who identified himself as not an accredited investor.  As noted above, the exemption from registration under SEC Rule 506 allows for up to 35 investors who are not accredited investors in a private placement offering.  Based on the evidence presented at the Confirmation Hearing, I find that the TIC Investors have presented sufficient evidence to establish that the new member units in the reorganized Debtor are not being offered in violation of federal bankruptcy or securities laws.

NSA further argue that the TIC Plan is not proposed in good faith because the TIC Investors have proposed their plan for their own benefit rather than for the benefit of the Debtor and other creditors in this case.  It is clear that the TIC Investors have proposed the TIC Plan to protect against the loss of their investments in Orchard Village.  Under the Joint Plan, they receive nothing.  However, the fact that a party before this court is motivated by self-interest does not automatically lead to the conclusion that its chapter 11 plan is not proposed in good faith.

Page 33 - MEMORANDUM OPINION

Under the TIC Plan, provisions are made to pay all creditor constituencies all or at least part of their allowed claims. In addition to paying creditor claims, the TIC Plan provides the TIC Investors with the opportunity to salvage their investments and obtain a return on new money put at risk through operations of the reorganized Debtor. I have found that the TIC Plan is feasible for purposes of the test of § 1129(a)(11). I have noted the questionable timing of the TIC Investors' amendment of their plan to create the new Class 11 impaired class of claims, but based upon my review of the evidence presented in the totality of the circumstances of this case, I ultimately conclude that the TIC Plan has been proposed in good faith and not by any means forbidden by law for purposes of § 1129(a)(3).

Further, based on the evidence presented at the Confirmation Hearing, I find that the TIC Plan satisfies all of the applicable requirements for confirmation set forth in § 1129(a), except § 1129(a)(8) because a number of impaired classes of claims did not vote to accept the TIC Plan.

This leads me to the discussion of NSA's objection that in light of NSA's vote to reject the TIC Plan, the TIC Plan does not meet the standards for cramdown of NSA's secured claim under § 1129(b)(2)(A).[7]

---

[7] § 1129(b)(2)(A) provides:
For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A) With respect to a class of secured claims, the plan provides–
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such
(continued...)

I will sustain NSA's objection to confirmation on this ground based on my
consideration of the following factors.

        i.   <u>NSA's treatment under the TIC Plan is not the
indubitable equivalent of its claim</u>.

      NSA's predecessor in interest, First State Bank of
Thermopolis, made a construction loan ("Loan") for the development of
Orchards Village. <u>See</u> Exhibit 100. The unaccelerated maturity date of
the Loan was September 20, 2008. <u>See</u> Exhibit 101, at p. 2. The Loan
matured prepetition. I previously have determined that the Debtor
defaulted on the Loan, and Debtor's Loan defaults are on-going and
uncured. <u>See</u> Memorandum Opinion, Docket No. 113, at p. 3. The default
interest rate on the Loan is prime plus 637.5 Basis Points, i.e., prime
plus 6.375%. <u>See</u> Exhibit 101 at pp. 1, 3. At the time of the
Confirmation Hearing, with a prime rate of 3.25% based on uncontroverted

<hr>

[7](...continued)
liens is retained by the debtor or transferred to another
entity, to the extent of the allowed amount of such claims; and
    (II) that each holder of a claim of such class receive on
account of such claim deferred cash payments totaling at least
the allowed amount of such claim, of a value, as of the
effective date of the plan, of at least the value of such
holder's interest in the estate's interest in such property;
    (ii) for the sale, subject to section 363(k) of this
title, of any property that is subject to the liens securing
such claims, free and clear of such liens, with such liens to
attach to the proceeds of such sale, and the treatment of such
liens on proceeds under clause (i) or (iii) of this
subparagraph; or
    (iii) for the realization by such holders of the
indubitable equivalent of such claims.

Since the TIC Plan does not contemplate a sale of Orchards Village,
§ 1129(b)(2)(A)(ii) is not relevant to my analysis.

Page 35 - MEMORANDUM OPINION

evidence presented by the TIC Investors, the default interest rate on the Loan would be 9.625%.

Under the TIC Plan, as noted above, NSA would be paid interest only on the allowed amount of its secured claim at the rate of 5% per annum for the first three years of the TIC Plan term; NSA would receive payments of principal and interest amortized over a 30-year term for the next four years; and NSA would be paid the balance of principal and accrued interest on its allowed secured claim at the end of the seven year term of the TIC Plan. During this period, NSA would retain its security interests in Orchards Village.

The concept of "indubitable equivalence" comes from the decision written by Judge Learned Hand in <u>Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)</u>, 75 F.2d 941, 942 (2d Cir. 1935):

> [P]ayment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears for the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most <u>indubitable equivalence</u>. (Emphasis added.)

The Ninth Circuit approved the following analysis of "indubitable equivalence" in <u>Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)</u>, 85 F.3d 1415, 1421 (9th Cir. 1996):

> [N]o matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such as would permit us to hold that the value of the land being offered is the indubitable equivalent of [the mortgagee]'s claim. "Indubitable" means "too evident to be doubted." <u>Webster's Ninth New Collegiate Dictionary</u> (1985). We

Page 36 – MEMORANDUM OPINION

profess doubt on the facts of this case.
(quoting In re Walat Farms, Inc., 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987)).

Under the TIC Plan, the NSA allowed secured claim is to be paid at a below market rate of interest (as discussed in greater detail below) over a term of seven years, with a substantial balloon payment due at the end of seven years, with prospects for refinancing unclear. I find that the treatment of NSA's secured claim under the TIC Plan is not its indubitable equivalent.

ii. <u>Interest at 5% on NSA's allowed secured claim is too low</u>.

The TIC Plan proposes to pay interest on NSA's allowed secured claim at "the rate of 5 percent per annum, or such other rate as the Bankruptcy Court may determine." The Projections assume that NSA's claim will bear interest at 5%. <u>See</u> Exhibit 201, at p. 8.

Generally, the appropriate rate of interest or discount factor to be applied to the payment of secured claims under a chapter 11 plan "should be the rate of interest that the debtor would pay to borrow a similar amount on similar terms in the commercial loan market." <u>United States v. Camino Real Landscape Maintenance Contractors, Inc. (In re Camino Real Landscape Maintenance Contractors, Inc.)</u>, 818 F.2d 1503, 1506 (9th Cir. 1987). Calculating the rate starts with an appropriate base rate plus the addition of a factor for risk. <u>Id.</u>

The TIC Investors have asserted that the prime rate is the appropriate base rate in this case, without contradiction. At the time of the Confirmation Hearing, as noted above, the prime rate was

Page 37 - MEMORANDUM OPINION

3.25%. In effect, the TIC Investors propose to add a risk factor of 1.75% to the base rate to arrive at the 5% rate that they suggest is appropriate to apply to NSA's allowed secured claim during the term of their plan. The problem I face is that the TIC Investors have presented no relevant evidence to support the calculation of their risk factor.

The TIC Investors presented the testimony of Mr. Thomas Peters to discuss lending terms with respect to senior assisted living projects. Mr. Peters testified that he was a partner in CW Capital that historically has competed with banks in commercial lending. He further testified that at the present time, lending in the senior housing business basically has dried up--"HUD's the only--only game in town." Transcript of Confirmation Hearing, Docket No. 386, at p. 199. He testified that HUD loans could be obtained at interest of 4.75% plus 55 basis points, or 5.3%, for a term of 35 years. Id. at p. 200. However, I find that the rate of interest that can be obtained from the Department of Housing and Urban Development, an agency of the federal government, is not relevant to what rate of interest can be obtained in the commercial marketplace. Federal agencies' conduct is dictated at least in part by the policies they serve rather than by market forces. Cf. Camino Real Landscape Maintenance Contractors, 818 F.2d at 1506 ("To be properly compensated, [the creditor] must receive the rate of interest based on the debtor's cost of borrowing, not the government's. [citation omitted] There is no indication that Congress meant to subsidize debtors undergoing reorganization by making available to them the government's own favorable rate of interest.").

NSA's witness, Mr. John Steven Gordon, the owner of

Page 38 - MEMORANDUM OPINION

Phoenix, LLC, which provides consulting services to the senior housing industry, testified that the conventional financing market for senior housing projects is very tight.  To obtain a loan in that market, one would need a "pristine project" with "solid operational results." Transcript of the Confirmation Hearing, docket No. 387, at pp. 309-10. One also would need "stabilized occupancy around 95 percent."  _Id._ at 311.  Such a project, with an appropriate loan to value ratio, might obtain a loan bearing interest at "six to ten percent."  _Id._ at 312. While operations at Orchards Village have improved, its occupancy is not stabilized, and to refinance at present would essentially require 100% financing.  The interest rates that Mr. Gordon suggested might be available at present for certain senior living projects simply are not applicable in the circumstances of Orchards Village, seeking to emerge from bankruptcy.  Further, the lowest rate mentioned by Mr. Gordon is higher than the 5% interest that the TIC Investors propose to pay NSA under their plan.

During argument, counsel for the TIC Investors suggested that even if I were to decide that the proposed 5% rate for NSA was too low, I could determine an appropriate rate, as allowed for in the TIC Plan, under the standards set forth in the Supreme Court's decision in _Till v. SCS Credit Corp._, 541 U.S. 465 (2004).  I decline to do so.

While _Till_ was a chapter 13 case, a footnote to the plurality opinion suggests that its analysis may be appropriate in chapter 11.  _See Id._ at 474 n.10.  Under the "formula approach" to determining the proper interest rate adopted in _Till_, the court starts with the prime rate and adjusts it upward for an appropriate risk factor

Page 39 - MEMORANDUM OPINION

determined from the presentation of evidence. Id. at 479.

In this case, I have evidence as to the prime rate (3.25%) at the time of the Confirmation Hearing. However, as discussed above, while I have evidence that leads me to conclude that the 5% interest rate proposed for NSA in the TIC Plan is too low, I have inadequate evidence to determine the appropriate risk factor to add to the prime rate. I simply have too little evidence to impose my view as to what constitutes a satisfactory interest rate in the cramdown context. See, e.g., In re Edgewater Motel, Inc., 85 B.R. 989, 997 (Bankr. E.D. Tenn. 1988) ("[I]f the Plan proposes to pay interest on the fully secured claim of Union Planters at a rate less than the current market rate, the Plan does not satisfy the 'fair and equitable' requirement of § 1129(b)(2)(A)(i).").

iii. The length of the proposed "stretch out" of payments to NSA.

The Loan was made as a three-year construction loan, with a possible extension for a fourth year. See Exhibit 100, at pp. 1, 10 and 18. The Loan matured on September 20, 2008. See Exhibit 101, at p. 2. Now, approximately 15 months later, the TIC Plan provides that repayment of the Loan, i.e., NSA's allowed secured claim, would be extended out a further 7 years.

The fact that a secured creditor's loan repayment term is extended beyond contract limits does not automatically breach the "fair and equitable" requirement for cramdown of a secured claim under § 1129(b)(2)(A), so long as the secured creditor's claim is adequately protected. See, e.g., In re James Wilson Assoc., 965 F.2d 160, 172 (7th

Page 40 - MEMORANDUM OPINION

Cir. 1992) ("Since Metropolitan is in the business of making loans, it can hardly complain that its loan was extended, provided not only that the security is adequate (as it is) but also that the interest rate compensates it for the opportunity cost of its money and the risk of default."); <u>In re Mulberry Agr. Enterprises, Inc.</u>, 113 B.R. 30, 33 (Bankr. D. Kan. 1990):

> The Court believes that § 1129 does not per se prohibit long term payouts. If the mathematical requirements of § 1129(b)(2)(A)(i)(II) are satisfied, if the creditor is adequately protected under the plan, pursuant to the general fair and equitable requirement of § 1129(b)(2), and if the debtors can prove they can make payments over the life of the plan pursuant to § 1129(a)(11), then the plan is confirmable and can be crammed down on a rejecting class of secured claim holders, regardless of normal lending practices or policies.

(quoting <u>In re White</u>, 36 B.R. 199, 203 (Bankr. D. Kan. 1983).

However, a plan proposal to extend a matured, short-term loan over a substantially longer term is subject to particularly close scrutiny, as determined in <u>Imperial Bank v. Tri-Growth Centre City, Ltd. (In re Tri-Growth Centre City, Ltd.)</u>, 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992), where the debtor attempted unsuccessfully to extend a fully matured construction loan for a further term of 7 years: "Although not per se objectionable, careful scrutiny must be given to a debtor's plan which proposes to convert a fully matured short term loan into permanent financing." <u>See also</u> <u>In re Pelham St. Assoc.</u>, 134 B.R. 700, 701 (Bankr. D.R.I. 1991). This point brings me to the next discussion.

iv. <u>No evidence was presented to establish that the reorganized Debtor will be able to refinance its debt at the end of the 7-year term of the TIC Plan</u>.

NSA and the Receiver presented evidence as of

Page 41 - MEMORANDUM OPINION

December 1, 2009 that the amount of NSA's secured claim, including accrued interest at the default rate, late fees and expenses, was $14,962,608.97. <u>See</u> Exhibit 145. The Projections assume that after the claims allowance process is completed, NSA's allowed secured claim would be $13,800,000. <u>See</u> Exhibit 201, at p. 8. Whichever amount ends up being correct, including the possibility that NSA's allowed secured claim may end up being somewhere between the two, under the TIC Plan, with its provisions for interest only for three years and payments amortized over 30 years for the next four years, the balloon payment owing to NSA at the end of 7 years would be many millions of dollars.

The evidence presented at the Confirmation Hearing tended to establish that conventional financing for senior living facilities, such as Orchards Village, is currently unavailable. Mr. Muhlbach testified that he assumed the lending environment will improve, and refinancing for Orchards Village in an improved market should be available at the end of the TIC Plan term. I have found that hope and assumption to be adequate to get the TIC Plan past the relatively forgiving standard for feasibility in § 1129(a)(11), but it is not sufficient to support a cramdown of NSA's claim under § 1129(b)(2)(A)(i)(II). Were I to overrule NSA's cramdown objections, I would be permitting the TIC Investors to speculate on an uncertain future lending environment not only with their own funds, but with NSA's money as well. I find that is not authorized or appropriate under § 1129(b)(2)(A)(i)(II). <u>See, e.g.</u>, <u>In re Tri-Growth Centre City, Ltd.</u>, 136 B.R. at 852 ("Imperial's rewritten loan is only partially amortized over a 7 year term. The debtor attempts to shift the risks associated

Page 42 - MEMORANDUM OPINION

with a declining motel business on a secured creditor who did not bargain for those risks when it initially lent the funds."); In re White, 36 B.R. 199, 204 (Bankr. D. Kan. 1983) ("While it might be interesting for the debtors, the court, and PCA to spend the next 30 years watching the debtors' cash flow, this Court cannot allow confirmation out of curiosity or interest."), and cases cited therein.

I find that the TIC Investors have not satisfied the "fair and equitable" standard for cramdown of NSA's claim under § 1129(b)(2)(A), and I will sustain NSA's objection to cramdown. Since the TIC Plan does not satisfy the requirements for confirmation under § 1129(b), I will deny confirmation of the TIC Plan.

E.  Section 1129(c) Considerations

Even if both the Joint Plan and the TIC Plan satisfied all requirements for confirmation under § 1129(a) and (b), as noted above, § 1129(c) allows me to confirm only one plan. Specifically, § 1129(c) provides, in relevant part: "If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

In this case, again, even if both the Joint Plan and the TIC Plan satisfied all the confirmation requirements of § 1129(a) and (b), I would confirm the Joint Plan and deny confirmation of the TIC Plan for the following reasons.

Based on the clear terms of § 1129(c), I give primary consideration to the preferences of creditors and equity holders. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 351-52 (Bankr. D. Del.

Page 43 - MEMORANDUM OPINION

1    2004); In re Turner Engineering, Inc., 109 B.R. 956, 961 (Bankr. D. Mont.

2    1989).  NSA, Washington Trust, LSR Architects, Inc., the City of

3    Vancouver, Washington, and all seven Buy-In Residents voted for and/or

4    expressed a preference for the Joint Plan.  The TIC Investors and their

5    affiliates, Carburton and LCG Pence Construction, Inc. voted for and/or

6    expressed a preference for the TIC Plan.  In other words, the TIC

7    Investors and one other party with tenant in common interests in Orchards

8    Village (Carburton) prefer the Joint Plan, along with one general

9    unsecured creditor.  The clear preference among interested parties in

10   this case is for the Joint Plan.  See Ballot Summary, Docket No. 371, and

11   TIC Investors' Ballot Summary, Docket No. 378.

12          In addition to creditor preferences, some courts consider some

13   other factors in deciding § 1129(c) issues.  See, e.g., In re Holley

14   Garden Apartments, Ltd., 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999):

15                 The following factors should be considered in
                   determining which competing plan to confirm, if more
16                 than one plan is confirmable:  (1) the type of plan;
                   (2) the treatment of creditors and equity security
17                 holders; (3) the feasibility of the plan; and (4) the
                   preferences of creditors and equity security holders.

18

19          The TIC Plan is a "reorganization" plan while the Joint Plan is

20   a "sale" or "liquidation" plan.  "[T]he courts have stated in numerous

21   contexts that reorganization is preferable to liquidation and the

22   philosophy of the Bankruptcy Code is to preserve economic units."  In re

23   Oaks Partners, Ltd., 141 B.R. 453, 465 (Bankr. N.D. Ga. 1992).  See also

24   In re Holley Garden Apartments, Ltd., 238 B.R. at 495.  However, the

25   differences between the two competing plans in this case are more form

26   than substance.

Page 44 - MEMORANDUM OPINION

Under both plans, the operator of Orchards Village will change from Regency Pacific, Inc.: to Merrill Gardens under the Joint Plan and to Encore under the TIC Plan.  Of course, neither plan suggests any intent to displace the current residents of Orchards Village, and neither Merrill Gardens nor Encore has expressed any wish or intent not to re-employ employees who currently provide services at Orchards Village and who would choose to remain when Regency Pacific, Inc. leaves.  Under the TIC Plan, the TIC Investors and Carburton could choose to retain their tenant in common interests in Orchards Village or exchange those interests for member interests in the reorganized Debtor.  In addition, some of the subscribing equity investors in the reorganized Debtor had equity interests in the prepetition Debtor.  There consequently appears to be overlap in equity.  Considering the "types" of the competing plans, I conclude that this factor favors the TIC Plan slightly.

Since the Joint Plan provides nothing for equity interest holders and only an unlikely possibility for a recovery by general unsecured creditors, while the TIC Plan proposes a 30% distribution on allowed general unsecured claims over time, and allows equity interests options to protect their investments in the prepetition Debtor, I find that the TIC Plan is preferable based on its treatment of interested parties across the board.  I note, however, that the treatment of the claims of NSA, Washington Trust, LSR Architects, Inc. and the Buy-In Residents clearly is superior under the Joint Plan to their treatment under the TIC Plan; so, the treatment of claims and interests factor does not one-sidedly favor the TIC Plan.

Finally, in terms of feasibility, the Joint Plan clearly is the

Page 45 - MEMORANDUM OPINION

1  stronger plan.  The sale of Orchards Village to Merrill Gardens will

2  allow for rapid payment of most claims provided for in the Joint Plan.

3  There is no financing contingency to closing of the Merrill Gardens sale.

4  Payment of claims under the TIC Plan is contingent both on the operating

5  results for Orchards Village over a term of seven years and the

6  availability of refinancing for Orchards Village when the balloon

7  payments under the TIC Plan come due.  The prospects for the reorganized

8  Debtor to meet its obligations under the TIC Plan are not clear.

9        Based on my consideration of factors relevant to the evaluation

10  of competing plans under § 1129(c), my ultimate conclusion is that I

11  would confirm the Joint Plan rather than the TIC Plan even if both plans

12  satisfied all conditions for confirmation under § 1129(a) and (b).

13                              <u>Conclusion</u>

14        Based on the foregoing findings and conclusions, I find that

15  the Joint Plan satisfies all the requirements for confirmation under

16  § 1129(a) and (b) and is preferable for confirmation purposes to the TIC

17  Plan under § 1129(c).  As stated at the outset, I will confirm the Joint

18  Plan and deny confirmation of the TIC Plan.  Counsel for NSA and the

19  Receiver should prepare and submit an appropriate form of confirmation

20  order consistent with this Memorandum Opinion.

21                              ###

22

23  cc:      Teresa H. Pearson
           Anita G. Manishan
24         John R. Rizzardi
           John R. Knapp, Jr.
25         Albert N. Kennedy
           Ava L. Schoen
26         James K. Hein


Page 46 - MEMORANDUM OPINION

1          Howard M. Levine
          U.S. Trustee
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 47 - MEMORANDUM OPINION